616 A.2d 529

**In the Matter of the Honorable Rolf LARSEN, Associate Justice.**

Supreme Court of Pennsylvania.

Argued May 7, 1992.

Decided Oct. 14, 1992.

Robert L. Keuch, Harrisburg, for J.I.R.B.

A. Charles Peruto, Richard A. Sprague, Philadelphia, for respondent.

Before McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

ORDER

PER CURIAM.

AND NOW, this 14th day of October, 1992, after review of the Record and due consideration of the Briefs and Arguments,[1] the Court accepts the Report of the Judicial Inquiry and Review Board submitted by Judge Joseph M. James, Judge Jess Juliante, Judge John T.J. Kelly, Jr., and Judge Frank J. Montemuro, a copy of which is attached as Appendix I, and the Recommendation contained therein that the Respondent receive a public reprimand, based upon the finding that, notwithstanding the lack of improper motive, the Respondent engaged in an ex parte communication prohibited by Canon 2 of the Code of Judicial Conduct by providing information to a common pleas court judge relating to a matter that was pending before her. Following entry of this Order, an admonition shall be delivered to the Respondent upon exhaustion of any further appeal, and the same shall be docketed and filed in the public record of this matter.

NIX, C.J., and LARSEN, FLAHERTY and McDERMOTT, JJ., did not participate in the consideration or decision of this matter.

PAPADAKOS, J., files a dissenting statement. [See page 489.]

1. The Respondent has set out a number of arguments sounding in due process, relating to the participation of certain persons in the proceedings and in the Report to the Court. It is apparent, however, that even if those whose participation was challenged had not participated, the Board would have submitted a Report and Recommendation of discipline as to Charge I. Indeed, it is the Report and Recommendation of Judges James, Juliante, Kelly, and Montemuro, whose participation was not challenged, that we have accepted, following our independent review of the record. Thus, the concern that the challenged members might provide the votes necessary to make a recommendation of discipline that otherwise would not be made, and make public a record that would otherwise be required to be kept confidential, did not materialize. Under the circumstances, we do not address these arguments, as any decision on them would not affect the resolution of the matter before us.

## APPENDIX I

## REPORT OF THE JIRB

## TO THE SUPREME COURT OF PENNSYLVANIA

Report of:

Judge Joseph M. James

Judge Jess Juiliante

Judge John T.J. Kelly, Jr.

Judge Frank J. Montemuro

The instant matter involves five allegations of misconduct levelled against Justice Rolf Larsen of the Pennsylvania Supreme Court. The relevant procedural history may be accurately summarized as follows.

In September of 1987, Judge Eunice Ross of the Allegheny County Court of Common Pleas made a formal complaint against Justice Larsen. Following preliminary investigation under JIRB Rule 1, notice of formal charges was issued to Justice Larsen setting forth two allegations of misconduct. The first charge asserted violations of Pa. Const. Art V, sec. 17(b), and Canons 1, 2, and 3(A) of the Pa.Code of Judicial Conduct with regard to an allegedly improper *ex parte* communication by Justice Larsen to Judge Eunice Ross relating to a case pending before Judge Ross at the time of the alleged communication. The second charge asserted violations of Pa. Const. Art. V. sec. 17(b), and Canons 1 and 2 of the Pa.Code of Judicial Conduct with regard to his alleged pursuit of an appeal from the grant of variances to a developer for the purpose of coercing an inordinate settlement from the developer, and not with the purpose of enforcing the zoning laws. Justice Larsen has denied both charges.

Proceedings before the JIRB followed with various motions disposed and hearings conducted. On October 3, 1988, Amended Charges were issued alleging three additional charges of misconduct.

The first added charge, Charge III, asserted a violation of Pa. Const., Art. V, sec. 17(b) and Canons 1, 2, and 3(A)(4) of the Pa.Code of Judicial Conduct with regard to an alleged improper *ex parte* communication by Justice Larsen to Judge Emil Narick of the Allegheny Court of Common Pleas concerning a case pending before Judge Narick at the time of the alleged communication. Charge IV alleged an identical violation with respect to a separate *ex parte* communication by Justice Larsen to Judge Narick concerning a different case pending before Judge Narick when the alleged communication occurred. The last added charge, Charge V, alleged violation of Pa. Const. Art. V, sec. 17(b) and Canons 1, 2, and 3A(4) by attempting to influence Judge Narick's assignment of then pending cases to particular judges.

On October 11, 1988, by unanimous vote of the six members then sitting, it was further decided that the added charges would be redesignated as having been filed pursuant to JIRB Rule 2, rather than JIRB Rule 8 as originally indicated. All five charges were to be heard *ab initio* by a six member panel. The full Board as then composed had been reduced from nine members to six members as the result of the recusal of Judge James E. Rowley and Judge Ross, and the resignation of Judge Alex Bonavitacola.

Proceedings were commenced, but then were continued until after January 1, 1989. JIRB members former Justice Bruce W. Kaufman and Mr. James H. Higgins continued to participate in this matter following the expiration of their terms, despite Justice Larsen's objection to this procedure. *See* Pa. Const. Art. V, sec. 18(b).

New members, Judge John T.J. Kelly, Jr., Judge Charles L. Durham and Judge Jess S. Jiuliante were later appointed to the JIRB, and added to the panel. Thus, the panel eventually presiding in this matter included a full complement of nine members. New proceedings including motions, discovery, and hearings followed. From March 15, 1989 forward, all proceedings were conducted before a full nine member panel. The final hearing at which new evidence was presented in this matter was conducted on June 10, 1989.

Effective April 11, 1990, Board Member Judge Durham resigned. In April 1990, three Rule 9 Reports were issued by remaining Board members.

A short time thereafter, proceedings were stayed pending disposition of a special petition for an order seeking a permanent injunction barring this Board from proceeding based upon alleged procedural irregularities/recusal grounds. Relief was denied by an evenly divided Court. *Larsen v. Kaufman [Kaufmann]*, [525] Pa. [278], [579] A.2d [1302] (1991) [1990] (No. 152 JIRB).

Judge Joseph M. James became a member of the Board and took Judge Durham's place in these proceedings. All transcripts, exhibits and related documents were provided for Judge James' review and analysis, including all three Rule 9 Reports.

Following removal of the Supreme Court's stay, this Board conducted the required Rule 11 Hearing on May 21, 1991. We now issue our Final Report and Recommendation to the Supreme Court.

The record in this case is voluminous. Twenty-one Board Hearings were conducted at which forty witnesses gave testimony. Twenty-four volumes of transcripts were produced containing three thousand five hundred and fourteen pages of testimony. The Board submitted sixty-four exhibits; Justice Larsen submitted another fifty-seven exhibits. The motions and pleadings are likewise numerous, intricate, and voluminous.

This report will proceed in the following manner. First, we will offer introductory remarks regarding the JIRB's fact-finding and credibility determining functions, along with some guiding principles we applied in evaluating the evidence presented. Second, we will review character evidence offered on Justice Larsen's behalf relevant to all five charges. We will then review the evidence, make findings, and discuss charges one and two separately and in turn. We dispose of charges three, four, and five in one brief section. Finally, we discuss

permissible sanctions and our recommendation to the Supreme Court in this case.

## I. JIRB'S ADVISORY FUNCTION

The Judicial Inquiry and Review Board is a constitutionally created agency, judicial in character, charged with the important function of receiving, investigating, and making disciplinary recommendations to the Supreme Court regarding formal and informal complaints of ethical misconduct by members of the Pennsylvania judiciary. *See* Pa. Const. Art. V, sec. 18; 42 Pa.C.S.A. §§ 3301 *et seq.; see also Matter of Chiovero*, 524 Pa. 181, 184, 570 A.2d 57, 58 (1990) (*per* Papadakos; McDermott and Zappala, JJ., join); *Matter of XYP*, 523 Pa. 411, 416, 567 A.2d 1036, 1038 (1989); *Office of Disciplinary Counsel v. Surrick*, 521 Pa. 264, 267–68, 555 A.2d 883, 885 (1989); *First Amendment Coalition v. JIRB*, 501 Pa. 129, 131–32, 460 A.2d 722, 723–24 (1983). Unless and until a majority of the JIRB finds good cause to recommend disciplinary action by the Supreme Court, all proceedings must remain confidential. Pa. Const. Art. V, sec. 18(h); 42 Pa.C.S.A. § 3334; JIRB Rule 20; *see also Matter of Chiovero, supra,* 570 A.2d at 61; *id.,* 570 A.2d at 67 (Nix, C.J., dissenting, Flaherty, J., joins); *In re Subpoena of JIRB*, 512 Pa. 496, 517 A.2d 949 (1986); *Application of Surrick,* 504 Pa. 25, 470 A.2d 447 (1983); *First Amendment Coalition v. JIRB, supra.*

Any recommendation of disciplinary action made to the Supreme Court must be accompanied by a certified record of all proceedings on those charges before the JIRB, and a report containing findings of fact and conclusions of law regarding those charges in support of the JIRB's recommendation. JIRB Rule 16. It is customary for any concurring or dissenting members of the JIRB to forward with the report of the JIRB majority a similar minority report explaining the grounds for concurrence or dissent. *See Matter of Sylvester,* 521 Pa. 300, 303 & n. 3, 555 A.2d 1202, 1203 & n. 3 (1989); *Matter of Braig,* 520 Pa. 409, 413 & n. 3, 554 A.2d 493, 495 n. 3 (1989); *Matter of Cunningham,* 517 Pa. 417, 423 & n. 2, 538 A.2d 473, 476 n. 2 (1988); *Matter of Dalessandro,* 483 Pa. 431,

436, 397 A.2d 743, 745 (1979) (plurality, *per curiam*, Manderino and Larsen, JJ., join); *Matter of Johnson*, 483 Pa. 227, 230, 395 A.2d 1319, 320 (1978).

A JIRB report, whether a majority or minority report, is *merely advisory* and carries only such weight as our Supreme Court shall find its analysis compels during our Supreme Court's own *de novo* review of any judicial disciplinary matter properly brought before it. *See* Pa. Const. Art. V, sec. 18(h). In the past, our Supreme Court has exercised its authority to modify as well as to reject outright, findings, conclusions, and disciplinary recommendations. *See Matter of Chiovero, supra; Matter of Sylvester, supra; Matter of Braig, supra; Matter of Cunningham, supra; Matter of Glancy (I)*, 515 Pa. 201, 527 A.2d 997 (1987); *Matter of Dalessandro, supra (per curiam;* Manderino and Larsen, JJ., join); *Matter of Johnson, supra.*

In making findings and drawing conclusions, we keep foremost in mind the burden of proof in disciplinary proceedings. Before any disciplinary action may be taken by our Supreme Court, they must first find that an ethical violation has been established by clear and convincing evidence. *See Matter of Chiovero, supra*, 570 A.2d at 60; *Matter of Sylvester, supra; Matter of Braig, supra; JIRB v. Snyder*, 514 Pa. 142, 523 A.2d 294 (1987); *see also Matter of Delassandro [Dalessandro], supra*, 397 A.2d at 751 ("it *was by no means clear and convincing* that the respondent was intentionally exploiting his judicial position"); *Matter of Johnson, supra*, 395 A.2d at 1325 ("The evidence concerning respondent's manner during the above proceedings was sharply in conflict.... The evidence in this regard *is not clear and convincing* and is insufficient to sustain the imposition of an official reprimand."). Our Supreme Court has repeatedly explained that:

> [t]he standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

*Matter of Chiovero, supra,* 570 A.2d at 60; *Matter of Sylvester, supra,* 555 A.2d at 1203–04; *Matter of Braig, supra,* 554 A.2d at 495; *JIRB v. Snyder, supra,* 523 A.2d at 299.

In order for a witness' testimony or other evidence to support a finding of clear and convincing evidence the witness must be credible and the evidence offered must be based upon distinct personal knowledge of the relevant facts, undecayed by time and untainted by the corrupting influences of bias or suggestion. *See generally LaRocca Trust,* 411 Pa. 633, 192 A.2d 409 (1963) (testimony was evasive and evinced both bias and a memory decayed by time); *Carlin v. Pa. Power & Light Co.,* 363 Pa. [543] 405, 70 A.2d [349] 345 (1950) (evidence lacked statements of personal knowledge of critical facts, was neither clear nor precise, and one witness had obvious bias); *Alliquipa [Aliquippa] Nat'l Bank v. Harvey,* 340 Pa. 223, 16 A.2d 409 (1940) (evidence was contradictory, biased, and hardly credible, inconsistencies between statements and conduct noted); *Matter of Jackson,* 302 Pa.Super. 369, 448 A.2d 1087 (1982) (witnesses lacked personal knowledge of relevant facts).

The effects of conflicts in the evidence or corroboration of particular evidence will vary depending upon the credibility of the individuals involved, the degree of conflict or corroboration, and the importance of the point with respect to which the conflict or corroboration occurs. The existence of a conflict in the evidence with regard to a material fact, by itself, may preclude a finding that a charge has been sustained by clear and convincing evidence. *See e.g. Matter of Johnson, supra.* On the other hand, there is no mechanistic corroboration requirement; rather, a charge could be sustained on the basis of the uncorroborated testimony of a single credible witness *in an appropriate case. Compare In re McDonough,* 296 N.W.2d 648, 692 (Minn.1980) ("no mechanistic corroboration requirement is necessary . . . in fact, depending on its source, uncorroborated evidence may be more reliable than that remotely corroborated by a dubious source"), *and In re Boyd,* 308 So.2d 13, 21 (Fla.1975) ("evidence to sustain a charge of unprofessional conduct against a member of the bar, where in his testimony . . . he has fully and completely denied the

asserted wrongful act, must be clear and convincing, and that degree of evidence does not flow from testimony of one witness, unless such witness is corroborated to some extent by either facts or circumstances").[1]

Likewise, in assessing the evidence, due consideration must be given to any character evidence offered on behalf of the respondent. *See Matter of Sylvester, supra.* The weight to be given character evidence will vary depending upon the circumstances. *Compare Matter of Sylvester, supra; JIRB v. Snyder, supra,* 523 A.2d at 304 (Papadakos, J., concurring and dissenting); *and In re Dandridge,* 462 Pa. 67, 70, 337 A.2d 885, 886 (1975). When there is slender evidence to sustain a charge or when the evidence is ambiguous, character evidence may dispel suspicions of impropriety a jaundiced eye might otherwise perceive; on the other hand, when proofs are credible, multiple, and incontrovertible, character evidence will be of little avail except in mitigation of the penalty. *Compare Matter of Sylvester, supra; JIRB v. Snyder, supra; and In re Dandridge, supra.*[2]

In assessing the credibility of witnesses and the weight to be accorded their testimony, the need to identify and discount for the deleterious effects of personal *animus* and/or bias is obvious. Less clear, but equally, if not *more* important, is our responsibility to identify and discount for the effects of innocent "fallacies of testimony" which infect and distort the testimony of even the most forthright and well-intended of witnesses.

1. We note that *Boyd* involved allegations of misconduct against a Florida Supreme Court judge regarding *ex parte* communications.

2. In *Shilling v. State Com'n on Judicial Conduct* [51 N.Y.2d 397, 434 N.Y.S.2d 909], 415 N.E.2d 900, (NY 1980), that court explained with regard to evidence of a judge's good character that:

> character evidence does not exist in a vacuum, and its value, influence, or the weight to be accorded it depends in great part upon the other evidence in the case. . . . If the evidence against a [respondent] is cumulative and reliable, the influence of contrary evidence of good character is likely to be slight. Under other circumstances, such evidence may be so good, if believed, as to create a reasonable doubt where without it none would exist.

[434 N.Y.S.2d at 911] 415 N.E.2d at 902. We agree.

The venerable trial advocate Francis Wellman cogently observed long ago:

No one can frequent our courts of justice for any length of time without finding himself aghast at the daily spectacle presented by seemingly honest and intelligent men and women who array themselves upon opposite sides of a case and testify under oath to what appears to be absolutely contradictory.

Wellman, *The Art of Cross–Examination*, at 139–40 (Rev. ed 1904).

We have reached various findings of fact and conclusions of law which implicitly or explicitly reject certain testimony as not credible. In doing so, we emphasize the numerous sources of *innocent* fallacies of testimony. *See generally* Wellman, *supra*, at 139–53. Our rejection of an individual's testimony in whole or in part is not intended to imply perjurious or corrupt motivation. To the contrary, the witnesses in these proceedings appeared generally forthright and sincere despite the various conflicts in their recollections of the relevant events.

We note that we are well aware of the potential for manipulation of the JIRB disciplinary process for personal and/or political motives. *Cf. Matter of Chiovero, supra,* 570 A.2d at 61. All proceedings before the JIRB are privileged from liability for defamation, even if allegations are false and made with actual malice. Pa. Const. Art. V, sec. 17[18](h); 42 Pa.C.S.A. § 3332(c); JIRB Rule 21. While statements regarding JIRB proceedings or the substance of allegations made outside JIRB proceedings are not covered by that privilege,[3] sanctions for violations of confidentiality and/or liability for defamation are still quite limited. *See First Amendment Coalition v. JIRB,* 784 F.2d 467 (3rd Cir.1986); *Office of Disciplinary Counsel v. Surrick, supra; Larsen v. Philadelphia Newspapers,* 375 Pa.Super. 66, 543 A.2d 883 [1181] (1988); *cf. Matter of Dalessandro,* 483 Pa. 431, 465, 397 A.2d 743, 760 (1979). Consequently, there is a very real risk

3. *Cf. Pelagatti v. Cohen,* 370 Pa.Super. 422, 437–38, 536 A.2d 1337, 1344–45 (1987).

that JIRB proceedings may be misused and manipulated for political and/or personal motives entirely unrelated to the maintenance of a just and ethical judiciary. *See First Amendment Coalition v. JIRB*, 784 F.2d 467, 475–77 (3rd Cir.1986) (collecting authorities); *cf. Matter of Chiovero, supra*, 570 A.2d at 67 (Nix, C.J.; dissenting, Flaherty, J., joins).

We recognize too, that it is our solemn responsibility to ensure that the authority of the JIRB is exercised carefully so as to promote the *independence* as well as the *integrity* of our judiciary. *Matter of Chiovero, supra*, 570 A.2d at 67 (Nix, C.J., dissenting, Flaherty, J., joins); *cf. Matter of XYP, supra.* We have kept in mind Justice Hugo Black's ominous warning that unless discipline of the judiciary is carefully controlled, "the hope for an independent judiciary will prove to have been no more than an evanescent dream." *Chandler v. Judicial Council*, 398 U.S. 74, 143, 90 S.Ct. 1648, 1683, 26 L.Ed.2d 100, 141 (1970) (Black, J., dissenting).

The burden of proof in these proceedings is *proof by clear and convincing evidence.* We therefore restrict our conclusions to whether the alleged misconduct was established by *clear and convincing evidence.* In this context, the concepts of proof by probable cause, preponderance, reasonable suspicion or mere suspicion are simply not relevant. We are neither authorized nor inclined to offer any opinion as to the *degree* by which an allegation may have failed of insufficient proof, nor do we offer any opinion as to the ethics of the conduct of the parties beyond that required to determine the specific charges of misconduct presented through proper procedures for review. *Cf. Matter of XYP, supra.* The provisions of the Code of Judicial Conduct, rather than our personal views of propriety, have been our measure in this matter. *Cf. Matter of Chiovero, supra*, 570 A.2d at 60–61.

Finally, we note that though Justice Larsen has raised numerous due process challenges to the manner in which these proceedings were conducted, as well as to the refusal of

certain members of the Board to recuse themselves,[4] we offer no opinion on these matters. Our reports to the Supreme Court are solely advisory, we are confident that the Supreme Court will consider Justice Larsen's various allegations in assessing the weight to be given the reports submitted, and take such other actions as it deems appropriate. *Cf. Matter of Chiovero, supra,* 570 A.2d at 61; *Matter of Dalessandro, supra,* 397 A.2d at 760 (per curiam; Manderino and Larsen, JJ. join).

## II. CHARACTER EVIDENCE REGARDING JUSTICE LARSEN

Because the character evidence offered on behalf of Justice Larsen is relevant to our analysis of all five charges, we consider it first and separately from the evidence and findings pertaining separately and solely to each charge raised. Our findings in this regard should be considered to be incorporated by this reference into the discussion of each of the separate charges which follow.

1. Upon graduation from Penn Township (now Penn Hills) High School in 1953, Justice Larsen served on active duty in the United States Army until his honorable discharge in 1956. (Larsen, TR at 2506–07).

2. Justice Larsen earned his law degree from Dickinson School of Law and was admitted to practice in Pennsylvania Courts in 1960. (Larsen, TR at 2506–07).

4. With regard to the varied recusal motions we make the following clarification. There are, as yet, no rules promulgated regarding the manner in which motions to recuse JIRB members are to be handled. In absence of clear authority, the Board is doubtful of its authority to pass on such motions as a Board. Consequently, the Board has followed the general rule of leaving recusal motions to the discretion of the Board member against whom the motion is addressed. *Cf. Matter of Chiovero, supra,* 570 A.2d at 60. *Goodheart v. Casey,* 521 [523] Pa. 316 [188], 565 A.2d 757 (1989); *Reilly by Reilly v. SEPTA,* 507 Pa. 204, 489 A.2d 1291 (1985). Orders entered denying such motions have reflected the decision of the individual member whose recusal was sought; the full board has taken no position on the merits of any of the petitions.

338

3. Justice Larsen was a sole-practitioner for 13 years with a concentration in personal injury and domestic relations matters. (Larsen, TR at 2633).

4. Justice Larsen was elected Judge of the Allegheny County Court of Common Pleas in November 1973. He was formally commissioned and took his oath of office in January 1974. (Larsen, TR at 2507).

5. Justice Larsen was elected Associate Justice of the Pennsylvania Supreme Court in November 1977. He was formally commissioned and took his oath of office in January 1978. (Larsen, TR at 2507).

6. From 1964 to 1980, Justice Larsen received, periodically, highly laudatory coverage by the press; however, from 1980 to the present, coverage in major newspapers such as the *Pittsburgh Post Gazette* and the *Philadelphia Inquirer* has been almost uniformly negative. Justice Larsen's suit for defamation and related claims against those papers remains pending. (EX R–24; *Larsen v. Philadelphia Newspapers*, 375 Pa.Super. 66, 543 A.2d 1181 (1988)).

7. Despite considerable adverse publicity concerning the substance of charges I and II of these proceedings and adverse publicity relating to charges dismissed by the JIRB in previous proceedings, Pennsylvanians voted to retain Justice Larsen for another 10–year term in November 1987. (Larsen, TR at 2507; Ross, TR at 823; Resp. Response to LOI, 10/22/87; EX B–53; EX R–2; Grochot & Gazarik, "Land Sale Scrutinized: FBI Looking Into Zdrale Bankruptcy," *Sunday Tribune Review*, at A–1, A–10 (April 19, 1987).

8. Testimony of twenty-nine distinguished and wholly credible citizens of this Commonwealth including businessmen, doctors, a member of the clergy, County Commissioners, labor officials, Pennsylvania's present Auditor General, the Dean of Duquesne Law School, private attorneys, law enforcement officers, defense attorneys, District Attorneys, and Pennsylvania's present Attorney General, established Justice Larsen's general reputation and character as an honest, diligent, impar-

tial, caring and intelligent individual and jurist. (Uehlein, TR at 1066–70; Lewis, TR at 1162–73; Cindrich, TR 1174–83; Lightman, TR 1221–30; Zavarella, TR 1319–21; Bascelli, TR 1385–87, McCommons, TR 1387–90; Hafer, TR at 2481–84; Preate, TR at 2485–2505; Mendelson, TR at 2933; EX R–24; EX R–25).

9. Evidence was presented that Justice Larsen, throughout his life, has demonstrated a genuine concern for the harried, the troubled, and downtrodden by personally intervening in attempts to address and resolve the personal and professional problems of Judge Finkelhor, Judge McFalls, and Judge Ross and through his conduct in befriending and supporting Attorney Ashton in his struggle with alcoholism and battles with cancer after his reinstatement to the bar. (Ashton, TR at 190–04; Zavarella, TR at 1332–34; Larsen, TR at 2670–01, 2681–83, 2541–48, 2518, 2595–97).

10. Further evidence of Justice Larsen's lifetime concern and compassion for his fellow man was presented in the form of an editorial printed by the *Pittsburgh Post Gazette*, on December 23, 1964. After lamenting the unwillingness of members of modern society to come to each other's aid and get involved, the article went on to state:

> In view of this recent history of callous indifference to the suffering of one's fellow man, it was most reassuring to read about the Pittsburgh lawyer, Rolf Larsen, who subjected himself to assault rather than tolerate the annoyance of a defenseless woman.
>
> Mr. Larsen intervened and, for his pains, was beaten by a Baltimore visitor subsequently charged by police with drunkenness and assault and battery.
>
> We commend Mr. Larsen for his chivalry in an age where it has all but ceased to exist. He is his brother's keeper and all of us are enriched by his conscience and his courage.

This evidence was supported by a second editorial in the Fall 1987 edition of *Juris: The Duquesne Law School News Magazine*, which quoted the *Pittsburgh Post Gazette* editorial *verbatim*, and went on to state:

We thought it would not be too extravagant to draw on the Post Gazette's comments since *it tends to characterize the life and service of Justice Rolf Larsen.* Moreover, since the pretext for electing (or retaining) a judicial candidate cannot be measured exclusively by his or her opinions alone—we don't elect opinions to office—*the foregoing observations aptly capture the essence of this otherwise enigmatic justice.*

(Emphasis added). (EX R–24; EX R–25).

11. Justice Larsen's excellent reputation and high standing in the community both as a caring individual and as a respected jurist was further evidenced by his receipt of numerous honors and awards, including:

*Outstanding Jurist Award*—Pennsylvania District Attorney's Association, August 7, 1985;

*Judicial Excellence Award*—Pennsylvania AFL–CIO, December 12, 1986;

*Justice Michael A. Musmanno Award*—Philadelphia Trial Lawyers Association, July 12, 1986;

*Allegheny County Citation of Merit,* Allegheny County Board of Commissioners, December 12, 1986;

*Humanitarian Award,* Careers, Inc., June 16, 1984;

*Special Tribute,* American Cystic Fibrosis Foundation, (date not specified in the *Juris* article);

*Man of the Year—1981,* Catholic War Veterans, January 23, 1982.

(EX R–24).

12. Justice Larsen's character and reputation as an ethical and competent jurist was further supported by evidence of the endorsement of his retention as Associate Justice of our Supreme Court in 1987, by various highly respected organizations, including:

—Pennsylvania State Democratic Committee

—Pennsylvania Republican State Leadership Committee

—Pennsylvania State Education Association

—Pennsylvania AFL–CIO

—Pennsylvania Mothers Against Drunk Driving
—Pennsylvania Fraternal Order of Police
—Pennsylvania Chiefs of Police Association
—Pennsylvania District Attorney's Association
—Pennsylvania Bar Association

(EX R–24, EX R–25).

13. Justice Larsen's commitment to the improvement of Pennsylvania's justice system, above and beyond his numerous significant opinions for the Supreme Court, was demonstrated by evidence of his initiation of substantial reforms in Allegheny County support payment enforcement, and his development and introduction of innovations such as the One Day/One Trial jury service system, the Client Security Fund, and the Jury Questionnaire for evaluation of trial court judicial performance. (EX R–24).

14. Based upon the foregoing we find that:

Justice Larsen enjoys an excellent reputation for truthfulness, integrity and ethical conduct as an individual, and as a jurist;

Justice Larsen is respected as a caring and compassionate individual; and finally,

Justice Larsen is further respected as a well-qualified, diligent, and effective jurist dedicated to the maintenance and improvement of Pennsylvania's justice system.

*Discussion*

Our findings regarding Justice Larsen's character evidence are a principle point of divergence between this report and the report filed by the Honorable Bruce W. Kauffman, James H. Higgins, Lawrence T. Hoyle, Jr., Esq., and Mrs. Antonia L. Scarlata. The later report briefly notes that character evidence was presented, makes no finding regarding the evidence, and then drops the character evidence issue entirely without ever considering the weight to which Justice Larsen's excellent character was entitled in accessing the numerous ambiguities and conflicts in the evidence presented on each of the charges presented.

The copious evidence of Justice Larsen's excellent character for truthfulness, integrity, compassion, and competence was both compelling and entirely uncontradicted. Significantly, the failure to give the character evidence its proper weight in analyzing the evidence is in direct contravention of unanimous, clear, and binding Supreme Court precedent. *Matter of Sylvester, supra (per* Stout, J.; Nix, C.J., and Flaherty, McDermott, Zappala, and Papadakos, JJ., join).

This distinction between our Reports is critical. The weight given to the character evidence permeates the analysis in each Report. While we note this difference in particular instances, *infra*, we imply the distinction with regard to all conflicts and ambiguities in the evidence which relate to Justice Larsen's conduct, or which involved testimony by Justice Larsen.

## III. EVIDENCE AND FINDINGS—CHARGE I

The first charge involves an allegation of an attempt by Justice Larsen to influence Judge Ross by an *ex parte* conversation relating to the *Estate of Francis* case, which was pending before Judge Ross at the time of the conversation at issue.

It is suggested that Justice Larsen was attempting to aid Attorney Robert Lampl and his counsel, Attorney James Ashton, in connection with a claim for the return of $17,000 by Attorney Lampl to the Francis Estate. It is further suggested that Justice Larsen was motivated to attempt to influence Judge Ross on Attorney Lampl's behalf as the result of Attorney Ashton's involvement in a real estate transaction in which Justice Larsen and his daughter, Nina Larsen, purchased undeveloped land from Mr. Nikolai Zdrale in Fairfield Township, Westmoreland County.

We shall begin with initial findings regarding the relevant testimony provided, and then conclude with ultimate findings of fact based upon our assessment of the credibility and

weight to be assigned to the testimony and evidence submitted.

Our ultimate findings may be summarized as follows:

—there was no need for Justice Larsen to attempt to influence Judge Ross on Attorney Lampl's behalf;

—there was no motive for Justice Larsen to attempt to influence Judge Ross on Attorney Lampl's behalf;

—Justice Larsen did not attempt to influence Judge Ross on Attorney Lampl's behalf; but

—Justice Larsen, without apparent improper motive, improperly provided Judge Ross with a prohibited *ex parte* tip concerning possible bankruptcy fraud in a case over which Judge Ross was then presiding.

## A. BACKGROUND REGARDING ESTATE OF FRANCIS

1. Eunice Ross is a commissioned judge of the Allegheny Court of Common Pleas, and has served in that capacity since her initial appointment in 1972. (Ross, TR at 795–96).

2. Attorney Robert Lampl is a sole practitioner practicing in the greater Pittsburgh area with a concentration on bankruptcy and debtor/creditor cases. (Lampl, TR at 31–32).

3. Attorney Ashton is an attorney who was readmitted to practice in Pennsylvania and federal courts in 1984 following his substantial rehabilitation and recovery from problems related to alcoholism which led to his original disbarment for felony offenses related to his substance abuse. Attorney Ashton had offices in the same building as Attorney Lampl. They referred cases to each other, and occasionally acted as co-counsel. Attorney Ashton represented Attorney Lampl in the *Estate of Francis* case. (Ashton, TR at 180–01, 230; Lampl, TR at 55).

4. Attorney Lampl represented Mr. Homer Douglas Francis in Bankruptcy Court; but, while bankruptcy proceedings were still pending, Mr. Francis died. (Lampl, TR at 55–56; EX B–5; EX B–9; EX B–10, EX B–62).

5. The matter of *Estate of Francis* was opened in Allegheny Court of Common Pleas on behalf of the estate of Mr. Francis, and Judge Ross was assigned to preside over the case. (Lampl, TR 57–58).

6. Attorney Jon Botula and Ms. Barbra Vanyo were appointed co-administrators on September 29, 1982. They were subsequently removed as co-administrators by order of court. (EX B–5).

7. In January 1986, the administratrix of the Francis Estate filed a motion to show cause why Attorney Lampl should not be ordered to return approximately $17,500 he had dispersed for Mr. Francis as his attorney in the bankruptcy matter prior to Mr. Francis' death; Judge Ross entered an order directing Attorney Lampl to show cause as requested. (EX B–5).

8. Attorney Ashton represented Attorney Lampl in the proceedings before Judge Ross.

9. On May 30, 1986, Justice Larsen met with Judge Ross and informed her that two informants who wished to remain anonymous had told him that Jon Botula had received the money in the *Estate of Francis* case, and used the money to buy a condominium in Florida.

10. On April 19, 1987, an article was published which suggested that Justice Larsen, Attorney Ashton, and Attorney Lampl had been involved in a questionable land deal in May, 1986. This article came to Judge Ross' attention and caused her to reconsider the nature and import of Justice Larsen's May 30, 1986 tip. When that reconsideration occurred is unclear, though it seems probable that it did not occur until after the JIRB meeting on May 18, 1987, and after a court hearing in the *Estate of Francis* case on July 7, 1987, as Judge Ross' conduct on both occasions indicated an absence of any well-formed suspicion of impropriety concerning the May 30, 1986 tip.

11. On July 7, 1987, Judge Ross indicated at a hearing in the *Estate of Francis* case that she was satisfied with the responses and documentation submitted on Attorney Lampl's behalf

and would consider that aspect of the case closed if the attorney for the estate had no objections. The attorney for the estate raised limited objections to the entitlement of a few recipients of certain checks, and so a final hearing on the matter was scheduled for October 27, 1987. (EX R–5).

12. On October 8, 1987, one month before Justice Larsen's scheduled retention election, an article appeared on the front page of the *Pittsburgh Post Gazette* by Bill Moushey discussing the May 30, 1986 conversation between Justice Larsen and Judge Ross, and the Zdrale land deal. The article suggested that Justice Larsen had specifically attempted to influence Judge Ross on behalf of Attorney Lampl and Attorney Ashton in the *Estate of Francis* case, and that Attorney Ashton and Attorney Lampl had been involved in Justice Larsen's questionable and very favorable land purchase from Mr. Zdrale at about the same time. The article indicated that Justice Larsen was suspected of impropriety and that Judge Ross had reported the matter to the Justice Department and to "at least one official of state government." The source of the disclosures was not revealed in the article. (*See* Moushey, "Larsen asked relief for lawyers," *Pittsburgh Post Gazette* at 1 (October 8, 1987)).

13. Attorney Lampl testified that he was told by Mr. Moushey that his principle source for the article was a member of Judge Ross' staff. (Lampl, TR at 90, 92 & 133). Mr. Moushey declined to confirm or deny Attorney Lampl's assertions. (Moushy, TR at 1145–46, 1657–85).

14. At the hearing before this Board, Judge Ross denied having anything to do with the Moushey article, or knowing how Mr. Moushey received information concerning Justice Larsen's conversation with her or her reports of the matter to state and federal authorities. Judge Ross noted various significant inaccuracies in the article, including the assertion that Justice Larsen had mentioned Attorney Ashton and Attorney Lampl in the May 30, 1986 meeting, which even she denies. She also noted that only $500,000 rather than $2,000,000 dollars (as indicated in the article) was suspected to have been

improperly taken from the Francis estate. (Ross, TR at 865–67).

15. Following publication of the Moushey article, Attorney Ashton moved to have Judge Ross recuse herself due to the *ex parte* contacts suggested in the article. In denying the motion, Judge Ross stated:

> The Petition for recusal on its face fails to allege any facts which would indicate that this Court is biased or prejudiced or not impartial toward Mr. Lampl.
>
> The Court has no control over what newspaper writers write about a public record. The opinion expressed in the article was the opinion of the writer of the article. The article indicated that this Court, and properly so, would not comment about that case nor about the allegations concerning Justice Larsen. The court is well aware, under the Canons of Judicial Ethics, the court may not, ever, comment to any newspaper reporter about pending litigation and certainly Homer Douglas Francis litigation. This Court has been careful to preserve the rights of all parties who appeared before it. I am sure that if the court had not been so impartial, we would have concluded these matters a long time ago. Your motion will be denied Mr. Ashton.

(Lampl, TR at 92, 153–54; EX R–3, at 19–20; EX R–5).

16. Judge Ross' February 29, 1988 opinion evinces a profound change for the worse in her disposition toward Attorney Lampl's conduct in the *Estate of Francis* case from that which she had expressed at the July 7, 1987 hearing. Her opinion provides in pertinent part:

> Respondent never disclosed initial fees to the bankruptcy court nor did he seek or obtain approval of subsequent fee payments (two of which were received after decedent's death). He is unable, because his records no longer exist, to testify as to services rendered or time spent or expenses incurred with the specificity and detail required by Rule 2016 of the bankruptcy court. The dismissal of the proceedings on March 30, 1986, by that court does not constitute an

approval of the fees nor have the creditors ratified or approved them and certainly the deceased debtor could not.

*Respondent failed reasonably to supervise or monitor the debtor's use of estate funds, compounding the hemorrhage of assets from the estate.* His actions raise no equity in favor of permitting him to retain any part of the fees paid over to him which were the subject of citation and petition.

Respondent *was at least negligent* in his failure to ensure that the debtor filed monthly financial statements or a plan of arrangement. He put estate funds at risk by his devious purchase of the Malley estate judgment followed by *two questionable sales from which a profit was reaped,* part of which came back to the instant estate in addition to the original loan amount. *He is fortunate this estate lost nothing.* Whether the Malley estate suffered is not for this Court to decide. Respondent's *loose supervision* made it possible for thousands of dollars of estate money to be frittered away in payment for luxury or non-estate items bearing no relationship to decedent's business and its debts.

*Under Disciplinary Rule 6–101 A(3) a lawyer is required not to neglect matter entrusted to him.* This, of course, applies to practice in the state courts of Pennsylvania and *is cited in a cautionary fashion, as a makeweight* in sustaining the surcharge *already imposed by reason of the failure to comply with bankruptcy statute and rules.*

Respondent, Robert O. Lampl, Esq., will be required to disgorge all counsel fees in the amount of $3500 paid to him in connection with the Low–Vol Fuels bankruptcy proceedings. The petition and citation will be dismissed as to the $10,000 Malley loan and the two $2000 checks paid to Ford Motor Credit Company. The $1000 fee retained from the Fayette realty sales was not the subject of petition and citation and will at this time not be surcharged.

Any claim for unpaid fees will be denied.

(Emphasis added). (EX B–9 at 9–10).

17. Attorney Lampl's appeal of the February 29, 1988 opinion and order, along with the denial of the October 26, 1987 recusal motion was quashed as untimely. The Superior Court

did not address the merits of the recusal motion or the order. (EX B–62; Ex R–18).

18. On July 29, 1988, Attorney Lampl filed a motion for reconsideration of the February 29, 1988 order expanding upon its grounds for recusal and specifically requesting that a second judge rule on the recusal motion. On August 8, 1988, Judge Ross denied the motion for reconsideration. (EX R–4; EX R–16).

19. On August 18, 1988, Attorney Lampl filed exceptions to the August 8, 1988 order. On August 19, 1988, Judge Ross entered an order dismissing the exceptions. (EX R–17).

20. On December 2, 1988, Attorney Lampl's appeal from the August 8, 1988 and August 19, 1988 order was quashed, again on *procedural* grounds. (EX. B–62).

21. To date, no one but Judge Ross has passed on the merits of Attorney Lampl's motion to have Judge Ross recuse herself on the basis of her acknowledged *ex parte* communications with Judge Cosetti, Judge Markovitz, and Justice Larsen, relating to the *Estate of Francis* case while it was pending before her. We note that her acknowledged discussions with Attorney Vaira and U.S. Attorney Johnson also involved *ex parte* discussions of the *Estate of Francis* case.

22. Attorney Lampl and Attorney Ashton both denied ever speaking to Justice Larsen about the *Estate of Francis* case. Justice Larsen denies having spoken with Attorney Lampl or Attorney Ashton regarding the *Estate of Francis* case. (Ashton, TR at 245; Lampl, TR at 72; Larsen, TR at 2520, 2552).

23. Neither Attorney Lampl, nor Attorney Ashton, nor Judge Ross found anything in the rule to show cause which would demonstrate a need or motive for Justice Larsen (or anyone else) to intervene on Attorney Lampl's behalf in the *Estate of Francis* case. (Ross, TR at 936–37; Lampl, TR at 75; Ashton, TR at 246).

24. Justice Larsen denies intervening with Judge Ross on behalf of Attorney Lampl or Attorney Ashton, in connection with the *Estate of Francis* case. (Larsen, TR at 2545–47, 2555, 2738–39).

25. Based upon the foregoing, we find that:

—there was no need for Justice Larsen to attempt to influence Judge Ross on Attorney Lampl's behalf in the *Estate of Francis* case.

—Justice Larsen did not intervene on Attorney Lampl's behalf in the *Estate of Francis* case.

## B. FAIRFIELD TOWNSHIP LAND PURCHASE

1. In September 1971, Mr. Nikolai Zdrale purchased a 34.8–35.9 acre tract of undeveloped land in Fairfield Township, Westmoreland County. (Zdrale, TR at 1239; Smith TR at 1604).

2. For seven years prior to the fall of 1985, Mr. Zdrale had tried to sell the property. No asking price was set; all offers were to be entertained. It was advertised for sale and listed with a couple of realtors, however, no offers were received. (Zdrale, TR at 1239–40, 1291, and 1303).

3. There were several substantial hindrances identified by Mr. Zdrale, Attorney Lampl, Attorney Ashton, Justice Larsen, and expert real estate appraisers Daniel Smith and Glen Ray, which would drive away prospective buyers and/or reduce any offer for the property:

a) The property was remote undeveloped land, with no available utilities except electricity, which was accessible only by unpaved roads in a Township with no local police protection, no fire protection, and no zoning code. (Lampl, TR at 110–13; Smith, TR at 1619–20; Ray, TR at 506–07; Larsen, TR at 2530).

b) Man-made lakes located on the property and covering approximately one-third of the total acreage of the property were held by earthen dams which were in a state of disrepair; trees, shrubs, and especially weeping willows growing on and near the face of the dams severely threatened its structural integrity; the dam was already suffering leakage and heavy overflow and was in violation of Pennsylvania Department of Environmental Resource regu-

lations. The lake and dams were liabilities rather than assets in that condition, and could cost between $20,000 and $30,000 to repair, which is more than it would cost to install such lakes originally. There would also be an extremely high maintenance cost for such lakes. (Zdrale, TR at 1240–41; Smith, TR 1600–17, 2313, 2325).

c) The property was heavily encumbered with liens. When it was first offered for sale it was encumbered with over $700,000 in liens. Attorney Ashton indicated in November 1985 that the property was then subject to approximately $300,000 in liens. In February 1986, when Justice Larsen purchased the property, he took subject to over $180,000 in liens for liquidated claims as well as subject to indeterminate liens for any judgment which might eventually be entered against Mr. Zdrale in five then pending law suits. The property was at all times involved subject to liens far in excess of the value of the property. No money could be borrowed on the property in those circumstances. (Zdrale, TR at 1239, 1243); Ashton, TR at 204–06; Larsen, TR at 2523; EX B–72).

d) Mr. Zdrale's only chances of extinguishing the liens and thereby clearing title to the property were the possible sale of a landfill in which he had a substantial *non-voting* interest, and an anti-trust suit he was prosecuting as plaintiff. When Justice Larsen's purchase was being negotiated, *Attorney Ashton, who represented Mr. Zdrale, estimated Mr. Zdrale's chances of extinguishing the liens as one in ten. Mr. Zdrale was even less optimistic in this regard placing his chances at zero.* (Ashton, TR at 213; Larsen, TR at 2525; Zdrale, TR at 1244).

e) Between 1983 and 1986, a considerable number of arson fires had occurred in the area around the property, with several arson fires involving second homes of absentee owners. The threat of such arson has a depressing effect on property values. (Lampl, TR at 110; Ashton, TR at 203; Ray, TR at 500; Smith, TR at 1619; Larsen, TR at 2530).

f) The Fairfield Township area is a depressed area, which has a negative effect on property values generally. (Smith, TR at 1621).

4. Although the precise value of the property unencumbered by liens is contested, all agree that it was worth only a small fraction of the $180,000 value Mr. Zdrale had placed on the property in the bankruptcy papers he filed:

a) Justice Larsen testified that after checking with various real estate agents in the area, he had learned that the asking price for land in that general area was between $400 and $1,000 an acre or between $14,000 and $35,000 for an undeveloped 35 acre parcel. (Larsen, TR at 2526).

b) Attorney Ashton received a rough opinion from land developer Alan Paterson that unencumbered, the Zdrale property could be worth no more than $30,000. The record does not disclose whether Mr. Paterson inspected the property or was aware of the condition of the dams. (Ashton, TR at 203).

c) Mr. Smith, a well-qualified real estate appraiser, set the value of the property (if unencumbered by liens) at $21,000–$24,000, without discounting for the expense of repairing the dams or removing the lakes. His detailed testimony was supplemented by a detailed appraisal report which is included in the record. (Smith, TR 1617, 2325, EX R–33).

d) Glen Ray, the appraiser selected by the Board, set the value of the property at $42,000. In his testimony he indicated that the lakes significantly enhanced the value of the property and that $22,400 of the total value was attributable to the lakes. He noted that when he visited the property in January of 1988, he saw nothing wrong with the dams. Mr. Ray filed a brief report in support of his appraisal. (Ray, TR 490–510; EX B–22).

5. We find that each of the appraisals is within a range of reasonable variance given the subjective nature of expert real estate appraisals.

6. We note that Mr. Ray's testimony indicated a more cursory inspection of the property and especially of the dams.

We further note that the lakes would have been frozen in Western Pennsylvania in January when Mr. Ray conducted his on-site appraisal, making careful inspection of the dams difficult, if not impossible. But for the material difference in their treatment of the lakes as an asset or as a liability, both Mr. Smith and Mr. Ray appear to agree on a base value in the $21,000 to $42,000 range for the Zdrale property, if unencumbered by liens, and if the dams were not in disrepair.

7. We note that there was some limited potential for latent bias on Mr. Ray's part, against Justice Larsen as the result of Mr. Ray's unsuccessful attempt to sell Justice Larsen a 52 acre parcel of undeveloped land in Cook Township, Westmoreland County in 1983, for an asking price of $8,000. Disagreement over price and Mr. Ray's commission impeded the deal. We do not consider this arguable potential for bias to be material to our analysis. Interestingly, however, that property was sold in November 1985 for $70,000, demonstrating both the volatile shifts which occur in the value of undeveloped land, and the speculative nature of investments in such land. (Ray, TR at 509–10).

8. In September or October of 1985, Attorney Ashton began representing Mr. Zdrale in an anti-trust matter Mr. Zdrale was pursuing as plaintiff. (Ashton, TR at 181).

9. Attorney Ashton became aware of Mr. Zdrale's critical financial condition and referred him to Attorney Lampl who thereafter represented Mr. Zdrale in his business bankruptcy. Attorney Ashton was also co-counsel of record in the bankruptcy matter and appeared with Attorney Lampl at some of the hearings, though Attorney Lampl was primarily responsible for the bankruptcy case and Attorney Ashton was not experienced in bankruptcy matters. (Ashton, TR at 181; Lampl, TR at 49–51; EX B–1; EX B–4).

10. During his representation of Mr. Zdrale in the anti-trust matter, Attorney Ashton became aware of Mr. Zdrale's desire to sell his Fairfield Township property. (Ashton, TR at 199; Zdrale, TR at 1291).

11.  Attorney Ashton had been disbarred in the early 1970's as the result of problems related to his alcoholism. In 1984, Attorney Ashton was readmitted to the Pennsylvania and federal bars following his substantial rehabilitation. (Ashton, TR 180, 192).

12.  Following his reinstatement, Attorney Ashton met Justice Larsen for the first time at a social gathering; they discussed Attorney Ashton's struggle against alcoholism and his efforts to renew his practice. Justice Larsen became a concerned and supportive friend, and helped Attorney Ashton in his continued struggle with alcoholism as well as through subsequent battles with cancer which twice required surgery. Justice Larsen informed Attorney Ashton early in their friendship that he would recuse himself in any matter involving Attorney Ashton which came before him. (Ashton, TR at 193, 246, 285–86; Larsen, TR at 2518–19).

13.  Under the Pennsylvania Code of Judicial Conduct, a Judge or Justice's opportunities for financial investment are severely restricted. Real estate investment is one of the few financial activities specifically authorized by the Code. Pa. Code of Judicial Conduct Canon 5 (*see especially* Canon 5(C)(2)). Thus, real estate as an investment opportunity has unique value to judges which it would not have to others who may choose freely from a wide array of investment opportunities forbidden to judges.

14.  Justice Larsen had for several years been looking to acquire some undeveloped rural land. His daughter and secretary confirmed this fact. It was also confirmed by the real estate appraiser selected by the Board, Mr. Ray. Attorney Ashton had become aware of Justice Larsen's general interest in purchasing undeveloped rural land as the result of various social conversations with Justice Larsen. (Ashton, TR at 190, 204, 261–61; Ray, TR at 508–09; N. Larsen, TR at 1390; Roberts, TR at 1414–15; Larsen TR at 2523–24).

15.  Sometime in November 1985, Attorney Ashton had a chance meeting with Justice Larsen in front of Justice Lar-

354

sen's office at the Grant Building in Pittsburgh during which he mentioned to Justice Larsen the availability of the Zdrale property. Attorney Ashton described the property favorably, but noted the speculative nature of any purchase in light of the considerable outstanding liens. Justice Larsen indicated interest, and it was agreed that Attorney Ashton would obtain pictures for Justice Larsen to review. (Ashton, TR at 204–06; Larsen, TR at 2523–25).

16. Justice Larsen reviewed the five sequential photographs forwarded by Attorney Ashton, and was sufficiently interested to walk the property with Attorney Ashton sometime between Thanksgiving and Christmas in 1985. (Ashton, TR at 205–06; Larsen, TR at 2525–27).

17. In light of the drawbacks noted in finding 3, and especially the one in ten chance of ever receiving clear title to the property, Justice Larsen settled on an offer of $5,000.00. Justice Larsen's method of arriving at this offer price was to take the highest per acre asking price in the area, add $15,000 for the lakes (which he apparently considered assets, not having Mr. Smith's expert assessment of the state of disrepair of the dams at that time), and divide by 10, in light of the one in ten chance of gaining title. (Larsen, TR at 2526).

18. As the result of his receipt of a $30,000 rough appraisal value from a developer for the property if unencumbered and notice of a possible deal in the works for the landfill, Attorney Ashton recommended to Mr. Zdrale that he reject Justice Larsen's offer. (Ashton, TR at 203, 210–11; Zdrale TR at 1258–59).

19. Mr. Zdrale nonetheless accepted the offer. He was ill, destitute, and pessimistic about his chances for economic recovery. He had no control over the landfill deal, and no meaningful (*i.e.* reasonably binding) options agreements had yet been signed. The $5,000.00 offer was the only offer for the Fairfield Township property he received despite having tried to sell the property for over seven years. The $5,000 offer was his only certain source of cash for the foreseeable future, and so in December 1985 Mr. Zdrale indicated his acceptance of Justice Larsen's offer. He also indicated that

despite his improved prospects in late January and early February after the first non-binding option agreement on the landfill sale was made, he did not want to go back on the gentlemen's agreement reached in December when prospects were gloomier; he simply did not want to go back on his word. Finally, even after it became apparent that the liens would be paid off, Mr. Zdrale indicated that he still considered the $5,000 price fair, because of the high cost he expected to be necessary to repair the dams on the property. (Zdrale, TR at 1239, 1241, 1244–45, 1258–59; Lampl, TR at 106–07, 114–16).

20. In late January 1986, Justice Larsen and his daughter signed the draft agreement prepared by Attorney Ashton. The agreement listed all encumbrances, including several business liens. (Ashton, TR at 197–98, 209–210; EX B–7A).

21. In February, the landfill deal looked promising and Attorney Lampl felt that even if current negotiations did not succeed, a deal on similar terms could be completed in the near future. Attorney Ashton advised Mr. Zdrale not to finalize his land deal with Justice Larsen, but Mr. Zdrale went ahead with it against counsel's advice. (Ashton, TR at 210–13, 263–64; Zdrale, TR at 1258–59; Lampl, TR at 51–52, 135–138).

22. On February 20, 1986, Justice Larsen's secretary, Mrs. Roberts, drafted a check for $5,000 to Mr. Zdrale to finalize the agreement. The transfer of the encumbered deed from Mr. Zdrale to Justice Larsen and his daughter was made the same day. (Roberts, TR at 1415; EX B–44).

23 Mr. Zdrale met Justice Larsen after the sale was completed, and did not know until that time that he was a Justice of the Pennsylvania Supreme Court. Mr. Zdrale spoke with Justice Larsen only once, when he showed him the property boundaries after the sale. (Zdrale, TR at 1241–42).

24. Three months after Justice Larsen purchased the Zdrale property, the sale of the landfill in which Mr. Zdrale was interested was finalized. Mr. Zdrale eventually paid all creditors 100% of debts owed, including lien holders on the Zdrale

property sold to Justice Larsen. Justice Larsen and his daughter then received clear title to the land purchased from Mr. Zdrale. Mr. Zdrale still realized over $400,000 from the landfill sale for himself. Lampl, TR at 122–03; Ashton, TR at 223; EX B–1).

25. Attorney Lampl represented Mr. Zdrale in his Chapter 11 business reorganization/bankruptcy matter during this time period. Because of various business liens, the Fairfield Township property was part of the Zdrale business bankruptcy estate. Attorney Ashton mistakenly assumed that because the property was held by Mr. Zdrale personally it would not be involved in a Chapter 11, business reorganization/bankruptcy matter. In hindsight, Attorney Ashton acknowledged that he should have sought approval of the sale of the Zdrale property from the Bankruptcy Court as the result of the various business liens recorded against it. No challenges to the sale were raised in the bankruptcy proceedings, however, in light of the contemporaneous landfill deal, and the subsequent extinguishment of all creditors' claims by payment in full.

26. There is no evidence to suggest that anyone involved became aware of Attorney Ashton's error until it had already become moot.

27. Based upon the foregoing, we find that:

—Attorney Ashton's first discussion of the Zdrale property with Justice Larsen occurred approximately two to three months before a rule to show cause was ever issued to Attorney Lampl in *Estate of Francis;*

—Attorney Lampl was not involved in the land deal;

—Attorney Lampl's attorney in the estate case, Attorney Ashton, though instrumental in initiating the land deal, nonetheless specifically advised Mr. Zdrale to reject Justice Larsen's offer; and therefore,

—The Fairfield Township land deal provided no motive for Justice Larsen to attempt to influence Judge Ross on Attorney Lampl's behalf in the Estate of Francis case.

## C. THE LARSEN/ROSS MEETING

1. Justice Larsen and Judge Ross were the nominees of the same party, were elected together, and served together on the Allegheny County Court of Common Pleas between 1974 and 1978. (Ross, TR at 814; Larsen, TR at 2506–07).

2. Justice Larsen and Judge Ross had until these proceedings enjoyed courteous professional relations. (Larsen, TR at 2537, 2552; Roberts, TR at 1403–03).

3. Justice Larsen testified that prior to May 30, 1986, he had received informal complaints from Judge Zavarella and others regarding Judge Ross' professional and personal conduct. None of the complaints involved good cause to believe Judge Ross had committed ethical violations which would be required to be reported to disciplinary authorities; but, the complaints and concerns, if left unaddressed, could have affected her personally, professionally, and politically. (Larsen, TR at 2540–44).

4. The existence of such complaints and rumors was confirmed by the testimony of Judge Zavarella and Attorney Lampl. Judge Zavarella specifically testified that he had discussed various concerns regarding Judge Ross' judicial conduct directly with Judge Ross, and that as his discussions with her had not been productive, he discussed the same concerns with Justice Larsen in the hope that Justice Larsen would intervene informally. Attorney Lampl discussed several concerns and rumors he was aware of, which were generally circulating among attorneys regarding Judge Ross' personal and judicial conduct. Because the rumors were wholly collateral to these proceedings, no attempt was made to determine their truth or falsity. We note that none of the complaints questioned her ability to understand or recall information she received from others. (Zavarella, TR at 1321–83; Lampl, TR at 76–81).

5. It has been common practice in Pennsylvania, and other jurisdictions, for judges to informally notify or admonish

colleagues regarding complaints circulating about their personal or professional conduct; Administrative Judges and Appellate Court Judges (including Supreme Court Justices) have been active in this respect. (Zavarella, TR at 1319–84; Larsen, TR at 2540–44; *cf.* McDevitt, *Judicial Disability and Removal Commissions,* 45 Pa.B.A.Q. 118, 119 (1974); Note, *Remedies for Judicial Misconduct and Disability,* 41 NYULR 149, 168–69 (1966)).

6. On Friday, May 30, 1986, Justice Larsen visited Judge Ross in her chambers and engaged in a conversation. No one else was present, and the conversation was not recorded. (Larsen, TR at 2540–48; Ross, TR at 806–07).

7. Justice Larsen testified that he went to see Judge Ross regarding complaints he had received from Judge Zavarella and others, including particularly negative comments he had overheard in the steamroom at his club. He indicated that he communicated these matters to her as a friend and concerned colleague, and that he was not making any accusations himself. He further testified that he recalled receiving a call from Judge Ross later that day or shortly thereafter, in which she seemed quite concerned and asked if Justice Larsen thought anyone would press a formal complaint against her; and that he reassured her that he thought that was unlikely. (Larsen, TR at 2537–47).

8. Judge Ross remembered the May 30, 1986 conversation dramatically differently. On August 30, 1988, she testified that the May 30, 1986 conversation began generally. She recalled that they discussed: her University of Pittsburgh trustees meeting and the conflict then arising over South African divestiture; the excellent performance of an attorney Judge Ross had appointed to represent a party in the Supreme Court; the possible outcome of a case then pending before the Supreme Court; and, the status of a Senior Judge of the Superior Court. Judge Ross indicated that Justice Larsen eventually stated, "listen, I met two guys on the street and they said to tell Judge Ross in the Homer Douglas Francis case that John Botula took all the money and used it to buy a condominium in Florida." She indicated that she had

responded that she knew about the condominium, and then told Justice Larsen that he was wrong about who got all the money and listed for Justice Larsen who got what, including the $17,000 which went to Attorney Lampl, but that Justice Larsen replied, "you are doing a good job, but Jon Botula is the one, you go after Jon Botula." She indicated that Justice Larsen then got up and left pleasantly. Judge Ross also recalled a follow-up call she made to Justice Larsen to find out if his confidential informants would come forward, but that Justice Larsen indicated that they would not. (Ross, TR at 801–33).

9. Judge Ross flatly denied that Justice Larsen, or anyone else (specifically including Judge Zavarella), had ever raised complaints or concerns to her regarding her judicial conduct. (Ross, TR at 1001–1004).

10. Justice Larsen flatly denied Judge Ross's account of the meeting. He indicated that he did not recall discussing any of the introductory topics noted, and testified further that he had not even heard of the *Estate of Francis* case until October 1987. (Larsen, TR at 2515).

11. On Monday, June 2, 1986, Judge Ross sat on an *en banc* panel hearing motions in the *Estate of Francis* case with Judge Schwartz and Judge Zavarella. Judge Ross did not communicate the fact or content of her discussion with Justice Larsen to her colleagues on the panel or to the parties, nor did she report it to this Board, as would have been required if Judge Ross had considered Justice Larsen's conversation to have constituted an improper *ex parte* communication or an attempt to influence her. (Pa.C.J.C. Canon 1; Pa.C.J.C. Canon 3(B)(3)). Judge Ross did not inform the parties or her colleagues on the *Estate of Francis* case of the conversation any time after that. (Ross, TR at 822, 861, 941; EX R–3; EX R–4; EX R–16; EX R–17).

12. On Thursday, June 5, 1986, six days after her meeting with Justice Larsen, Judge Ross contacted former United States Attorney Peter Vaira. Judge Ross was a personal friend of Attorney Vaira's uncle, whom Attorney Vaira de-

scribed as his "mentor." Judge Ross had worked with Attorney Vaira previously on a separate matter. In his testimony on August 31, 1988, Attorney Vaira indicated that he did not take notes of his discussion with Judge Ross on June 5, 1986, and that his memory of the precise content of their conversation was not clear; but, Judge Ross had indicated in general and "circumspect" terms that Justice Larsen had given her a tip about possible bankruptcy fraud in an estate case based upon information he had received from someone on the street. Attorney Vaira indicated that she had given him no reason to suspect that Justice Larsen had acted from anything but the purest motives in providing her with the "tip" concerning her case. Attorney Vaira conceded that he had no first-hand knowledge of the meeting between Judge Ross and Justice Larsen, and no recollection of any further information from Judge Ross. We note that Attorney Vaira also testified that he had "handled matters involving sensitive political matters like this" before, and that "I know a lot of hearsay, and some people have called me," but that he had no further first-hand information to relate to the Board. (TR at 1026–27). Attorney Vaira recommended that she discuss the tip with Western District of Pennsylvania United States Attorney Alan Johnson; and he also suggested that she make a written record of the tip, which she indicated was "a good idea." She did not indicate that she had already begun such a record in her diary. (Vaira, TR at 1024–46).

13. Judge Ross' acceptance of Attorney Vaira's suggestion that she make a written record of the tip as "a good idea" at least arguably suggests that any notes of the May 30, 1986 meeting made by Judge Ross were made at least six days after her meeting with Justice Larsen; though, on the other hand, it may reflect only the degree of circumspection she exercised in her conversation with Attorney Vaira. (Ross, TR at 801–33; Vaira, TR 1024–46).

14. Attorney Vaira characterized his impressions as follows, "I presumed that the Justice [Larsen] had the best of motives and was not good at these kinds of things. Quite often judges

may not be as good as we law enforcement people are in taking statements." (Vaira, TR at 1045).

15. According to the Board interviewers' report contained in EX R–23, when interviewed by Board investigators on November 9, 1987, Attorney Vaira indicated that Judge Ross had informed him that Justice Larsen had suggested that mob figures or narcotics were involved, and that it was the narcotics aspect which led him to suggest to Judge Ross that she contact U.S. Attorney Alan Johnson. At the hearing in this matter on August 31, 1988, Attorney Vaira reviewed EX R–23 and specifically affirmed its accuracy. (TR at 1047). However, following direct and cross-examination, on supplemental inquiry by Board Member Hoyle, Attorney Vaira indicated that Judge Ross had made no mention of "narcotics" or "mob figures" and that those references were merely inaccurate interpolations he had made, the source of which he did not know. (TR at 1048–49). Thus, his reference to the "mob figures" or "narcotics" appears to be a classic "interpolation" type innocent fallacy of testimony, as there is no other indication that Judge Ross or Justice Larsen ever made such a reference. This underscores the effects of the passage of time on the recollections of even the most forthright and disinterested witnesses in this matter. (Vaira, TR at 1047–50; EX R–23).

16. Attorney Vaira testified that Judge Ross seemed "uncomfortable" about Justice Larsen's visit (TR at 1026–27, 1038). However, when specifically asked by Board Member Higgins, whether Judge Ross' concern, as Attorney Vaira recalled perceiving it, was inconsistent with his perception that Justice Larsen had been acting from the best of motives, Attorney Vaira explained that it was not inconsistent, and that the discomfort which he was describing was that which would naturally arise from the fact of the *ex parte* contact, regardless of whether Justice Larsen had the best of motives for giving Judge Ross the tip. (TR at 1050–51).

17. On October 13, 1987, Judge Ross told the FBI that she had gone to Attorney Vaira because she thought Justice

362

Larsen had tried to influence her improperly. Judge Ross' own prior and subsequent statements and conduct, as well as Attorney Vaira's testimony, however, reveal that Judge Ross suspected no attempt to influence her for an improper motive at the time of her meeting with Attorney Vaira. (Vaira, TR at 1024–46; Ross, TR at 823–04, 865–87; EX R–1a; EX R–21, EX R–22).

18. The indication in the interlineation on Judge Ross' diary page that she had discussed the May 30, 1986 conversation with Attorney Vaira at "Cindrich's" (a Pittsburgh law firm) was incorrect. Her conversation with Attorney Vaira had not taken place at "Cindrich's." The indication in the diary entry that she asked Vaira "if Larsen's tip was a crime" was also inaccurate; she had actually asked whether the conduct the alleged tip concerned was criminal, *i.e.* would the conduct suggested constitute federal bankruptcy fraud. Arguably, neither the error nor the inaccuracy were mistakes likely to be made in *contemporaneous* accounts of events, though they were of a type likely to occur in an attempt to reconstruct events later from a more distant past. It is possible that Judge Ross may have been mistaken as to when the diary entries had been made. (Vaira, TR at 1024, 1035–07; Ross, TR at 988–99; EX R–21; EX R–22).

19. On Monday, June 9, 1986, Judge Ross had a telephone conversation with Western District of Pennsylvania United States Attorney Alan Johnson, regarding her May 30, 1986 conversation with Justice Larsen. By the time of the August 31, 1988 hearing before this Board, U.S. Attorney Johnson had no independent recollection of his conversation with Judge Ross more than two years earlier, a fact he freely and forthrightly conceded. He did authenticate a brief hand written note he had made at the time of the call, and a brief typed memo made shortly after the call. Both indicated that Judge Ross had informed him that Justice Larsen had passed on a tip to Judge Ross that he had received from two men on the street that Jon Botula had received the money in the *Estate of Francis* case, and that Judge Ross was reporting it to him as a tip on a possible bankruptcy fraud. He indicated that his

notes did not reflect an attempt to make a verbatim record of his conversation with Judge Ross. The notes and memorandum do not reflect, nor did U.S. Attorney Johnson recall, that Judge Ross had in any way intimated that Justice Larsen had attempted to influence Judge Ross improperly, or that Justice Larsen had done anything more than pass on a tip based on hearsay regarding her case. There is no mention of mob figures or narcotics in U.S. Attorney Johnson's notes or memo; thus, confirming that Attorney Vaira's reference to mob figures or narcotics was merely an inadvertent interpolation on his part, and an example of an innocent fallacy of testimony. (Johnson, TR at 1051–59; EX R–23).

20. Judge Ross conceded at the August 1988 hearing before this Board that she had reported the matter to U.S. Attorney Johnson solely as a tip regarding possible bankruptcy fraud, and not as a complaint regarding Justice Larsen's alleged misconduct. Like her October 13, 1987 report to the FBI regarding her conversation with Attorney Vaira (*See* I, C, 14), her October 13, 1987 report to the FBI included a similarly inaccurate characterization that her report to U.S. Attorney Johnson had involved a complaint against Justice Larsen, rather than merely the transmission of the tip alleged to have been received from Justice Larsen by Judge Ross to U.S. Attorney Johnson. (Johnson, TR at 1051–59; Ross, TR at 891–92; EX R–1; EX R–1a).

21. Judge Ross stated in her testimony before this Board that her only occasion between May 1986 and December 1986 to discuss the content of Justice Larsen's alleged attempt to influence her was with Judge Cosetti of the Federal Bankruptcy Court who was presiding over a related case. She admitted to having initiated several *ex parte* conversations with him regarding the *Estate of Francis* case, and she stated that she told him during one of those conversations that "Justice Larsen came to see me and said 'look, I met two guys on the street and they said to tell Judge Ross in the Homer Douglas Francis case that John Botula got all the money and put it in a condominium in Florida.'" Significant-

ly, Judge Ross' own version of her *ex parte* conversation with Judge Cosetti omits any reference to the critical follow-up comments, "Botula's the one, you go after Botula," which Judge Ross included in other reports of the May 30, 1986 exchange between she and Justice Larsen. (Ross, TR at 819–21).

22. By stipulation, Judge Cosetti flatly denied Judge Ross' assertion. The stipulation provides as follows:

It is hereby stipulated and agreed among the parties that Judge Joseph P. Cosetti of the Bankruptcy Court of the Western District of Pennsylvania, if called to testify, would testify that he had a number of telephone conversations with Judge Ross in 1986 and 1987. That the substance of those conversations was the handling of the Low–Vol Fuels case in the Bankruptcy Court and how it impacted on the Homer Douglas Francis Estate before Judge Ross. He would also testify that *he does not remember Judge Ross telling him that Justice Larsen had intervened with her on the Francis estate and that fact, if clearly communicated to him, would be so unusual that he would probably remember it.*

We find Judge Cosetti's denial, rather than Judge Ross' assertion, to be credible. (Cosetti, by stipulation, TR at 132–33).

23. On December 12, 1986, the Pennsylvania AFL–CIO presented Justice Larsen with their Judicial Excellence Award. In connection with that occasion, and despite Judge Ross' testimony that Justice Larsen had attempted to influence Judge Ross improperly in the *Estate of Francis* case six months earlier, Justice Larsen received the following note from Judge Ross on November 25, 1986:

"Dear Justice Larsen: I was pleased to send a contribution of $50.00 to the labor tribute dinner in your honor. I cannot attend because I recently had my arm and hand operated on for severed tendons. I hope the dinner is a success. Happy Thanksgiving. Sincerely yours" "Eunice" (written) "Eunice Ross" (typed).

Judge Ross acknowledged sending the note, but discounted it as merely a "courteous" note. (Ross, TR at 980–81; EX R–20)

24. On March 26, 1987, Justice Larsen and Judge Ross attended a viewing for Judge Watson's deceased mother. Justice Larsen sat by Judge Ross and had a friendly conversation with her. Judge Ross asked Justice Larsen if he could arrange to have her included on the dais, rather than merely in the audience, for the upcoming AFNA Dinner at which Mrs. Anwar Sadat was to be the featured speaker. Justice Larsen told her he would look into it, and in fact arranged for Judge Ross to be moved onto the dais. (Larsen, TR at 2550–01; Ross, TR at 901, 979).

25. On Sunday, April 19, 1987, an article by Jack Grochet and Richard Gazarick regarding an FBI investigation into the Zdrale bankruptcy appeared on Page A–1 of the Greensburg *Sunday Tribune Review* with a large picture of Mr. Zdrale and Attorney Lampl. The article was continued on page A–10 with a large picture of Justice Larsen who was by then campaigning for his retention election in the fall. The article suggested possible impropriety with respect to the sale of Mr. Zdrale's Fairfield Township property to Justice Larsen. The story noted that Attorney Ashton and Attorney Lampl represented Mr. Zdrale. *See* Grochet & Gazarick, "Land Sale Scrutinized: FBI Looking Into Zdrale Bankruptcy," *Sunday Tribune—Review,* at A–1, A–10 (Greensburg, Pa. 4/19/87).

26. Judge Ross indicated that upon reading that article she became convinced that Justice Larsen's conversation with her a year earlier had been part of a pattern of events which indicated that Justice Larsen had passed the tip on to her in an effort to aid Attorney Lampl, and his attorney in the *Estate of Francis* case, Attorney Ashton, in return for Attorney Ashton's role in the Zdrale land deal. (Ross, TR at 874–75).

27. On cross-examination, Judge Ross' testimony on this point at the August 30, 1988 hearing before this Board was somewhat confused. At several points she indicated that she first drew negative inferences about Justice Larsen's motives

as a result of the April 19, 1987 article. (Ross, TR at 823–24, 871, 873–75). In the same testimony, however, she indicated that she felt from the beginning that Justice Larsen was suggesting that she go after Jon Botula and not the others, despite her knowledge from bank records that others had also received money, and that he was telling her, in effect, to find a fact in a case before her regardless of what the evidence proved. (Ross, TR at 828, 831–33, 835–36, 862). Upon further examination, however, Judge Ross conceded that she had not interpreted Justice Larsen's words to her as anything but a tip about possible bankruptcy fraud in the *Estate of Francis* case until after she read about the Zdrale land deal in the April 19, 1987 article, and that only then did she reinterpret his meaning and intent, and decide that the conversation should be reported. (Ross, TR 875–88).

28. Judge Ross did not report Justice Larsen's alleged attempt to influence her improperly to the parties or her colleagues on the *Estate of Francis* case, despite her reinterpretation of the meeting following review of the April 19, 1987 article.

29. This Board takes official notice of the fact that Judge Ross participated in a teleconference meeting of the JIRB on May 18, 1987, a full month after the appearance of the April 19, 1987 newspaper article, but that Judge Ross made no report of the fact, content, or presumed import of her May 30, 1986 conversation with Justice Larsen as Canon 1 and Canon 3B(3) would require if she had been of the opinion then that Justice Larsen had attempted to influence her improperly. We take further notice of the fact that she remained silent on this point despite the fact that the April 19, 1987 article was itself discussed by the Board during that meeting and despite the fact that she voted with the Board to issue a letter of inquiry to Justice Larsen regarding the content of that article. (Minutes of JIRB Conference Call Meeting 5/18/87; *see also* Rowley, TR at 1117, 1126); *see Falasco v. Commonwealth Probation and Parole Board,* 521 A.2d 991 (1987) (regarding "official notice").

30. Judge Ross testified at the August 1988 hearing that she had reported the fact, content, and presumed import of her May 30, 1986 conversation with Justice Larsen, to JIRB Chairman Judge James Rowley on May 26, 1987, while en route from the Harrisburg Airport to the JIRB headquarters in Harrisburg. (Ross, TR at 822–31).

31. Judge Rowley testified, however, that while Judge Ross had mentioned the article and that Justice Larsen had been to see her, Judge Ross had not indicated that Justice Larsen had attempted to influence Judge Ross, and that if she had indicated that, it would have struck him "like bolt of lightening," and that he would certainly have remembered it. (Rowley, TR at 1130). We find Judge Rowley's denial, rather than Judge Ross' assertion, to be credible. Moreover, we note that not only did she not report the incident to Judge Rowley as alleged, but she failed to report the incident subsequently at any of the numerous Board meetings or one-on-one contacts she had with Judge Rowley prior to her actual first report of the incident to Board Counsel Robert Keuch in September 1987. (Rowley, TR at 1110–32, 1034; Ross, TR at 822–25, 830–31, 897–98).

32. On July 8, 1987, a hearing was held in the *Estate of Francis* case at which Judge Ross indicated her tentative satisfaction with Attorney Lampl's explanation of his conduct in that case. It does not appear that *at that time* she suspected Attorney Lampl of conspiring with Justice Larsen and Attorney Ashton, to influence her improperly. (EX R–5).

33. We conclude that Judge Ross' reinterpretation of the May 30, 1986 meeting as the result of the April 19, 1987 article probably did not take its final, settled form until sometime after the JIRB meeting May 18, 1987, and the July 7, 1987 hearing in the *Estate of Francis* case.

34. On or about, October 16, 1987, Justice William Hutchinson formally resigned his position as Justice of the Pennsylvania Supreme Court in order to assume the post of Judge of the Third Circuit Court of Appeals. His nomination to the Third Circuit post was rumored in the legal press as

368

early as May 4, 1987. Between June 6, 1987, and June 26, 1987, reports of confirmation of the pending nomination by aides to Senators John Heinz and Arlen Specter were published in major newspapers. The nomination was formally submitted on June 26, 1987, and was formally confirmed by the United States Senate on August 7, 1987. We note that during this time many presidential nominations were not acted upon, and so until confirmation, the likelihood of a vacancy occurring on our Supreme Court as the result of a resignation by Justice Hutchinson was a matter of prognostication and speculation rather than certainty. These dates coincide with the timing of *Judge Ross' reinterpretation of her May 30, 1986 conversation* with Justice Larsen. *See Sprague v. Casey*, 520 Pa. 38, 50, 550 A.2d 184, 190 (1988). *See e.g.* "Around the State—Third Circuit Picks," *Pennsylvania Law Journal Reporter*, Vol. X No. 18 at 1 (*May 4, 1987*) (Senator Heinz' aide disclosed that President Reagan was planning to appoint State Supreme Court Justice Hutchinson to a vacant Third Circuit post); "Justice Dept. to Act on Judgeships," *Philadelphia Inquirer*, at __ (*June 6, 1987*) (Senator Specter confirmed that Justice Hutchinson was a likely nominee); "Around the State—Judicial Nominees," *Pennsylvania Law Journal Reporter*, Vol. X, No. 24, at 1 (*June 15, 1987*) (Senators Specter & Heinz confirmed that Justice Hutchinson is nominee); "Reagan to Name Two Pennsylvania Judges to Federal Court," *Allentown Morning Call*, at __ (*June 21, 1987*) (White House announced that the President will nominate Justice Hutchinson); "Committee May Vote August 4 on Hutchinson Nomination," *Pottsville Republican*, at __ (*July 25, 1987*) (Senate–Judiciary Committee to *vote as early as August 4* on Justice Hutchinson's nomination); Stoffer, ". . . as high court justice assumes U.S. post," *Pittsburgh Post Gazzette*, at __ (*Oct. 17, 1987*) (Hutchinson will resign and take new seat on same day [*Monday, Oct. 19, 1987*]; "Around the State—Third Circuit Addition," Pa.L.J.R. Vol. X, No. 42 at 1 (Justice Hutchinson was *nominated in June,* unanimously *confirmed in August,* and *sworn in October 19, 1987*).

35. In September 1987, Judge Ross made a formal complaint against Justice Larsen to Board Counsel Keuch regarding

Justice Larsen's May 30, 1986 conversation with her. This was her first formal report of the incident to the JIRB, and occurred more than fifteen months after the alleged misconduct, and about six months after the April 19, 1987 newspaper article. (Ross, TR at 898).

36. On October 8, 1987, two months after Justice Hutchinson's confirmation, days before his formal resignation, and only one month before Justice Larsen's scheduled retention election, an article appeared on the front page of the *Pittsburgh Post Gazette* by Bill Moushey discussing the May 30, 1986 conversation between Justice Larsen and Judge Ross; and the Zdrale land deal. The article suggested that Justice Larsen had specifically intervened with Judge Ross on behalf of Attorney Lampl and Attorney Ashton in the *Estate of Francis* case, and that Attorney Ashton and Attorney Lampl had been involved in Justice Larsen's "questionable" and "very favorable" land purchase from Mr. Zdrale at about the same time. The article indicated that Justice Larsen was suspected of impropriety, and that Judge Ross had reported the matter to the Justice Department and to "at least one official of state government." The source of the disclosures was not revealed. (*See* Moushey, "Larsen asked relief for lawyers," *Pittsburgh Post Gazette*, at 1 (October 8, 1987)).

37. Attorney Lampl testified that Mr. Moushey had told him that a member of Judge Ross' staff was his principal "informed source." At the Board hearings Mr. Moushey claimed statutory privilege and declined to reveal his sources, or to confirm or deny Mr. Lampl's assertions, even though the Board had ruled the asserted privilege inapplicable. (Lampl, TR at 90, 92 & 133; Moushey, TR at 1145–46, 1657–85).

38. At the hearing before this Board, Judge Ross denied having anything to do with the Moushey article, or knowing how Moushey received information concerning Justice Larsen's conversation with her, or her reports of the matter to state and federal authorities. Judge Ross noted various significant inaccuracies in the article including the assertion that

370

Justice Larsen had mentioned Attorney Ashton and Attorney Lampl in the May 30, 1986 meeting (which she denied). She also noted that only $500,000 rather than $2,000,000 dollars (as indicated in the article) was suspected to have been improperly taken from the estate. (Ross, TR at 865–67).

39. On October 13, 1987, Judge Ross was interviewed by FBI Agents. We noted the inaccurate information in her report to the FBI regarding her conversations with Attorney Vaira and U.S. Attorney Johnson at numbers C–15, C–17, and C–20. We note that the FBI report also indicates that Judge Ross had stated, then, that her first report to the JIRB was through Mr. Keuch and not Judge Rowley as she later testified before the Board. Interestingly, in a letter to Board Counsel Keuch regarding the FBI report, she noted that the only error in the report was its reference to the person to whom she reported the incident, but she made no mention of the errors discussed *supra* at numbers C–15, C–17, and C–20. (EX R–1; EX R–1a).

40. On October 27, 1987, following publication of the Moushey article, Attorney Lampl moved to have Judge Ross recuse herself as the result of *ex parte* contacts suggested in the article. In denying the motion, Judge Ross stated:

"The Court has no control over what newspaper writers write about a public record. The opinion expressed in the article was the opinion of the writer of the article. The article indicated that this Court, and properly so, would not comment about that case nor about the allegations concerning Justice Larsen. The court is well aware, under the Canons of Judicial Ethics, the court may not, ever, comment to any newspaper reporter about pending litigation and certainly the Homer Douglas Francis litigation. This Court has been careful to preserve the rights of all parties who appeared before it. I am sure that if the court had not been so impartial, we would have concluded these matters a long time ago. Your motion will be denied, Mr. Ashton."

(Lampl, TR at 92, 153–54; EX R–3, at 19–20).

41. At the August 1988 hearing in this matter, Judge Ross gave three reasons for her failure to recuse herself from the

*Estate of Francis* matter. First, she did not consider communications between Judge Cosetti, Judge Markovitz, or Justice Larsen and herself to be *"ex parte,"* because she understands (or at least understood) that term to apply only to conversations between a Judge and a party or a party's counsel. (Ross, TR at 861; *see also* EX R–3 at 3–22; EX B–10 at 4–20. She noted further that she did not feel she had to report Justice Larsen's contact with her because that part of the case was no longer before her. (Ross, TR at 861). Finally, she testified that she felt that the JIRB secrecy provision required her to keep silent about the matter since she had reported it to the JIRB. (Ross, TR at 868–69).

42. Judge Ross also testified that she felt she was unaffected by her belief that Justice Larsen had attempted to influence her improperly on behalf of Attorney Lampl and Attorney Ashton in the *Estate of Francis* case, and further testified that she could continue to judge the outstanding matters in which Attorney Ashton continued to represent Attorney Lampl in the *Estate of Francis* case, fairly and impartially despite the fact she believed that they had worked together with Justice Larsen to influence her improperly in that case. (Ross, TR at 870).

43. Although Judge Ross had indicated her satisfaction with Attorney Lampl's accounting at a hearing on July 7, 1987, the opinion she filed in February 29, 1988, severely criticized Attorney Lampl, stating that Attorney Lampl was guilty of unethical neglect of the bankruptcy matter, contributing to the "hemorrhaging" of assets from the estate, but nonetheless made no formal findings of misconduct by Attorney Lampl. Neither the February opinion, nor the ruling on the recusal motion, were reviewed on their merits on appeal to the Superior Court. (Ex. B–9, Ex B–10, Ex B–62).

44. At the August 31, 1988 hearing, Judge Ross identified and authenticated handwritten notes which she testified that she had made contemporaneously with the events indicated in the notes beginning on May 30, 1986. (Ross, TR at 981–1001; EX R–22).

45. Judge Ross' notes do not purport to relate her conversation with Justice Larsen on May 30, 1986 in its entirety. They contain no reference to the unrelated matters she testified that she recalled she and Justice Larsen discussing, and omit reference to the follow-up call. The notation regarding her call to Attorney Vaira is squeezed in as an interlineation and incorrectly notes that she spoke with him at Cindrich's (law firm), when in fact she had not. Both the notations regarding her calls to Attorney Vaira and U.S. Attorney Johnson merely noted the contact and neither indicated the specific content of the calls other than that they related to her conversation with Justice Larsen. The brief characterizations of those calls in her notes are also inaccurate. The notes contain no entries for her alleged contacts with Judge Cosetti or Judge Rowley. After a June 9, 1986 entry a long space is left blank with the date 11/10/86 written on the bottom of the following page with the beginning of a new entry, scribbled out. Significantly, the notes do not contain reference to the critical alleged statements, "Botula is the one" or "Go after Botula," which she testified that she recalled. The diary notes provide no corroborative support for Judge Ross's testimony; the inconsistencies noted, in fact, undermined her credibility to some extent. (EX R–22).

46. On August 31, 1988, Judge Ross testified to this Board that she "had no present desire" to go onto the Supreme Court, that she did not have a desire to go onto the Supreme Court in 1986 or 1987, and that she had decided to run in early 1988, because "the vacancy was suddenly certified" and she had "as good a chance as anyone else." (Ross, TR at 1005–06). Under cross-examination on July 10, 1989, Judge Ross conceded:

Q. Did you contemplate a race for the Supreme Court at the time that you made known your charges or accusations against Justice Larsen, to the Judicial Inquiry and Review Board?

A. First, I don't make accusations. I reported an incident to the Board which I felt was connected with the sale of the real estate.

Q. I'll ask you, at the time that you reported that which had, which later resulted in the charges, I'll put it that way, did you contemplate a race for the Supreme Court?

A. I don't think at that time I was thinking about it. I have always had a hankering to go to the Supreme Court, but I don't think I had done anything that really was—

Q. All I have asked is if you had—

A. Just a latent desire, I would say, all right?

(Ross, TR at 34–35). (Emphasis added).

47. Judge Ross' testimony was challenged in the following additional respects throughout cross-examination:

a. Judge Ross testified she accepted a ride with Justice Larsen from the Pittsburgh airport in 1985, and that she could place the date based upon her recollection that Justice Larsen had suggested that she run for one of the Superior Court vacancies available in 1985. However, Justice Larsen denied ever having made such a suggestion, and Mrs. Roberts indicated that by checking Justice Larsen's calendar and files, she was fairly certain that she had given Justice Larsen and Judge Ross rides home from the Pittsburgh airport on September 19, 1984, but not in 1985. (Ross, TR at 901–02; Roberts, TR at 1403–05; Larsen, TR at 2538, 2686).

b. Judge Ross first indicated that she did not recall her conversation with Justice Larsen in the car, but was certain she would not have brought up her *Baby Girl D* adoption case which was pending in the Superior Court and virtually certain to be appealed to the Supreme Court. On further cross-examination, however, she conceded that she may have discussed work on hearings for new adoption legislation and a possible grand jury adoption investigation, but not the *Baby Girl D* case itself. (Ross, TR at 905, 920–22).

c. Judge Ross testified that Justice Larsen was dropped off first and that she was invited in to see his condominium. Justice Larsen and Mrs. Roberts denied that Judge Ross was invited into Justice Larsen's condominium. (Ross, TR at 805; Robert, at 1403–05; Larsen, TR at 2535–39).

374

d.  Judge Ross testified that she was dropped off down-town.  Mrs. Roberts recalled that she drove Judge Ross to her home and complimented Judge Ross on her "lovely flowers along the walkway."  Judge Ross denied any memory of the compliment, but did not deny the existence of the flowers Mrs. Roberts described.  (Ross, TR at 805–06, 814–16; Roberts, TR at 1403–05; Larsen, TR at 2535–39).

e.  Judge Ross acknowledged that she dropped off a draft adoption statute, a memorandum, and hearing testimony to Justice Larsen's chambers, but insisted that they did not relate to her "Baby Girl D" adoption case.  When confronted with Mrs. Robert's statement that the papers had been marked "Baby Girl D," Judge Ross suggested that her secretary must have not known what to caption the specimen documents and must have labeled them "Baby Girl D," coincidentally.  (Ross, TR at 905–20; Roberts, TR at 1405–09, 1425; EX B–41A; *In re Baby Girl D*, 512 Pa. 449, 517 A.2d 925 (1986)).

f.  Judge Ross testified that she did not recall receiving a letter from Attorney Schuchert asking Judge Ross not to report Attorney Jon Botula's alleged misconduct to the Disciplinary Board.  However, Judge Ross' own diary notes refer to such a letter.  (Ross, TR at 991–92; EX R–22).

g.  Judge Ross denied writing to Justice John P. Flaherty on September 2, 1986.  When confronted with a copy of her letter, she stated that she "had a bad memory."  (Ross, TR at 977–79;  EX R–19).

h.  When confronted with a copy of Attorney Lampl's Au-gust 18, 1988 exceptions in the *Estate of Francis* case at the August 31, 1988 Board Hearing, Judge Ross denied she had ever received them.  Her denial was contradict-ed, however, by her own order denying those exceptions entered on August 19, 1988, less than two weeks earlier.  (Ross, TR at 969–71;  EX R–17;  EX R–18).

 

48.  Based on the foregoing, we find that:

Justice Larsen, without any apparent improper motive, improperly provided Judge Ross with a prohibited *ex parte* tip concerning possible bankruptcy fraud in a case over which Judge Ross was then presiding.

## IV.  DISCUSSION: CHARGE I

Charge I involves an alleged improper *ex parte* communication by Justice Larsen to Judge Ross regarding the *Estate of Francis* case.  In discussing the findings relating to this charge we must first determine what we know about what occurred, and then determine its legal significance.

Both Justice Larsen and Judge Ross appear to be convinced that their versions of the May 30, 1986 meeting are complete and accurate;  each believes that the other's version is a willful fabrication.  Neither Justice Larsen's version, nor Judge Ross' version, however, can be accepted as complete or accurate.

Each of the witnesses, the principal parties as well as the witnesses to relevant subsequent events, presented testimony demonstrably flawed by one or more of Wellman's "innocent fallacies of testimony."  The witnesses' memories of relevant conversations evidenced varying degrees of deterioration and distortion as the result of their initial levels of inattention to details of the conversations, the relative insignificances of the details of the conversations at the time they occurred, the press of innumerable other weighty matters on their minds during the interim, sources of false interpolations, and the deleterious effects of the considerable period of time which elapsed between the events to be recalled and the request by this Board that the witnesses attempt to recall those events. Most of the witnesses recognized the potential for such fallacies of testimony and attempted to disclose and discount for them.

United States Attorney Alan Johnson directly and forthrightly acknowledged that the press of events in his life and the passage of years had erased all independent memory of his conversation with Judge Ross by the time he testified before this Board in this matter. Judge Cosetti, Judge Rowley, and Attorney Vaira each acknowledged that they retained only the outlines of their past conversations with Judge Ross which were the focus of their testimony in this matter.

Even so, risks remain in reviewing their qualified testimony. The innocent interpolation of false references to "mob figures" and "narcotics" into Attorney Vaira's memory of his conversation with Judge Ross on June 5, 1986, in his interview with Board investigators on November 9, 1987 (which he acknowledged in his testimony to this Board), underscores the tenuous ground upon which each of these witness' testimony was founded, as well as the manifest opportunity for innocent fallacies of testimony to distort the actual facts in the witnesses' subsequent reports.

Both Justice Larsen and Judge Ross, on the other hand, claimed far more for their respective memories of the relevant events than the record before this Board could sustain. In rejecting portions of their testimony, however, we expressly reject their reciprocal invitations to find that the other is lying and committing willful perjury. To the contrary, we find that both are respected jurists with excellent reputations for honesty and integrity, who appear to be sincerely mistaken in portions of their recollections of the relevant events. We note that there is abundant cause to believe that innocent fallacies of testimony, rather than willful perjury, account for the dramatic differences in their accounts of their conversation during their May 30, 1986 meeting.

Initially, we must concede that even after extensive and detailed investigation, there is no clear and convincing evidence, to establish the precise context, content, and manner of delivery of Justice Larsen's comments to Judge Ross during the May 30, 1986 meeting. Nonetheless, we find sufficient clear and convincing evidence that Justice Larsen stated something to the effect that, two men on the street had told

him that in the *Estate of Francis* case, Jon Botula took all the
money and used it to buy a condominium in Florida. We
reject, as an inaccurate interpolation, Judge Ross' further
testimony that Justice Larsen had followed that statement
with a further directive to the effect that "Botula's the one,"
"you go after Botula."

The reason for rejecting part of Justice Larsen's denial and
part of Judge Ross' accusation is the same—neither are
consistent with the available corroborative evidence from cred-
ible and disinterested witnesses. We will explain the partial
rejections of Justice Larsen's and Judge Ross' testimony
separately.

Justice Larsen's flat denial of any knowledge of or comment
regarding the *Estate of Francis* case must be rejected, despite
his excellent character for both truthfulness and integrity,
because it is clearly and convincingly rebutted by the portion
of Judge Ross' testimony which has been corroborated by
Attorney Vaira, and United States Attorney Johnson. Both
testified that Judge Ross had reported to them shortly after
the May 30, 1986 meeting that Justice Larsen had provided
her with a tip in the *Estate of Francis* case concerning
possible bankruptcy fraud by Jon Botula. The testimony of
U.S. Attorney Johnson and Attorney Vaira thus confirmed
that Judge Ross had made prior *partially* consistent state-
ments near the time of the May 30, 1986 meeting.

It is true that Judge Ross was the sole source for both of
the corroborating witness' testimony, thus, undermining the
value of their corroboration evidence in that respect, as mere
repetition does not corroborate. However, we find it signifi-
cant that the reports were contemporaneous with the events
and both the timing and tenor of these initial reports by Judge
Ross lacked even arguable political implications, as they were
made far in advance of Justice Larsen's retention election, and
were not in any way accusatory toward Justice Larsen. Thus,
the prior partially consistent statement provides significant,
albeit partial, corroboration by at least partially rebutting

challenges to Judge Ross' testimony on grounds of post-event memory decay and distortion, and political bias.

Moreover, there are several reasons to believe that Justice Larsen's sincere and adamant denials of the portion of Judge Ross' account we find proved were caused by innocent fallacies in his testimony. First, a substantial lapse in time occurred before Justice Larsen ever had cause to recall his May 30, 1986 conversation with Judge Ross (in this regard we note that U.S. Attorney Johnson found, after only a slightly longer lapse in time, that he had no independent recollection of his conversation with Judge Ross which had occurred nine days after Justice Larsen's conversation with Judge Ross). Second, if the remark was made to Judge Ross as merely a "tip" (as we find), then Justice Larsen would have had little or no reason to have been attentive to that detail during or immediately after the May 30, 1986 meeting. Hence, Justice Larsen would have no reason to recall the tip by the time accusations were raised concerning that conversation a year and one half later. Third, when the accusations were first made, the corroborated remark was lumped together with the uncorroborated and far more accusatory remarks, "Botula's the one," "you go after Botula." Having forgotten the first remark, and knowing that he had never made the other far more culpable remarks, it is not unlikely that Justice Larsen would have convinced himself that the entire allegation was patently false, though part of it was true.

In this regard, we note the following cogent observations of Francis Wellman:

> *Every mind is attentive to what it sees or hears, more or less, according to circumstances. It is in the region of hazy impressions that the imagination is wont to get in its most dangerous work.* It thus appears that it is partly owing to this variation in intensity of attention that different individuals get such contradictory ideas of the same occurrence or conversation. *When we add to this variance in the degree of attention, the variance, just explained, in the individual interpretation or coloring of the physical sensation, we have*

*still further explanation of why men so often differ in what they think they have seen and heard.*

\*     \*     \*     \*     \*     \*

Still another most important factor and itself the source of an enormous number of "fallacies of testimony" is memory. *We are accustomed to speak of memory as if it consisted in an exact reproduction of past states of consciousness, yet experience is continually showing us that this reproduction is very often inexact,* though the modifications which the "trace" has undergone in the interval. Sometimes the trace has been partially obliterated; and what remains may serve to give a very erroneous (because imperfect) view of the occurrence. *When it is one in which our own feelings are interested, we are extremely apt to lose sight of what goes against them, so that the representation given by memory is altogether one-sided.* This is continually demonstrated by the entire dissimilarity of the accounts of the same occurrence or conversation which is often given by two or more parties concerned in it, even when the matter is fresh in their minds, and they are honestly desirous of telling the truth. *This diversity will usually become still more pronounced with the lapse of time,* the trace becoming gradually but unconsciously modified by the habitual course of thought and feeling, so that *when it is so acted upon after a lengthened interval as to bring up a reminiscence of the original occurrence, that reminiscence really represents, not the original occurrence, but the modified trace of it.*

Wellman, *supra,* at 142–44. (Emphasis added). Such appears to be the case here. This potential for an innocent fallacy of testimony on Justice Larsen's part provides us with a satisfactory explanation of how the adamant denial of a man known to be truthful could nonetheless be wrong. We note that we suggest *subconscious* paths to those fallacies, and not *conscious* ones.

Judge Ross' testimony that Justice Larsen attempted to direct her decision in *Estate of Francis* by stating that "Botula's the one," "you go after Botula," likewise must be rejected

because it is clearly and convincingly rebutted by the portion of Justice Larsen's denial which is corroborated by the content and tenor of Judge Ross' own initial reports of the conversation to Attorney Vaira and United States Attorney Johnson. It is also rebutted by Judge Ross' course of conduct following the May 30, 1986 meeting including her continued courtesy toward Justice Larsen, and her failure to promptly report what would have been egregious misconduct to either the parties and her colleagues on the *Estate of Francis* case or to this Board. Had Justice Larsen actually attempted to importune Judge Ross so brazenly, we have no doubt that as an ethical jurist and as a then serving member of the JIRB, she would not have hesitated an instant in making a prompt formal complaint to this Board; her failure to do so significantly undermines her credibility on this point. Finally, it is further rebutted by the fact that her original characterization of the May 30, 1986 comments by Justice Larsen as a "tip" was not recharacterized as an attempt to influence her improperly until after she read the April 19, 1987 article suggesting misconduct by Justice Larsen regarding the Fairfield Township Land purchase, almost a full year after the May 30, 1986 meeting.

Similarly, we reject her adamant denial that Justice Larsen discussed complaints raised by Judge Zavarella and others regarding her personal and judicial conduct during the May 30, 1986 meeting. Justice Larsen's clear testimony on this point, his reputation for truthfulness, his prior similar conduct regarding other judges, and the corroborative evidence supplied by Judge Zavarella and Attorney Lampl, all combine to clearly and convincingly rebut her adamant denials.

Moreover, as with Justice Larsen, there are various avenues by which Judge Ross' testimony in this respect may have become innocently mistaken. Again, there is the deleterious effect of time. Judge Ross' contemporaneous prior partially consistent statements to United States Attorney Johnson and Attorney Vaira, indicated that Justice Larsen had provided her with a tip. Her testimony after reading the suggestive April 19, 1987 news article, however, added the alleged rejoin-

der "Botula's the one," "you go after Botula," which was not included in earlier reports, and which involved a fundamental change in the nature of Justice Larsen's alleged conduct. Once this false interpolation occurred, Judge Ross quite naturally would have become convinced of her duty to bring Justice Larsen to justice *via* JIRB proceedings; thus, explaining her first, belated report to this Board in October 1987, a year and one half after the May 30, 1986 conversation with Justice Larsen. Moreover, it is likely that her status as key prosecution witness, and as a lightening rod for counter-accusations, negative aspersions, and rigorous cross-examination may have increased both her indignation and her false certainty regarding these matters.

In this regard, we note the following equally cogent observations of Francis Wellman:

> *Not only does our idea of the past become inexact by the mere decay and disappearance of essential features; it becomes positively incorrect through the gradual incorporation of elements that do not properly belong to it.* Sometimes it is easy to see how these extraneous ideas become imported into our mental representation of a past event. Suppose, for example, that a man has lost a valuable scarf-pin. His wife suggests that a particular servant, whose reputation does not stand too high, has stolen it. When he afterwards recalls the loss, the chances are that he will confuse the fact with the conjecture attached to it, and say he remembers that this particular servant did steal the pin. *Thus the past activity of imagination serves to corrupt and partially falsify recollections that have a genuine basis of fact.*

>       *     *     *     *     *     *

> Witnesses in court are almost always favorable to the party who calls them, and this feeling induces them to conceal some facts and to color others which might, in their opinion, be injurious to the side for which they give their testimony. This *partisanship in the witness-box is most fatal to fair evidence; and when we add to the partisanship of the*

*witness and similar leaning of the lawyer who is conduct-
ing the examination, it is easy to produce evidence that
varies very widely from the exact truth.*

$$* \quad * \quad * \quad * \quad * \quad *$$

*There is still another class of persons who would not
become witnesses for either side unless they felt that some
wrong or injustice had been done to one of the parties, and
thus to become a witness for the injured party seems to
them to be a vindication of the right. Such witnesses allow
their feelings to become enlisted in what they believe to be a
cause of righteousness, and this in turn enlists their sym-
pathy and feelings and prompts them to color their testimo-
ny as in the case of those influenced by the other motives
already spoken of.*

Wellman, *supra,* at 146, 150, 152. (Emphasis added, footnotes
omitted). Such appears to have been the case here; though
we again in no way suggest that either post-event distortion,
partisanship, or indignation played anything more than a
subconscious role in coloring her testimony.

In reaching our conclusion that part of Justice Larsen's
testimony and part of Judge Ross' testimony must be rejected,
we specifically reject suggestions of improper motives on the
part of Justice Larsen and Judge Ross respectively. We shall
deal with these suggested motives briefly.

It was suggested that Justice Larsen was motivated to
attempt to influence Judge Ross in order to deflect attention
from Attorney Lampl's conduct in the *Estate of Francis* case,
in return for Attorney Ashton's involvement in Justice Lar-
sen's favorable land purchase from Mr. Zdrale (whom both
Attorney Ashton and Attorney Lampl had represented). We
reject this suggested motivation for four reasons. First, the
record reveals that Attorney Ashton, Attorney Lampl, and
Judge Ross, all agree that at the time of the Fairfield Town-
ship Land deal and the May 30, 1986 meeting there was no
reason to believe that there was any need for Justice Larsen,
or anyone else, to intervene on Attorney Lampl's behalf.
Second, under the circumstances presented, a tip implicating
misconduct by Attorney Botula would have had negligible, if

any, effect of exculpating Attorney Lampl. Third, Attorney Ashton initiated discussions regarding the potential sale prior to the issuance of a rule to show cause in the *Estate of Francis* case, and eventually, actively opposed the favorable land deal, specifically advising Mr. Zdrale not to go through with it. Finally, the assertion is wholly inconsistent with Justice Larsen's excellent reputation as an ethical jurist. Hence, Justice Larsen had no reason to intervene on Attorney Lampl's behalf and had nothing to repay Attorney Ashton for doing; and, we have no reason to believe Justice Larsen would intervene improperly on Attorney Lampl's behalf, even if the motivations alleged had existed. Thus, we reject the suggestion of an improper *quid pro quo* motive for Justice Larsen to attempt to influence Judge Ross on Attorney Lampl's behalf.

It was suggested that Judge Ross was motivated to raise false charges against Justice Larsen for political gain, both by currying favor with Justice Flaherty, and by enhancing her own chances of ascending to a seat on our Supreme Court. We shall address these suggestions briefly, separately.

There is not even a scintilla of evidence to support the suggestion that Judge Ross brought charges against Justice Larsen to curry favor with Justice Flaherty. We reject that suggestion entirely.

It is true that there was a temporal overlap between Justice Hutchinson's vacancy, Justice Larsen's retention election, and Judge Ross' re-evaluation of Justice Larsen's statements in the fall of 1987, more than a year and one half after the May 30, 1986 meeting. It is also true that Judge Ross harbors an acknowledged ambition to serve as a Justice on our Supreme Court. Nonetheless, it is apparent that the April 19, 1987 news article motivated her re-assessment of the nature and import of Justice Larsen's statements on May 30, 1986, and that the imputation of a political motive is unnecessary to explain the part of her testimony which we reject.

The question, then, is whether the "tip" provided by Justice Larsen to Judge Ross on May 30, 1986 constituted misconduct which would warrant a recommendation of formal discipline to

our Supreme Court. We find that such a tip violates the rule forbidding all attorneys (including judges and justices) to communicate with a judge regarding a case, outside of the presence of one or more of the parties or their attorneys, while that case is pending before that judge, and that a recommendation of discipline would seem appropriate despite the absence of any apparent improper motive for the improper *ex parte* communication.

The Respondent was charged herein with violating Canons 1, 2, and 3(A)(4) of the Code of Judicial Conduct.

Canon 1 provides:

## A JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY.

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

Canon 2 provides:

## A JUDGE SHOULD AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY IN ALL HIS ACTIVITIES.

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or,

knowingly permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.

Canon 3 provides:

## A JUDGE SHOULD PERFORM THE DUTIES OF HIS OFFICE IMPARTIALLY AND DILIGENTLY.

A. Adjudicative Responsibilities ...

(4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and except as authorized by law, must not consider *ex parte* communications concerning a pending proceeding.

Canon 1 is primarily a statement of purpose and rule of construction, rather than a separate rule of conduct. It requires that each of the other Canons be construed in accordance with the Code's fundamental purpose of ensuring both the independence and the integrity of the judiciary. To the extent Canon 1 has been construed to set forth independent rules of conduct, we find none of those rules implicated by Justice Larsen's alleged tip to Judge Ross. *See Lawyers Manual on Professional Conduct,* § 2101 (ABA/BNA 1985); *cf. Sprague v. Waller* [*Walter*], 22 D & C3d [Pa.D. & C.3d] 564, 592 (Pa.Ct.Cm.Pl.1982). Canon 1 is inapplicable here except in providing a gloss on the intent of the other more specific provisions.

Any perceived applicability of Canon 3(A)(4) to this case is wholly illusory. Indeed, Canon 3(A)(4) by its express terms relates to Judge Ross' duties and obligations in the scenarios set forth in the allegations. Under Canon 3(A)(4) any judge presiding in a case has an obligation not to consider *ex parte* communications such as those which Justice Larsen was alleged to have provided Judge Ross. Canon 3(A)(4) is inapplicable here.

Canon 2 is the only provision cited in the charge which applies. *Ex parte* communications with a judge regarding a

case over which that judge is presiding may give rise to an appearance of impropriety which may undermine public confidence in the judiciary. Whether a communication will give rise to such improper appearances, however, will depend upon the context, content and manner of the *ex parte* communication. *See generally* Markey, *The Delicate Dichotomies of Judicial Ethics*, 101 FRD 373, 373–89 (1984); Rehnquist, *Sense and Nonsense About Judicial Ethics*, 28 The Record 694, 694–713 (1973).

While this issue has not been addressed in any of the published opinions our Supreme Court has issued on judicial ethics matters, it is clear that an *ex parte* communication by one member of the judiciary to another member of the judiciary may constitute censurable misconduct in Pennsylvania. In 1974, the appearance of impropriety which arose when one district justice called another district justice, asked the district justice to give a friend he identified a "fair trial," and then proceeded to offer the district justice two tickets to a Pittsburgh Steelers football game—as a "favor" to the district justice, was found to constitute censurable misconduct by our Supreme Court. *See In re Regan*, No. 36 JIRB Dkt. 1974, unreported (Pa.1974), *digested in Judicial Discipline and Disability Digest: 1962–1978*, at 305 (Rossenbaum ed. 1979).

Other jurisdictions have likewise held that an *ex parte* communication by a judge to another judge regarding a case pending before the second judge may constitute censurable judicial misconduct. *See e.g. In re Edwards*, 67 N.Y.2d 153, 501 N.Y.S.2d 16, 492 N.E.2d 124 (1986) (judge *publicly censured* for calling *Magistrate* identifying self as a judge, and inquiring as to how to settle his son's traffic violation case); *Matter of Harned*, 357 N.W.2d 300 (Iowa 1984) (impulsive attempt by district justice to have another district justice dismiss her daughter's speeding ticket warrant a *four day suspension*, dissent would merely have reprimanded); *Matter of Murray*, 92 N.J. 567, 458 A.2d 116 (1983) (municipal judge *publicly reprimanded* for *ex parte* communication to second municipal judge attempting to gain special treatment for former client's daughter); *Roberts v. Commission on Judicial*

*Performance* [33 Cal.3d 739, 190 Cal.Rptr. 910], 661 P.2d 1064 (1983) (trial judge's improper *ex parte* communication with an appeals court judge, and other conduct, warranted *public censure*); *Matter of Cunningham* [57 N.Y.2d 270, 456 N.Y.S.2d 36], 442 N.E.2d 435 [434] (N.Y.1982) (trial judge's *ex parte* letter to appeals court judge warranted *public censure*); *Dixon v. State Com'n on Judicial Conduct* [47 N.Y.2d 523, 419 N.Y.S.2d 445], 393 N.E.2d 441 (N.Y.1979) (district justice admonished for asking for special treatment for a friend, mitigating circumstances noted).

While all *ex parte* communications with judges regarding cases pending before those judges, may be equally prohibited, all *ex parte* communications are not equally sanctionable. Indeed, we find that there is spectrum of culpability with respect to *ex parte* communications which ranges from the plainly criminally culpable, through the injudicious, to good faith errors, and finally to truly innocent and innocuous *ex parte* remarks. The magnitude of the misconduct will depend upon the context, content, and manner of delivery of the *ex parte* communication.

In light of the dearth of case law from our jurisdiction, we turn to cases from other jurisdictions to illustrate this continuum of culpability. We emphasize, however, that these cases are cited for illustrative purposes only.

At the highest level of culpability are *ex parte* communications for criminal or other clearly improper motives. In *Florida Bar v. McCain*, 361 So.2d 700 (Fla.1978), a former Supreme Court Justice who had resigned under a cloud of allegations of misconduct was disbarred based upon multiple instances of misconduct while a Supreme Court Justice which included two admitted attempts to improperly influence lower court judges to rule in favor of his political/financial supporters by *ex parte* communication. One case involved an appeal by a union official from a criminal bribery conviction, the second case involved a pending petition for attorney's fees.

Justice McCain's culpability as to each of the attempts to influence lower court judges improperly were proved beyond any doubt by his own unequivocal confessions to both the conduct and the improper motives. Such is not even vaguely the case here.

We have specifically found that there was no need to attempt to influence Judge Ross on Attorney Lampl's behalf, there was no motive to attempt to influence Judge Ross on Attorney Lampl's behalf, and Justice Larsen in fact did not attempt to influence Judge Ross on Attorney Lampl's behalf. Moreover, the absence of evidence of an improper motive, and Justice Larsen's excellent reputation as an ethical jurist warrant an inference that the "tip" was what it appeared to be, *i.e.* merely a "tip," albeit a tip improperly communicated by prohibited *ex parte* communication. Hence, *Florida Bar v. McCain, supra,* is plainly inapposite.

At the middle level of culpability stand plainly injudicious *ex parte* communications which are not made for clearly improper motives. In *In re DiLorenzo* [38 A.D.2d 401], 330 N.Y.S.2d 394 (1972), a recommendation of removal was rejected, and public censure was substituted as the appropriate sanction for the appearance of impropriety which arose when a judge arranged to meet and confer with counsel in charge of a Waterfront Commission investigation involving a close friend of the judge. The court found that the judge's conduct was "injudicious" in that an appearance of impropriety arose as the result of the fact that: the judge did not know the commission counsel; the judge was a friend of the target of the investigation; the judge arranged for the meeting through an intermediary; and, the judge specifically initiated a discussion of the investigation with the commission counsel. The court agreed, however, that, in light of the direct and irresolvable conflict in the evidence regarding the content and manner of the conversation, there was not clear and convincing evidence that the Judge had tried to influence the investigation improperly, as opposed to merely attempting to discover its scope and status.

*In re DiLorenzo* involves conduct distinguishable from that involved here. In *In re DiLorenzo,* an appearance of impro-

priety to a reasonable person arose from the very fact of the meeting, regardless of the contested content of their discussion. Here, the meeting itself was entirely innocuous and unobjectionable absent reference to the contested context, content, and manner of delivery of the conversation between Justice Larsen and Judge Ross; judges and justices often meet and converse on a broad range of topics, such meetings, by themselves, raise no untoward appearances.[5] Moreover, the instant case involved an *ex parte* tip apparently made to aid a judge in ferreting out potential bankruptcy fraud in a pending case, while *In re DiLorenzo* involved, at best, an informational fishing expedition by a friend of the target of the commission attorney's investigation into possible criminal misconduct.

On the other hand, unlike *DiLorenzo*, the evidence here indicates that Justice Larsen provided factual information via the *ex parte* communication which (though presented in terms of anonymously or confidentially received hearsay informa-

---

**5.** We have found that although Justice Larsen provided Judge Ross with the prohibited *ex parte* tip, he also discussed with her various complaints which had been circulating regarding her personal and professional conduct. This portion of the May 30, 1986 meeting was entirely proper.

A 1966 law review on judicial discipline notes:

It is common for judges to discuss the performance of their colleagues, particularly those within their court, and subsequently to make informal approaches aimed at curing any defect in performance. The judges spoken to are usually responsive and will often correct a fault without anything further having to be said or done. *Judges on higher courts will sometimes speak to lower court judges— even in the absence of a legally recognized supervisory power.*

Note, *Remedies for Judicial Misconduct and Disability*, 41 NYULR 149, 167–68 (1966). (Emphasis added). Richard McDevitt, former Executive Director of the JIRB, wrote in 1974:

To date, I have gone to the Administrative Judge or President Judge and had him warn the respondent, or, better still, have one or both of the appellate Judges on our Board administer a strong warning.

McDevitt, *Judicial Disability and Removal Commissions*, 45 Pa.B.A.Q. 118, 119 (1974). While informal admonitions, without directive of the Supreme Court, may no longer be imposed by the JIRB (*See Matter of XYP, supra*), the foregoing authorities confirm the still valid practice of judges and justices informally policing themselves. *Cf. Goodheart v. Casey, supra,* 565 A.2d at 764. (*per* Nix, C.J.; Flaherty, J., joins; McDermott, J., joins as to this issue) (colleagues have a duty to suggest recusal in some cases).

tion), nonetheless, was intended apparently to trigger at least further inquiry by Judge Ross. Moreover, unlike the situation in *DiLorenzo,* Justice Larsen stood in a position of authority over Judge Ross, which could exacerbate the general appearances of impropriety arising from the *ex parte* nature of the tip itself.

At the last level of culpable *ex parte* communications, are those improperly provided for unquestionably proper motives. In *In re Emmett [Emmet],* 300 So.2d 435 (Ala.1974), the Alabama Supreme Court reversed an order of censure entered against a trial court judge who had sent *ex parte* letters to appeals court judges explaining why he imposed high bail in particular cases and why he thought that they should affirm his orders. Significantly, the letters contained a statement by the judge that he had received an anonymous tip by phone that one of the defendants intended to flee the state if indicted, and had been given a financial inducement to do so. That information was plainly relevant to the merits of the bail decisions, *i.e.* the likelihood of flight. The court found that because the letter was not sent to the parties or counsel it was an *ex parte* communication, and therefore, was technically improper. However, the court found further that while the letters were technically improper *ex parte* communications, the Judge had sent them in good faith, without improper intent, and therefore censure was not appropriate under Alabama law.

*Emmett [Emmet]* too, however, is distinguishable. The improper *ex parte* communication in *Emmett [Emmet]* went from the trial court judge to several appeals court judges, rather than as here from a Supreme Court Justice to a trial court judge. Moreover, the *ex parte* communication in *Emmett [Emmet]* was contained in a letter; thus, reducing the potential for appearances of impropriety by providing a certain record of the information conveyed. Here, the tip was conveyed orally in a setting where there were no witnesses to confirm the content of the tip.

We conclude that Justice Larsen's conduct was improper, regardless of his motivation. If an appellate court judge or

justice learns information he or she feels should be communicated to a trial court, it is incumbent upon the appeals court judge or justice to communicate that matter to counsel involved, or to the court *via* accepted channels of communication, *e.g.* affidavits, depositions, or testimony. *Ex parte* communication of a "tip" based on hearsay (or any other source) to a trial judge, regarding a case then pending before that judge, is prohibited.

The reason for the prohibition of such *ex parte* communications is illustrated here. Because the tip was presented in terms of having been provided by an anonymous or confidential source, and because it was communicated *ex parte*, rather than through proper channels, the tip raised an appearance of impropriety regarding the need and/or motive for communicating the tip *ex parte*, notwithstanding Justice Larsen's excellent reputation as a truthful, ethical, and respected jurist.

The appearance of impropriety raised by the improper *ex parte* communication here, was exacerbated further by the fact that Justice Larsen stood in a position of authority over Judge Ross. The status of the party making the *ex parte* communication may affect the recipient's response, whether or not such an effect was intended.

Compelling evidence was presented regarding Justice Larsen's excellent reputation as a truthful, ethical, and competent jurist. While this evidence sheds favorable light on the ambiguities and conflicts in the evidence presented, the fact of the improper *ex parte* tip remains.

Hence, we conclude that Justice Larsen violated Canon 2 by providing a prohibited *ex parte* "tip" concerning of the *Estate of Francis* case to Judge Ross, when that case was pending before Judge Ross. We find that the conduct warrants disciplinary action despite the absence of an improper motive, because the conduct by itself raised an appearance of impropriety, which could undermine public confidence in our judiciary.

## V. EVIDENCE AND FINDINGS: CHARGE II

The second charge involves an alleged appearance of impropriety in violation of Canons 1 and 2, as the result of Justice Larsen's opposition to the grant of variances for construction of a new condominium complex 150 feet from Justice Larsen's luxury condominium.

It is suggested that Justice Larsen's opposition to the development was not sincere, and that he merely used the legal process to attempt to coerce a settlement from the developer which was wholly disproportionate to the damage likely to be incurred by Justice Larsen as the result of the new condominium complex. Such conduct is alleged to constitute a censurable appearance of impropriety.

Again, we shall begin with initial findings regarding the relevant testimony provided and then conclude with ultimate findings based upon our assessment of the credibility and weight to be assigned to the testimony and evidence submitted.

Our ultimate findings may be summarized as follows:

—Justice Larsen had strong if not compelling grounds to challenge the variances granted to Highpointe Associates;

—Justice Larsen did not want the project built, but later agreed to seek settlement on the advice of counsel;

—Justice Larsen's settlement offers were arguably reasonable, given the subjective nature of real estate appraisals, the subjective nature of the idiosyncratic damages allowable, and the customary inflation of settlement demands in the negotiation process; and,

—Justice Larsen's conduct was not plainly unethical, though it plainly involved "hard bargaining."

## A. THE ROLES OF THE INDIVIDUALS INVOLVED

1. Attorney Nicholas Cafardi was attorney for the Pittsburgh Catholic Diocese between 1981–1988.

2. Attorney Leo Kelly was attorney for St. Mary's Parish in connection with the sale of the St. Mary of the Mount school and property to the Highpointe Associates project.

3. Attorney Joel Aaronson was attorney for Highpointe Associates until September 1985, when he withdrew from the case due to Highpointe Associates failure to pay his fees.

4. Attorney John Zagari was attorney for Highpointe Associates from January or February 1986 until the project finally fell through in May 1987.

5. Attorney Nancy Scalise was an associate of Attorney Zagari who also represented Highpointe Associates between January or February 1986 and May 1987.

6. Attorney Leonard Mendelson represented Justice Larsen in this matter until September 1985.

7. Attorney William Grove was an associate of Attorney Mendelson who represented Justice Larsen in this matter until September 1985.

8. Mr. Frank DiPlacido was a seller of luxury automobiles in Washington, D.C., who formed Highpointe Associates with Lykes Boyken.

9. Mr. Lykes Boyken was an Arlington, Virginia real estate developer who formed Highpointe Associates with Frank DiPlacido.

10. Justice Rolf Larsen was the owner of a condominium located approximately 150 feet from the proposed Highpointe condominium complex development.

11. Mrs. Barbara Roberts was Justice Larsen's secretary during the relevant events.

12. Ms. Nina Larsen was Justice Larsen's daughter and heir apparent. She did the interior decorating for Justice Larsen's condominium and maintained a private room in the condominium for her personal use.

13. Mr. Rocco Scigliano was a real estate developer and friend of the late mayor of Pittsburgh, Richard Caliguiri.

14. Judge Richard E. McCormick was a judge of the Court of Common Pleas of Westmoreland County who was specially assigned by Chief Justice Nix to hear Justice Larsen's zoning

appeal after the entire bench of Allegheny Court of Common Please recused itself *sua sponte* in light of the fact that Justice Larsen had previously been a judge of the Allegheny Court of Common Pleas.

15. Mr. Daniel Smith was an experienced real estate appraiser, who also holds a law degree, who was hired by Justice Larsen to provide expert testimony regarding the value of his condominium and the potential impact of the Highpointe project.

16. Mr. John Welch was an experienced real estate appraiser, not associated with Mr. Smith, who was also hired by Justice Larsen to provide expert testimony regarding the value of his condominium and the potential impact of the Highpointe project.

17. Mr. Robert Nell was an experienced real estate appraiser hired by the Board to provide expert testimony regarding the value of Justice Larsen's condominium and the potential impact of the Highpointe project.

## B. CHRONOLOGY OF RELEVANT EVENTS

1. On December 5, 1980, Justice Larsen purchased a luxury condominium in the Marmont development at the apex of Mount Washington in Pittsburgh, Pennsylvania for $385,000. The condominium was an excellent purchase for Justice Larsen in that it provided him with a luxurious home with a unique scenic view; he was able to purchase it at a discount as the first buyer, and it was expected to appreciate in value at a rate greater than that of the general housing market. The investment potential was a special value to Justice Larsen because judges' investment opportunities are limited by the ethical obligations of Pa.C.J.C. Canon 5, wherein real estate investment is specially favored and exempted. (Mendelson, TR at 1498–1507; EX R–30).

2. In 1982, the St. Mary of the Mount parochial school on the apex of Mount Washington in Pittsburgh, Pennsylvania closed. Between 1982, and June 1986, the Church incurred expenses in excess of $600,000 in maintenance and interest

costs. The Church listed the property through a real estate agency for sale. (Cafardi, TR at 772–73; Kelly, TR at 475).

3. Frank DiPlacido of Highpointe Associates was referred to the Church as a potential buyer by a real estate agent. The Church and Highpointe Associates settled upon a selling price of $1,785,000 with closing depending upon receipt of all governmental approvals necessary to go forward with the development as planned. The deal also involved the reservation of parking space in a lot one block away from the development sight for Highpointe condominium owners. The lot had been used by the Church for parking when the school had been open. (Cafardi, TR at 756).

4. Highpointe Associates intended to construct approximately 50 condominium units and to sell them in the $350,000 to $400,000 price range. He indicated that Highpointe was a $20 million project. (DiPlacido, TR at 403–05).

5. In October 1983, Attorney Aaronson met with DiPlacido and Highpointe's architects and identified various problems including the need for a special exception for grading, and variances for height, and front, back and side setback requirements. (DiPlacido, TR at 441–43; Aaronson, TR at 525–27).

6. In an intra-firm memo dated October 27, 1983, Attorney Aaronson stated:

Frankly, the developer probably can satisfy the specific criteria authorizing occupancy of the lower levels as basements a lot easier than he can legally justify the grant of the dimensional variances.

\* \* \* \* \* \*

Although this appears to be an attractive development and the Planning Department in general seems supportive of the concept, my instinct tells me that *the only way the Board will approve the variances, since they are both extreme and probably not justified as a matter of variance law, is if neighborhood people appear in support of the proposal.* This is particularly true of the two adjacent homeowners who will be substantially affected by the proximity of the

structure. *Even if the Board approves the variance requests, I don't think that approval can stand up on appeal.* The time table mentioned by the developers, wherein they hoped to close on the property by November 10, 1983, seems totally unrealistic considering the developer's desire to know by that time that they have approval for their proposed development.

\* \* \* \* \* \*

Finally, although the developers indicated that they have had some communication with the community, it is imperative in this circumstance that the developers neutralize all opposition to their proposal. *Since it does not appear that they have a legal entitlement to the variances they seek, any significant opposition by members of the community will make it difficult for the Board of Adjustment to approve the variances, and even if the Board approves the variances, the appearances of opponents raise the possibility of appeals to court with the developers' entitlement to the variances legally unsupportable.*

Attorney Aaronson testified that this grim assessment was based on incomplete information regarding the geotechnical aspects of the property. (Aaronson, TR at 625–28, 723–24; EX R–6) (emphasis added).

7. In a November 1, 1983 memo Attorney Aaronson urged Mr. DiPlacido to meet with abutting property owners before the initial zoning meetings. A meeting was arranged by the Planning Department and a second meeting was arranged with the parish members. Justice Larsen was not personally contacted and did not attend these meetings. The memo also reiterated the concerns expressed regarding the basis for the variances requested, which had been stated for the October 31, 1983 memo:

The key to the success of the variance request before the Board of Adjustment is going to be the neutralization of any community opposition to the proposal. As we indicated in our earlier discussion there is not a strong legal basis for the grant of the requested variances and therefore *the*

*Board is likely to be willing to act favorably only if it does not appear there is significant community opposition. . . .*

Attorney Aaronson explained that this advice was based on still incomplete information, and that it was intended to deflate his client's unreasonable expectations. (Aaronson, TR at 532–34, 622, 631; DiPlacido, TR at 405–06; EX R–7) (emphasis added).

8. Prior to the first zoning hearing, the following concerns were raised by the parties indicated:

DPW —number of curb cuts and traffic safety
Fire Dept. —lack of 360 degree access for fire fighting personnel and equipment
City Planning —development down the hill was inconsistent with the master development plan
Neighborhood —excessive development, impairment of scenic view.

(Aaronson, TR at 532–53; DiPlacido, TR at 446–56; Mendelson, TR at 1547).

9. Some revisions were made to the project plans. However, in an inter-departmental memo, the director of city planning indicated that the revised drawings were as bad or worse than the originals on all points discussed at the meetings. (Mendelson, TR at 1576; EX R–32).

10. In a third memo, Attorney Aaronson recommended that further revisions be made to the plans before the initial zoning hearings. The memo also stated:

The developers have been informed on several occasions that any approval by the Board of Adjustment of the developers' variance requests will be specific to the site plan submitted with those requests, and therefore, any change in the design of the building, even minor locational changes, would probably require a whole new variance proceeding before the Board with no guarantee of success, and a second risk of court appeal. Despite this caution, and the developers' architects' advice to postpone application for a Board hearing for at least 2 weeks in order to allow the architects more time to finalize the site design, the developers have

chosen to proceed with an application and a hearing on November 17.

This is significant in two respects, it repeats the concerns regarding opposition and possible appeal, and also highlights the unmanageable nature of Attorney Aaronson's attorney/client relationship with Mr. DiPlacido. (Aaronson, TR at 637; EX R–8).

11. The first zoning hearing was conducted on November 17, 1983. Justice Larsen was represented at this meeting by Attorney Grove. The objections indicated in finding 9 were renewed in the public hearing. While Attorney Grove conducted limited cross-examination and presented no evidence as to the specific effect of the development on Justice Larsen's condominium, various other objectors raised concerns regarding obstruction of views, removal of foliage, and the deleterious effects of excessive development in the area. We note particularly, the testimony of Ms. Evans who represented 311 neighborhood residents in opposition to the project (Ex B–24(a) at 62–64), Mrs. Parry (Justice Larsen's next-door neighbor) who objected that about one-third of her scenic view would be obstructed (Ex B–24(a) at 64–65), and Mr. Grealish, the son of the owner of the property abutting the Highpointe site, who also raised objections concerning obstruction of view, overdevelopment, and increased traffic (Ex B–24(a) at 66–67). We also note the generally accommodating posture of the Zoning Board toward Highpointe witnesses and the rather hostile and curt demeanor of the Zoning Board toward the objectors who were cut-off, sped up, and hurried out in a less than impartial manner. (See Ex B–24(a), *passim; see especially* Ex B–24(a) at 44, 46, 48, 52, 53, 55, 56, 59–60, 62, *64*, 65, 66–67, *71*, 74). (Aaronson, TR at 535, 586; DiPlacido, TR at 409, 446–56; Mendelson, TR at 1528, 1548; EX B–24).

12. A second zoning hearing was held on January 5, 1984. Highpointe presented a revised plan which modified the extent of the variances requested. Neither the Department of Public Works nor the Fire Department raised objections to the revised plans. The City Planning Department objected to the proposed length of the complex, and the fact that in accor-

dance with the master plan, development of this kind should be restricted to the other side of Grandview Avenue. (Aaronson, TR at 545–47; DiPlacido, TR at 409; Mendelson, TR at 1548; EX B–24).

13. Despite the fact that Justice Larsen had entered an appearance through Attorney Grove as an objector in the first hearing, Justice Larsen did not receive notice of the second hearing until the day of the hearing. At the second hearing, Attorney Grove cross-examined witnesses, submitted exhibits, and testified as to the location of Justice Larsen's property; but again declined to present evidence of anticipated detriment to Justice Larsen's property which would only have been cumulative of objections raised at the prior hearing by neighborhood residents who also objected to the development, including Mrs. Parry (Justice Larsen's next door neighbor). The objections raised by Ms. Evans, Mrs. Parry, and Mr. Grealish at the first hearing were echoed and expanded upon by Mr. Burroughs, Mr. Reaves, Mr. Grealish, and Ms. Azzaro. (Ex 24(b), *passim*). There is no indication in this record that either Ms. Evans or Mrs. Parry was given timely notice of the second hearing, that the changes made between the first hearing and the second hearing in any way removed or reduced their adamantly stated objections, or that they were informed that changes had been made in the plans which would require a renewal of previously expressed adamant objections. (DiPlacido, TR at 409; Mendelson, TR at 1513, 1548; EX B–24).

14. The only evidence of "hardship" offered by Highpointe to justify the grant of the requested variances was the testimony of a Highpointe architect that "greater stability" for the proposed building could be achieved by stretching out the building. (Mendelson, TR at 1512–13; EX B–24a, at 27–28, 40–41, 43; EX B–24b, at 28–39).

15. The Zoning Board granted Highpointe variances and special exceptions as follows:

*Variances:*

| | | |
|---|---|---|
| Height | | 50' instead of 35' as required |
| Side Yard Setback | | 6'6" instead of 15'15" as required |
| Rear Yard Setback (balconies) | | 12' instead of 30' as required |
| Rear Yard Setback (structure) | | 17' instead of 30' as required |

*Special Exception*

permit use of 6 basements for dwelling occupancy (EX B–25, App. A).

16. Attorney Aaronson felt Highpointe had a strong legal position at this point. Highpointe believed that it had a strong technical challenge to the absence of evidence of Justice Larsen's standing; and, given the limited scope of review an appeals court might accept the claim of hardship based upon the geotechnical concerns in development. (Aaronson, TR at 725–26).

17. Attorney Mendelson felt Justice Larsen had a strong legal position. Justice Larsen's grounds for standing were obvious and incontrovertible. Any defect in proof at the hearing was excused by the improper notice of the second hearing, and the absence of challenge on that issue at the hearings. With respect to the variances, Attorney Mendelson felt the proof of required hardship was obviously inadequate, and that the variances could not be sustained on appeal. (Mendelson, TR at 1512–13).

18. Justice Larsen filed a timely appeal of the order granting the variances to Highpointe Associates.

19. In April 1984, Mr. DiPlacido went to Justice Larsen's office to convince him to drop his appeal. Justice Larsen's secretary was also present.

20. Mr. DiPlacido testified that he offered $100,000 for Justice Larsen to drop his appeal, but that Justice Larsen had demanded $500,000. Mr. DiPlacido also testified, in apparent self-contradiction, that Justice Larsen just didn't want the project built. When Mr. DiPlacido spoke with his partner Mr. Boyken, he indicated that Justice Larsen had been unwilling to talk about anything but his $500,000 demand. (DiPlacido, TR at 411–414; Boyken, TR at 3087).

21. Mr. DiPlacido's version of this meeting is contradicted by both Justice Larsen and Justice Larsen's secretary, Mrs. Roberts. They both indicate that Mr. DiPlacido was "unprofessional" and "abrasive," that he offered Justice Larsen $100,000 to drop his appeal but that Justice Larsen flatly rejected the offer, explained that he was not interested in a cash settlement, and that he simply did not want the project built. While Justice Larsen did attempt to explain his anticipated damages and the grounds for his objections to the project, he made no $500,000 settlement offer. Eventually, Mr. DiPlacido was ordered to leave. (Larsen, TR at 2562; Roberts, TR at 1410–12).

22. On November 12, 1980, Mr. Frank DiPlacido was arrested in the parking lot of a Federal Express Office in Greentree, Pennsylvania. He had just picked up a package containing 57.25 grams of cocaine which had been sent to him by an undisclosed source in Colorado. Assuming that it had already been cut to street purity, 57.25 grams of cocaine could provide between 1,908 and 2,862 standard 20–30 milligram doses of cocaine. *See Commonwealth v. Savage* [388 Pa.Super. 561], 566 A.2d 272, 274 nn. 1–2 (1989). In April 1981, he plead guilty to conspiracy and possession with intent to deliver (cocaine) felonies. (EX R–41; EX R–41a). We find the convictions to be relevant and admissible. *See Commonwealth v. Cunningham, supra,* 538 A.2d at 483–84 (exclusionary rule inappropriate in JIRB hearings); *Commonwealth v. Randall,* 515 Pa. 410, 528 A.2d 1326 (1987) (relaxing former restrictions on admission of prior convictions evidence); *Commonwealth v. Eubanks,* 511 Pa. 201, 512 A.2d 619 (1986) (emphasizing the diminished interest in excluding prior conviction evidence against witnesses rather than defendants); *see also Green v. Shearson Lehman/American Express, Inc.,* 675 [625] F.Supp. 382 (E.D.Pa.1985) (5 year old cocaine distribution conviction admissible in civil trial to discredit a witness, trial court had no discretion to exclude). Moreover, we did not find this particular witness credible generally.

23. Mr. DiPlacido also suggested that during this meeting Justice Larsen had acted as if he was concerned that Mr. DiPlacido might be "wired" with a listening device. Justice Larsen testified that he never thought, and never intimated that he thought Mr. DiPlacido was wearing a bodywire. Mrs. Roberts fully corroborated Justice Larsen's testimony on this point. We reject Mr. DiPlacido's testimony as clearly contradicted by evidence of two credible witnesses. We also note Justice Clarke's cogent observation that, "it is not uncommon for ignorant and corrupt men to falsely charge others with doing what they imagine that they themselves, in their narrow minds and experience, would have done under the circumstances." *Valdez v. United States*, 244 U.S. 432, 450 [37 S.Ct. 725, 730, 61 L.Ed. 1242] (1917). (Larsen, TR at 2562; Roberts, TR at 1410–12; DiPlacido, TR at 411–14).

24. Attorney Aaronson provided uncorroborated hearsay evidence that an associate, Attorney Flaherty, had spoken with Justice Larsen, and that Justice Larsen had indicated he would drop his appeal for $500,000. Attorney Flaherty did not testify and no contemporaneous business records (memorandums, letters) were produced to confirm the content of the alleged exchange between Justice Larsen and Attorney Flaherty. Justice Larsen unequivocally denies having ever made the statement. In light of Justice Larsen's excellent character for truthfulness and the patent unreliability of such wholly uncorroborated hearsay, we reject Attorney Aaronson's assertion. (Aaronson, TR at 541–42; Larsen, TR at 2563, 2769–72); *cf. Matter of Braig, supra,* 554 A.2d at 497 n. 5.

25. In order to avoid the appearance of attempting to influence the Zoning Board, the Church took no active role in the dispute with Justice Larsen until after the Zoning Board entered its order granting the variances and the special exception requested. (Cafardi, TR at 758).

26. When Attorney Cafardi first contacted Attorney Aaronson and Mr. DiPlacido, they indicated that Justice Larsen had placed his damages at $500,000. This assertion was made in conjunction with Mr. DiPlacido's request for a refund of $35,000 of the $100,000 earnest money paid to the Church in

order to pay Attorney Aaronson, and his associates, their legal fees. (Cafardi, TR at 758–59).

27. The only person to testify that Justice Larsen told him personally that he was willing to settle the case for $500,000 was Mr. DiPlacido. His testimony generally lacked credibility.

28. Several witnesses testified that Justice Larsen was unequivocally opposed to the project, and was not the least interested in any cash settlement offer at that point in the proceedings:

- —Judge McCormick indicated that Attorney Mendelson expressed to him Justice Larsen's lack of interest in a cash settlement to drop the appeal, and that Justice Larsen had confirmed his lack of interest in such a settlement in a telephone conversation with him (conducted with the knowledge and approval of all parties) (McCormick, TR at 1011–13);

- —Attorney Mendelson indicated that Justice Larsen was strongly opposed to the project, considered moving if it was built, and was not interested in a cash settlement. (Mendelson, TR at 1497–98)

- —Mr. Roberts, Justice Larsen's secretary, recalled that Justice Larsen had told Mr. DiPlacido that he was not interested in a cash settlement to drop his appeal, that she was aware that he was against the project going forward, and had not heard Justice Larsen express any interest in a cash settlement at that time. (Roberts, TR at 1409–13).

- —Nina Larsen, Justice Larsen's adult daughter, testified that Justice Larsen was opposed to the project going forward and that he was considering moving if it did. (N. Larsen, TR at 1392–94).

- —Justice Larsen, himself, testified that while he had talked about his damages with various witnesses to explain his opposition, he was not interested in a cash settlement to drop his appeal, and was seriously considering moving if the project went through. (Larsen, TR at 2558, 2917–18).

—Mr. DiPlacido, in apparent self-contradiction, testified that Justice Larsen didn't want the project build. (DiPlacido, TR at 411–14).

We reject Mr. DiPlacido's assertions regarding Justice Larsen's alleged settlement demands at that juncture, in light of Justice Larsen's denial, Justice Larsen's excellent reputation for truthfulness, and the corroboration of Justice Larsen's denial by several credible and disinterested witnesses, as well as Mr. DiPlacido's general lack of credibility and self-contradiction on this point.

29. The Allegheny County judges recused themselves to avoid any suggestion of partiality in favor of their former colleague, Justice Larsen, and so Chief Justice Nix assigned Westmoreland County Common Pleas Judge Richard E. McCormick. (Aaronson, TR at 577–79).

30. On May 31, 1984, Highpointe filed a motion to dismiss Justice Larsen's appeal on the technical ground that Justice Larsen had failed to put sufficient evidence on the record at the hearings before the Zoning Board to establish his standing. (Aaronson, TR at 540–75; EX B–28).

31. Attorney Mendelson, on Justice Larsen's behalf, petitioned the court to set the briefing schedule to expedite consideration of the standing issue. (Aaronson, TR at 579).

32. Attorney Cafardi petitioned to intervene on behalf of the Pittsburgh Catholic Diocese. This motion was unopposed. (Cafardi, TR at 760).

33. Attorney Mendelson countered the motion to dismiss on standing grounds with a motion for a *de novo* hearing on due process grounds. It was asserted that a *de novo* hearing was required because of the inadequate notice to Justice Larsen of the second hearing, especially in light of his status as a record objector at the first hearing. (Mendelson, TR at 1515).

34. The disposition of the dismissal motion and the motion for *de novo* hearing were of critical strategic significance. If dismissal was granted the project would go forward, whether or not its variances were proper, because, of the over 300 persons who had registered opposition to the project, Justice

Larsen had been the only one who had properly preserved his right to challenge the variances granted. If dismissal was denied or a de novo hearing was granted, Justice Larsen's standing problems could be easily corrected, and the appeal would then focus solely on the adequacy of Highpointe's proof of hardship. Justice Larsen's grounds for asserting standing were obvious and the burden in this respect was not an onerous one. Highpointe's objection was purely technical, *i.e.* that Justice Larsen had failed to place sufficient proof of standing on the record, and not that sufficient evidence could not be produced. (Aaronson, TR at 540–75, 579–81, 593, 598–99, Mendelson, TR at 1568–69).

35. While the motion for dismissal and the motion for a *de novo* hearing were pending, no settlement offers were made. (Aaronson, TR at 580).

36. On July 16, 1984, Judge McCormick held a conference with the parties on the motion for a *de novo* hearing. On July 24, 1984, Judge McCormick granted the motion for a *de novo* hearing and scheduled it for September 1984. (Aaronson, TR at 580–82).

37. The granting of a *de novo* hearing effectively removed the standing issue from the appeal, as Justice Larsen could easily supplement the record to meet the minimal standing requirements. Attorney Aaronson conceded that Highpointe's legal position on appeal was substantially undermined. (Aaronson, TR at 580–82).

38. After Judge McCormick granted the motion for a *de novo* hearing, a series of conferences were conducted in which Judge McCormick strongly urged settlement. (Aaronson, TR at 582; Mendelson, TR at 1526; McCormick, TR at 1010, 1013–14).

39. It was agreed by the parties that to facilitate non-acrimonious settlement negotiations Judge McCormick would meet or communicate with each party, *ex parte*, in turn. (Aaronson, TR at 582; Mendelson, TR at 1520; McCormick, TR at 1010).

40. When Attorney Mendelson first met with Judge McCormick, Judge McCormick indicated that he felt both sides faced risks and that the case should be settled. Attorney Mendelson explained that Justice Larsen was not interested in settling the appeal, as he did not want the project built. Judge McCormick indicated that Highpointe had offered $100,000. At Judge McCormick's urging, Mendelson agreed to begin negotiating toward a possible settlement, and set Justice Larsen's anticipated damages at $500,000, but he also indicated that Justice Larsen might not consent to any settlement. (Mendelson, TR at 1519–21; McCormick, TR at 1011–13).

41. Attorney Mendelson (and not Justice Larsen) selected the $500,000 initial anticipated damages assessment/settlement offer amount. He considered the amount fair, and had never heard any suggestion of immorality or impropriety from the Church or Judge McCormick. He further indicated his belief that neither he, nor the Church, nor Judge McCormick would have permitted themselves to be involved if Justice Larsen had made unethical settlement demands. (Mendelson, TR at 1521–23).

42. Attorney Cafardi recalled the settlement meeting at which the compromise figure was reached. Attorneys Cafardi, Aaronson, Grove, and Mendelson and Judge McCormick were present. Justice Larsen was not present. Highpointe offered $100,000; Mendelson made a counter offer of settlement for $500,000. Judge McCormick pressed hard for settlement and suggested separately to Attorney Cafardi that the Church come up with the money necessary to reach a compromise, which Attorney Cafardi at that time refused. Attorney Cafardi did not recall who suggested the $350,000 figure upon which a compromise was eventually based. (Cafardi, TR at 762–63).

43. Attorney Aaronson and Attorney Mendelson recalled that it was Judge McCormick who recommended a $350,000 settlement figure as a compromise. Judge McCormick recalled that he recommended a compromise figure, but believed that his figure had been $300,000. (Aaronson, TR at 614, 699; Mendelson, TR at 1521, McCormick, TR at 1014).

44. Attorney Mendelson took the $350,000 offer to Justice Larsen and recommended that he accept it. His principal justifications were:

—Judge McCormick had recommended settlement, and if no settlement was reached the matter would be decided without a jury by Judge McCormick;

—Although the $350,000 offer was less than his assessment of damages at $500,000, the offer would offset the cost of moving, assuming a new (higher) mortgage, lost time, fees and commissions on a new home purchase, and the lost investment potential of the unique location on the apex of Mt. Washington;

—Judge McCormick might be influenced by the fact that the Church was the seller of the property to Highpointe, and would be hurt financially if Justice Larsen's appeal was sustained; and finally,

—Given that Justice Larsen was to stand for retention in two years, he could not afford to antagonize and risk political opposition by the Church.

(Mendelson, TR at 1517–26; Larsen, TR at 2566).

45. Justice Larsen reluctantly agreed to accept the settlement offer. (Mendelson, TR at 1498. 1526. 1567, 1576–78; Larsen, TR at 2777, 2917).

46. Highpointe and the Church modified their prior agreement to grant Highpointe a credit on the sale price of one half of the settlement amount paid to Justice Larsen not to exceed $175,000.00, in anticipation of a $350,000.00 settlement of Justice Larsen's zoning appeal. (EX B–38; Aaronson, TR at 586–87; Cafardi, TR at 764; Mendelson, TR at 1522).

47. Settlement proved elusive, however, as Justice Larsen expected payment of the settlement amount upon discontinuance of his appeal, but Highpointe did not intend to make *any* payment on settlement until final closing, which could be a considerable time later. Negotiations then focused on how payment on settlement would be made, and whether and how much Justice Larsen would be compensated if payment was

delayed until closing. (Aaronson, TR at 587; Mendelson, TR at 1555–56).

48. Between January 1985 and August 1985 a series of offers and counter-offers were made in an effort to resolve the conflict regarding the payment of the settlement amount. No agreement was reached. (Aaronson, TR at 586–88, 591; Mendelson, TR at 1565–67; EX B–20; EX B–31).

49. Attorney Mendelson and Attorney Aaronson differ in their recollection of the terms of the offers and whose suggestion particular offers were. A series of memoranda from Attorney Aaronson to Mr. DiPlacido were submitted to the Board as exhibits. Their accuracy and significance were contested and remain questionable. They provide in pertinent parts as follows:

January 25, 1985:

As I discussed with both of you earlier this week, Justice Larsen has now proposed a modification to the terms of the *draft* Settlement Agreement that I forwarded to Leonard Mendelson last month.

*Mendelson* indicated that it was Justice Larsen's position that the *terms of the proposed Settlement Agreement were predicated on his understanding that your business deal would be closed in January, and that he would, therefore, be paid in January.* Since the draft Settlement Agreement allows us to pay Larsen as late as mid-April, Larsen had demanded the payment of additional consideration for any payment made beyond January 31, 1985.

He has proposed two options. First, that the settlement payment be increased by $25,000.00 for each calendar month beyond January until payment is made. (Extending, however, to not later than April). In the alternative, if we pay $100,000.00 at the time of the execution of the Settlement Agreement, the "escalation" amount for each month beyond January is decreased from $25,000.00 to $10,000.00.

June 26, 1985:

*I spoke with Leonard Mendelson* yesterday reiterating your *earlier conveyed offer to pay an additional* $5,000 *per month until closing* in addition to the agreed upon settle-

ment amount, which $5,000 per month payment would commence this month. In response to Mendelson's observation that *this offer was less favorable* than the *offer you made 3 months ago which would have made the* $5,000 *per month additional payment retroactive to February,* I advanced your argument that had the matter been settled back then, you would have been much further along with respect to financing and other related matters.

Mendelson called me back and told me that *Larsen had refused this latest offer.*

As we have discussed for the last few months, *I am very concerned that the failure to reach a settlement agreement after all these months will convince Judge McCormick that settlement is not forthcoming and that the matter should be set down for trial. Of even more concern is that, in reaching this conclusion, the Judge may also allow* the intervention *of William Parry* if he assumes that the matter is not going to be resolved and is going to be litigated anyway. As I told you in my letter of April 26, Parry's intervention will make any settlement with Larsen moot if Parry intends to contest the Zoning Board approval regardless of Larsen's presence in the case.

August 15, 1985:

As we discussed on Thursday, August 8, it is my opinion that *unless you reach an immediate settlement with Larsen,* it is likely *that Judge McCormick will allow the Parry* intervention. Once Parry is permitted to intervene, any settlement with Larsen will become meaningless.

Moreover, if an immediate settlement is not reached, Leonard Mendelson has indicated that Larsen will withdraw his objection to Parry's intervention, reasoning that if no settlement is forthcoming the matter will have to go to trial and, in such event, *Larsen is better off from a cost point of view as well as a public relations point of view if there is another substantial party in the litigation on his side.*

While a settlement with Larsen at this point in time does not, as a matter of law, affect whatever right of intervention Parry may have, *as a practical matter,* I think *Judge McCormick is much more likely to rule against Parry's intervention if a settlement agreement has been reached.*
August 23, 1985:

*Leonard Mendelson* called me this morning with the following response in connection with the settlement of the litigation.

In lieu of the $5,000 per month payment, Larsen countered with the following. A payment of $75,000, not to be credited against the $350,000 settlement amount, would be paid immediately. The obligation to pay the $75,000, however, would be predicated on the Common Pleas Court refusing the Parry intervention. If the Common Pleas Court refused the Parry intervention, the $75,000 payment would be due *regardless* of a Parry appeal of the Common Pleas Court decision to the Commonwealth Court.

In essence, Larsen is asking you to bet $75,000 that the Commonwealth Court will uphold a Common Pleas Court refusal of intervention. *This one-time $75,000 payment, however, would also give you whatever additional time was necessary after the resolution of the Parry* question to put the deal together. *In other words, rather* than *paying* $5,000 *a month until the closing, the* $75,000 *payment settles the litigation with Larsen and buys whatever time is required to (a) settle the Parry dispute and (b) put the deal together.* At closing the $350,000 payment to Larsen would be due.
September 30, 1985:

Enclosed is a copy of the favorable decision from Judge McCormick denying the Parry's request to intervene in the above-referenced matter. The Parrys have 30 days from the date of the decision to appeal that denial to Commonwealth Court should they choose to do so.

*If the Parrys do appeal the denial of intervention, it will take approximately 1 year for that appeal to be decided by the Commonwealth Court.* If they do not appeal, some

decision will still have to be made with respect to the settlement of this matter with Justice Larsen since Judge McCormick will probably want to set a trial date if the Parrys are out of the case.

In any event, *no decision needs to be made until we see whether the Parrys are going to appeal* the denial of intervention.

Aaronson, TR at 595–97, 602–04; Mendelson, TR at 1524–25, 1568–69; EX B–31; EX R–11; EX B–33; EX B–34; EX B–36; Mendelson, TR at 1566–67) (emphasis added).

50.  On May 1, 1985, Mr. and Mrs. William Parry petitioned to intervene in Justice Larsen's appeal.  Their property stood between that of Justice Larsen and the project.  Though Mrs. Parry had appeared and testified at the first hearing as an objector, they had not attempted to challenge the variances by appeal until 14 months after the 30 day appeal period had expired.  The Parrys' had moved from that property shortly after the variances they objected to had been granted.  They explained in their petition to intervene that they had not thought their intervention would be necessary to preserve their interests until they learned that Justice Larsen was considering settlement of his appeal.  (Aaronson, TR at 592; Mendelson, TR at 1524–25, 1582–84; EX B–24a; EX B–24(b)).

51.  Highpointe strenuously objected to the proposed intervention, which would have rendered the settlement with Justice Larsen meaningless, and would have doomed the project to considerable delay, settlement expense, or discontinuance of the project altogether.  No settlement offers were made by Highpointe to the Parrys despite the fact that Highpointe conceded that their property was more immediately and substantially affected by the proposed project than was Justice Larsen's property for which they were negotiating compensation for damages.  Instead, Highpointe elected to take advantage of the legitimate strategic advantage the Parry's delay in asserting their rights had created in Highpointe's favor.  (Aaronson, TR at 596–97; Zagari, TR at 321, 356; Scalise, TR at 290; Mendelson, TR at 1568–69).

52. Attorney Mendelson first indicated Justice Larsen's opposition to the petition, based upon the effect the Parrys' intervention would have on virtually completed settlement negotiations. However, when a final settlement did not materialize, Attorney Mendelson indicated to Highpointe that he would withdraw Justice Larsen's objection to intervention on tactical grounds. Mr. Parry was chairman of the Alcoa Corporation and his presence in the appeal might substantially lessen any adverse political consequence, as well as divide the costs of appeal. When Highpointe made no steps to finalize settlement, Attorney Mendelson wrote to Judge McCormick and formally withdrew Justice Larsen's opposition to the Parrys' intervention motion. (Aaronson, TR at 595–97; Zagari, TR at 317, 326–29, 353; Larsen, TR at 2569, 2781; Mendelson, TR at 1524–25; EX B–32; EX B–33; EX B–34; EX B–35).

53. Nonetheless, on September 27, 1985, Judge McCormick denied the Parrys' petition to intervene. Settlement negotiations between Justice Larsen and Highpointe remained on hold, however, pending resolution of the Parrys' appeal to the Commonwealth Court. (Aaronson, TR at 605–06; Mendelson, TR at 1525; EX B–36).

54. After the Parrys appealed to the Commonwealth Court, both Attorney Aaronson and Attorney Mendelson withdrew from the case. Attorney Aaronson withdrew because Highpointe failed to pay his attorney's fees. (Aaronson, TR at 607; Mendelson, TR at 1537).

55. Attorney Carol Rosenbloom became Justice Larsen's attorney after Attorney Mendelson's withdrawal. (EX B–12).

56. In late 1985, Attorney Mendelson had a chance meeting with the late Mayor Richard Caliguiri during which the Mayor told Attorney Mendelson that the Church had asked him to see if he could help remove the stumbling blocks Justice Larsen and Attorney Mendelson had presented to the project. Attorney Mendelson passed this message on to Justice Larsen. Justice Larsen indicated he had also spoken with the Mayor and that he would try to get things moving again. Attorney Mendelson interpreted that as an indication of a

change of heart by Justice Larsen, though Justice Larsen had not indicate to him (or presumably the Mayor) that his cooperation would include a modification of his offers as to the amount or timing of settlement. (Mendelson, TR at 1537–40; Larsen, TR at 2582, 2586).

57. In January or February of 1986, Attorneys Zagari and Scalise became Highpointe's attorneys for the Parrys' appeal in the Commonwealth Court. (Zagari, TR at 321–22; Scalise, TR at 289–90).

58. Justice Larsen contacted Attorney Zagari regarding the Parrys' appeal. After receiving formal advice from the Allegheny County Bar Association's Ethics Committee, and a letter of consent from Attorney Rosenbloom, Attorney Zagari began direct discussions with Justice Larsen concerning the Parrys' appeal. (Zagari, TR at 318, 353; EX B–12).

59. By the time Attorney Zagari met Justice Larsen the first brief had already been filed. At a meeting with Justice Larsen and Attorneys Zagari and Scalise, Justice Larsen made minor suggestions regarding emphasis of various points raised in the brief, he reviewed the draft of the reply brief and made grammatical correction suggestions and provided a few case citations, but he rejected the suggestion that he join the brief as another shift in his position on the Parry intervention petition would not be helpful. (Zagari, TR at 322–25, 344, 356; Scalise, TR at 306–12; Larsen, TR at 2581–82).

60. The second reply brief reflected Justice Larsen's suggested shift in emphasis and incorporated handwritten revisions made on a draft of the brief by Justice Larsen. (Scalise, TR at 297–99; EX B–11).

61. Eventually, Justice Larsen acquiesced, and noted on the record in the Commonwealth Court his joinder in Highpointe's brief. (Scalise, TR at 302, 310; EX B–15).

62. At Justice Larsen's suggestion, Attorney Zagari filed for advancement in the Commonwealth Court. In October 1986, the Commonwealth Court affirmed Judge McCormick's order

denying the Parrys' petition to intervene.  (Zagari, TR at 329, 334–35).

63.  In June, while the Parry appeal was still pending, Justice Larsen met with Attorney Kelly regarding a possible extension of the final closing date in the Church's agreement with Highpointe.  Justice Larsen explained that because of the Parrys' appeal, the settlement date could not be met, and that an extension was necessary.  When Attorney Kelly suggested that there were other possible buyers, Justice Larsen responded that they would face similar zoning problems, likely delays, and that it would not make sense to go back to square one.  Attorney Kelly did not think Justice Larsen was being helpful, and concluded that he was only trying to preserve his own settlement.  Nonetheless, an extension was granted by the Church.  (Kelly, TR at 471–78).

64.  Justice Larsen then renewed settlement negotiations with Attorney Zagari by indicating his willingness to accept Highpointe's April 1985 offer of $350,000 plus $5,000 per month from February 1985.  While acknowledging this early offer had since mushroomed to over $120,000, Justice Larsen indicated that he intended this as a high offer from which to begin to negotiate down.  Attorney Zagari rejected that offer outright, and suggested that Justice Larsen accept the $350,000 settlement at closing without any compensation for the delay in payment, despite prior delay payment offers by Highpointe.  Attorney Cafardi noted that while Attorney Aaronson had sought settlement actively, Attorney Zagari did not.  (Zagari, TR at 336–40;  Cafardi, TR at 763–68, 782;  Larsen, TR at 2777–83).

65.  The negotiations reached an impasse, and the Church indicated that it was not inclined to further extend its option agreement with Highpointe.  At Mayor Caliguiri's request, Justice Larsen agreed to acquire the plans for review by Mr. Scigliano, a real estate developer and close friend of the Mayor, whom the Mayor hoped might be able to salvage the project.  Mr. Scigliano had been given plans to review previously by Mr. DiPlacido, but had thrown them away.  Justice Larsen told the Mayor that he felt the development was an

unwise investment, but nonetheless acquired the plans for Mr. Scigliano to review. Mr. Scigliano reviewed the plans, returned them, and informed the Mayor that the project could not be salvaged. (Larsen, TR at 2794–98; Scigliano, TR at 1192–95, Zagari, TR at 344–46).

66. Attorney Zagari indicated that neither he nor Mr. DiPlacido knew Justice Larsen was requesting the plans so that Mr. Scigliano could review them, but that Justice Larsen had informed them that it was a potential buyer. Attorney Zagari was of the opinion that Justice Larsen's conduct was calculated, nonetheless, to salvage the project and thereby aid Highpointe, the Church, Mayor Caliguiri, and to preserve his own $350,000 settlement as well. Justice Larsen characterized this conduct as an accommodation to his good friend Mayor Caliguiri, and a genuine effort to help the Church. (Scigliano, TR at 1192–95; Zagari, TR at 344–46; Larsen, TR at 2794–98).

67. In May 1987, Highpointe failed to attend settlement and their option was not renewed. The Highpointe condominium project was dead. As of August 1989, the Church land was still for sale, and Highpointe owed the Church $20,000. (Zagari, TR at 341, 366; EX B–18).

### C. LARSEN'S ANTICIPATED DAMAGES IF THE HIGHPOINTE PROJECT HAD BEEN COMPLETED AS PLANNED

1. Justice Larsen anticipated the following damages if the Highpointe zoning variances were sustained:

   a) oversaturation of the condominium market driving down the condominium property values;

   b) obstruction of a unique scenic view causing annoyance and reducing his property value;

   c) increased traffic and decreased safety, again causing annoyance and reducing his property value;

   d) increased parking problems, causing annoyance and decreased property values;

416

e) setting a precedent for further construction contrary to the master plan for the area, and contrary to a zoning code, causing annoyance and a substantial threat to property values.

(Mendelson, TR at 1510–12; Larsen, TR at 2567–76, 2820, 2846–48).

2. Justice Larsen was sufficiently distressed by the prospect of the completed Highpointe project that he was seriously considering moving and anticipated the cost of moving, assuming a new (higher rate) mortgage, real estate commission costs on the sale of the condominium and the purchase of a new home, and the annoyance of losing his unique scenic location and of having to move in general. His neighbors, the Parrys, had been so distressed by the prospect of the completed development that they moved when the variances were granted. (Mendelson, TR at 1517 Larsen, TR at 2567–76, 2820, 2846–48; N. Larsen, TR at 2558).

3. Various witnesses corroborated different aspects of Justice Larsen's anticipated damages as genuine concerns of Justice Larsen:

—The settlement agreement drafts to which Highpointe and Attorney Aaronson had agreed, stipulated that the $350,-000 settlement payment represented damages to offset interference with Justice Larsen's rights in air, light and view as well as the diminution in his property value. Attorney Aaronson acknowledged these terms had been agreed to, but claimed that he did not agree that such damages existed, and had assumed they were included for tax purposes. (Aaronson, TR at 583–88; 614–16; EX B–20).

—Attorney Cafardi indicated that analysis of Justice Larsen's anticipated damages was not the focus of settlement negotiations, but that Justice Larsen's overriding concern seemed to be overdevelopment in the area. (Cafardi, TR at 766–68).

—While Highpointe representative at the zoning hearing asserted that Highpointe would have twice the parking required, he conceded that that would still be only two

spaces per luxury apartment, with minimal visitor parking, and that many of the spaces would be located in a private lot a block further away from Highpointe than Justice Larsen's condominium, thus making it likely that nearer spaces would be filled by Highpointe visitors and residents. (EX B–24; EX B–24a).

—Judge McCormick indicated that both Attorney Mendelson and Justice Larsen had expressed concern regarding the obstruction of Justice Larsen's view and the impact of the Highpointe project on his property's value. (McCormick, TR at 1011–16).

—Nina Larsen, Justice Larsen's adult daughter, testified that Justice Larsen felt the project would decrease property values, obstruct the scenic view from his condominium, and that he might have to move. (N. Larsen, TR at 1392–98).

—Mrs. Roberts, Justice Larsen's secretary, testified that Justice Larsen had told Mr. DiPlacido at a meeting in April 1984 in her presence that he was concerned about the effect of the Highpointe project on property values, as well as his personal concerns regarding parking and other matters. (Roberts, TR at 1410–16).

4. Evidence of the amount or value of the damages Justice Larsen anticipated as a result of the Highpointe project as proposed was neither required nor even particularly relevant at the hearings before the Zoning Board or on appeal before Judge McCormick. All that was required was that Justice Larsen meet the minimal impact threshold to establish standing. On appeal, if Justice Larsen had been successful, the variances would have been revoked; if he had not, the variances would have been upheld. In neither case, would Justice Larsen be entitled to damages. Consequently, there was no reason to go to the expense of a detailed expert evaluation of the anticipated damages at that time. (Mendelson, TR at 1518, 1571; Aaronson, TR at 540–75; 579–81, 593, 598–99).

5. Though representatives of both Highpointe and the Church questioned the existence and amount of damages suggested by Attorney Mendelson in negotiations, neither the

Church nor Highpointe undertook an independent appraisal of the impact of the Highpointe project on Justice Larsen's property. Rather, both proceeded with negotiations despite their own reservations, knowing that neither they nor Justice Larsen had undertaken the expense of such a detailed professional analysis of the impact. The negotiations simply did not focus upon the question of what Justice Larsen's actual anticipatable damages might be. (Aaronson, TR at 609; Zagari, TR at 392–93; Cafardi, TR at 766, 784, 788; Kelly, TR at 477–78, 480–86; McCormick, TR at 1011).

6. Attorney Mendelson, a real estate attorney with over 20 years experience, testified that he (and not Justice Larsen) had made the initial assessment of Justice Larsen's anticipated damages. He provided detailed testimony regarding the factors which he felt justified the $500,000 initial assessment. He specifically reaffirmed his assessment of that figure as a fair compromise which under-compensated Justice Larsen. (Mendelson, TR at 1498–1518, 1562–79).

7. Attorney Mendelson's testimony regarding the reasonableness of Justice Larsen's settlement offers was supported in part by the even more detailed analysis of expert real estate appraiser Mr. Daniel Smith. (Smith, TR at 1642–43, EX R–9; EX R–35).

8. Attorney Mendelson's testimony was also supported in part by the testimony of expert real estate appraiser Mr. John Welsch, whose testimony was more limited in scope but which substantially confirmed the reasonableness of Attorney Mendelson's assessment of the damages to Justice Larsen's property value if the Highpointe project had been built as planned. (Welch, TR at 2391, EX R–54).

9. While the Board's appraiser indicated a lower appraisal value than Mr. Smith, Mr. Welsch, or Attorney Mendelson, he did not indicate that he considered their appraisals unreasonable. Moreover, Mr. Nell's appraisal considered only the market value of the condominium and the likely impact of the project on the market value; no incidental, consequential, sentimental, speculative or idiosyncratic values or anticipated

damages were considered in his assessment. (Nell, TR at 2225–85).

## D. SUBJECTIVE IMPRESSIONS OF PARTICIPANTS

1. The following persons agreed that they did not feel that Justice Larsen had in any way attempted to use his status as a Supreme Court Justice to influence this matter in his favor:

— Judge Richard McCormick    (TR at 1012, 1014–16);
— Attorney Joel Aaronson    (TR at 682–83);
— Attorney John Zagari    (TR at 348–52);
— Attorney Nancy Scalise    (TR at 305);
— Attorney Leo Kelly    (TR at 486);
— Attorney Nicholas Cafardi    (TR at 780–81);
— Attorney Leonard Mendelson    (TR at 1519).

2. Both Judge McCormick and Attorney Mendelson specifically testified that they did not find anything illegal, tortious, or unethical about Justice Larsen's conduct in this matter. Attorney Mendelson further stated that he did not think Justice Larsen, Bishop Bevilacqua, Judge McCormick, or Attorneys Aaronson and Cafardi would have participated (as they all had) in anything they felt was unethical or immoral. (McCormick, TR at 1016; Mendelson, TR at 1522–24, 1535).

3. Attorney Kelly indicated that he had "moral" reservations regarding the Church's participating in settlement based on information he had concerning the value of Justice Larsen's property, and that there was some sentiment in the Church against participating in the settlement. Attorney Kelly disclosed neither the source nor substance of the information upon which he based his opinion of the reasonableness of the settlement offer, nor did he elaborate upon the identity and grounds for dissent by Church members or officials allegedly opposing settlement. That evidence was inadmissible hearsay, entitled to no weight. *Cf. Matter of Braig, supra,* 554 A.2d at 497 n. 5. Significantly, the Church, nonetheless, formally agreed to credit Highpointe one half the settlement amount to Justice Larsen against their purchase price up to a maximum credit of $175,000.00 (or half of $350,000.00 settlement), and granted an extension of Highpointe's option in the hope that

settlement could be reached. (Kelly, TR at 477–84; EX B–38).

4. Attorney Aaronson testified that Judge McCormick had characterized Justice Larsen's offer as "legal extortion." Attorney Aaronson acknowledged that he could not recall whether Judge McCormick had been referring to the original $500,-000 offer or the $350,000 compromise figure. Judge McCormick, however, indicated that he could not recall if he or if Attorney Aaronson had used the phrase, and indicated that if he had said it, he would have meant it "facetiously." In either case, the oxymoronic figure of speech is of little if any relevance. Judge McCormick testified further that he had no reason to think Justice Larsen had not been acting in good faith, and that he did not believe Justice Larsen had done anything improper. Although Judge McCormick indicated that he did not share Justice Larsen's view of the anticipated damages, we note the significant fact that neither Justice Larsen nor Highpointe had presented any evidence expert or otherwise to Judge McCormick on the issue of damages, which in fact was not an issue in the proceedings then pending before Judge McCormick, but was relevant only to the parties as an informal guide in settlement negotiations. When asked directly whether he had been informed of the basis for Justice Larsen's anticipated damages, Judge McCormick responded, "Not very much in detail, but I was aware of what had been done before the hearing board ... we didn't go into great detail, no." (Aaronson, TR at 681, 709; McCormick, TR at 1011, 1015–16).

## VI. DISCUSSION: CHARGE II

The second charge alleges a censurable appearance of impropriety in violation of Canons 1 and 2 arising from Justice Larsen's alleged misconduct in "using the legal process for a purpose other than for which it was designed, and as a weapon in an attempt to coerce an inordinantly large financial settlement."

We analyze this charge as follows. First, we find that Canons 1 and 2 prohibit the use of legal process in the manner described only to the extent that the filing of a frivolous suit, or tortious conduct analogous to either malicious prosecution or abuse of process by a judge could constitute censurable misconduct. We then apply the law of zoning to the facts of this case and conclude that Justice Larsen's appeal was highly likely to succeed, and therefore any suggestion of malicious prosecution by Justice Larsen was unfounded. Finally, we find that the law of permanent nuisance rather than eminent domain is the appropriate gauge for determining the reasonableness of Justice Larsen's settlement demands, and that given the subjective nature of the damages Justice Larsen was entitled to consider, we cannot say that his settlement offers, which could be inflated for negotiation purposes, were plainly excessive. Hence, a suggestion of abuse of process could not sustained by this record.

We conclude that no censurable misconduct was established, and that the charge must be dismissed.

## A. SCOPE OF CANONS 1 AND 2 WITH REGARD TO ALLEGATIONS OF OFF–BENCH MISCONDUCT

Before we can determine whether ethical misconduct warranting a recommendation of discipline to our Supreme Court has occurred, we must first determine the yardstick by which the challenged conduct is to be measured. There is a serious conflict of opinion here between Justice Larsen and Board Counsel.

It is suggested on one hand that off-bench conduct only constitutes ethical misconduct in violation of Canons 1 and 2 if the off-bench conduct is prohibited by law. (Respondent's Proposed Findings of Fact and Conclusions of Law, at 138). On the other hand, it has been suggested by Board Counsel that Canons 1 and 2, prohibit not only illegal or tortious abuses of legal process, but also requires such a judge litigant to forego reliance upon legitimate strategic advantages regularly pressed in negotiations by other litigants, because of an

avowed concern that the public might perceive settlement as the result of the judge litigant's adversary's perception that the legal system would improperly favor the judge litigant. We accept neither suggestion.

Neither the public, nor the Canons are as indulgent or as jaundiced as either of those extreme constructions of Canons 1 and 2 suggest. Rather, a reasonable construction of the mandate of the Canons leads us to a position between those two extremes.

The applicable Canons provide as follows:

Canon 1:

## A JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

Canon 2:

## A JUDGE SHOULD AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY IN ALL HIS ACTIVITIES

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or knowingly permit others to convey the impression that they are

in a special position to influence him. He should not testify voluntarily as a character witness.

Professor Thode, in his commentary on the Code of Judicial Conduct, has opined:

The text of Canon 1 places an obligation on a judge to observe high standards of judicial conduct and to participate in establishing, maintaining, and enforcing those high standards. The last two sentences of the text make clear that if a judge is aware of a need for new or changed standards, he has an obligation to work toward their establishment. *Similarly, if a judge is aware of conduct by another judge that is in violation of a mandatory standard of this Code, the first judge has an obligation to bring the violation to the attention of the proper disciplinary authorities so that high judicial standards can be maintained and enforced. Canon 3B(3) prevents any possible doubt about the existence of this latter obligation by establishing it in specific language.* The Committee was convinced that the public and the judiciary are entitled to have each judge fulfill these obligations.

\*      \*      \*      \*      \*      \*

The black-letter statement of Canon 2 is very broad in its terms and perhaps the nearest to being hortatory of any provision in the Code. Its origin is found in old Canon 4. The Committee was of the opinion that despite the generality, an "impropriety and the appearance of impropriety" standard is necessary. The need for frequent references to that standard throughout the Reporter's Notes demonstrates the wisdom of that decision.

Thode, *Reporter's Notes to the Code of Judicial Conduct*, at 46–47 & 49 (ABA 1973).

When discussing these provisions in the abstract courts and commentators have tended to wax eloquent in their hortative admonitions, emphasizing the "reverence" in which judges are held, and the importance of off-bench "propriety." In *In re*

*Greenberg,* 442 Pa. 411, 280 A.2d 370 (1971) for example, our Supreme Court opined:

> *"The place of justice is a hallowed place; and therefore not only the bench but the foot-pace and precincts, and purprise thereof ought to be preserved without scandal and corruption. \* \* \* " So spoke Sir Francis Bacon in the 16th Century.* For generations before and since it has been taught that a judge must possess the confidence of the community; that he must not only be independent and honest, but, equally important, believed by all men to be independent and honest. A cloud of witnesses testify that "justice must not only be done, it must be seen to be done." Without the appearance as well as the fact of justice, respect for the law vanishes in a democracy.

280 A.2d at 372.[6] Professor Martineau has collected a representative sample of similar expressions from other jurisdictions in his law review article. *See* Martineau, *Disciplining Judges for Non-official Conduct,* 10 U.Balt.L.Rev. 225, 231–34 (1981) (emphasis added); *cf.* Rifkind, *A Judge's Non–Judicial Behavior,* 38 N.Y.St.B.J. 22, 22–23 (1966) (expressing a peculiarly broad view of the restrictions on off-bench conduct including prohibition of "dress[ing] in an excessively high style, or play[ing] too hard.").

While the importance of both on-bench and off-bench propriety should not be understated, such hortative admonitions are an inadequate substitute for careful analysis in the application of the canons *in concrete cases.* The question in such cases is not *whether* off-bench conduct may be proscribed, but whether and to what extent *particular* conduct may constitute censurable judicial misconduct.

**6.** Two things ought to be noted concerning this oft cited quotation of Sir Francis Bacon. First, on March 25, 1620, Bacon himself was removed from the bench for accepting bribes. *See* Hall, *Bacon and the Corruption Issue,* 6 J.L.Hist. 201, 201 (Eng.1985); Kurland, *The Appointment and Disappointment of Supreme Court Justices,* 1972 Law & Soc.Order 183, 222–23 (1972) (discussing Bacon's removal, and noting the political *animus* of Sir Edward Coke which drove the removal proceedings). Second, in Bacon's essay "On Judicature" the oft cited quotation regarding "foot-pace and precincts and purprise thereof" referred to the corruption of the judge's clerks and ministers and not to off-bench judicial misconduct, as is often implicitly suggested.

That the Code of Judicial Conduct forbids or requires acts neither forbidden nor required by ordinary citizens, or even attorneys subject to other ethical restriction, is both readily apparent and incontrovertible. The express provisions of Canons 2, 3, 4, 5, 6 and 7 each contain restrictions and mandates which address non-criminal, and even non-tortious conduct. There is no particular controversy with regard to the legitimacy of canonical restrictions on non-criminal, non-tortious conduct which are specifically identified and prohibited by clear provisions in the canons. Each such mandate or restriction has a demonstrably legitimate nexus to the overarching purpose of preserving both the integrity and independence of the judiciary. The controversy arises from attempts to translate the broad-brush hortative admonitions of Canons 1 and 2 into guides of conduct and rules of discipline standing by themselves.[7]

Our Supreme Court noted in the plurality opinion in *Matter of Dalessandro, supra:*

[7]. *See generally* Shaman, *Judicial Ethics,* 2 Geo.J.L.Ethics 1, 1–20 (1988); Lubet, *Regulation of a Judge's Business and Financial Activity,* 37 Emory L.Rev. 1, 1–44 (1988); Lubet, *The Search for Analysis in Judicial Ethics or Easy Cases Don't Make Much Law,* 66 Neb.L.Rev. 430, 430–44 (1987); Shaman, *Off–the–Bench Conduct,* 57 Pa.B.Q. 24, 24–29 (1986); Lubet, *Judicial Impropriety,* 1986 Ariz.St.L.J. 379, 379–99 (1986); Lubet, *Judicial Ethics and Private Lives,* 79 Northwestern U.L.Rev. 983, 983–1008 (1985); Markey, *The Delicate Dichotomies of Judicial Ethics,* 101 FRD 373, 373–89 (1984); Blynt, *Judicial Discipline,* 84 Dickinson L.Rev. 447 (1980); Martineau, *Disciplining Judges for Non–Official Conduct,* 10 U.Balt.L.Rev. 225, 225–45 (1981); King, *Judicial Activities and Ethics,* 75 FRD 107, 107–16 (1977); McDevitt, *Judicial Disability and Removal Commissions,* 45 Pa.B.Q. 118, 118–21 (1974); Rehnquist, *Sense and Non–Sense About Judicial Ethics,* 23 The Record 694, 694–713 (1973); Hall, *Judicial Removal For Off–Bench Behavior,* 21 J.Pub.L. 127, 127–49 (1972); McKay, Judges, *The Code of Judicial Conduct, and Nonjudicial Activities,* 1972 Utah L.Rev. 391, 391–401 (1972); Frankel, "Judicial Conduct, Discipline and Removal, and Involuntary Retirement," *in The Improvement of the Administration of Justice,* at 55–61 (ABA 5th ed. 1971); Kaufman, *Lions or Jackels: The Function of a Code of Judicial Ethics,* 35 L. & Cont.Prob. 3, 3–8 (1970); McKay, *The Judiciary and Nonjudicial Activities,* 35 L & Cont.Prob. 9, 9–36 (1970); Rifkind, *A Judge's Nonjudicial Behavior,* 38 N.Y.St.B.J. 22, 22–28 (1966).

Of necessity, the Canons of Judicial Ethics are written in broad language. Prohibitive canons or rules, or laws of any kind written with such a broad brush, give very little notice to those affected regarding the kinds of specific conduct prohibited. Nor can it be otherwise. It would be impossible to conceive of, or specifically enumerate, every situation which might arise.

397 A.2d at 751 (plurality *per curiam*, Manderino and Larsen, JJ., join). On the other hand, a more recent majority opinion of our Supreme Court admonished:

As far as the interpretation of the Code of Judicial Conduct and its application, we recognize that the Code is written in broad language. *Prohibitive canons or rules, or laws of any kind, written with a broad brush as are our Rules of Judicial Conduct, given very little notice to those affected regarding the kinds of specific conduct prohibited. The broadness of Canons is considered in determining the degree of notice afforded a judge consistent with due process. We have also made clear that the whole of the Code of Judicial Conduct does not have the force of substantive law,* rather, it imposes standards of conduct upon the judiciary to be referred to by a judge in his *self-assessment* of whether to act in a particular manner.

The interpretation of those canons is within our sole jurisdiction and the application and enforcement of those canons is a part of our exclusive role as administrative and supervisory head of the unified judicial system in our Commonwealth. Where we determine that the canons have been violated, we unhesitatingly impose discipline to insure public faith in the integrity of our judiciary and in fulfillment of our constitutional role.

The JIRB, in conformance to legal evidence, can only proceed upon probable cause for an identifiable, defined offense. That is *they do not have independent authority to determine what is appropriate, they can only determine what conduct is or is not appropriate according to a promulgated rule. Not their rules, but rules*

*defined as the Constitution provides, by the judicial Canons and rules of procedure enacted by this Court. Nor are they entitled to interpret them according to what they believe they ought to provide.*

*Matter of Chiovero, supra,* 570 A.2d at 60–61 (emphasis added) (citations omitted). We have considered both admonitions in analyzing this charge.

Despite the broad brush with which Canons 1 and 2 are painted, certain types of conduct are conceded to fall properly within their prohibitive mandate. A judge plainly violates Canon 1 if he ignores the separation of powers and becomes excessively entangled in the prosecutorial functions of the police and district attorney, and likewise violates the canon if the judge persistently defies lawful orders of a superior tribunal and wilfully refuses to discharge judicial duties in accordance with laws with which the judge disagrees. *See e.g. In Re Hogue [Hague],* [412 Mich. 532] 315 N.W.2d 524 (Mich. 1982); *State of Wotring* [167 W.Va. 104], 279 S.W.[S.E.]2d 182 (W.Va.1982). Similarly, it is uniformly agreed that Canon 2 prohibits any attempt by a judge to intervene on his own behalf or a friend's behalf with regard to a matter pending before another judge. *See generally Lawyer's Manual on Professional Conduct,* § 61:2201 (ABA/BNA 1985) (collecting cases). Thus, even the principle of regulating non-criminal, non-tortious, and non-specified behavior is generally accepted as legitimate in some circumstances.

In 1970, however, Professor McKay cautioned,

The more relaxed standards of yesterday are no longer acceptable. But this relatively abrupt change in attitude creates problems. As a result of this new zeal for a higher ethics in performance of the judicial function, some *judges are charged with wrongdoing where there is not fault by any standard, and others are held responsible for failure to meet a standard never before demanded, and only now in the process of formulation.* [ . . . ] New standards of judicial conduct, now being developed, must satisfy two broad objectives. On the one hand, the standards must be appropriately demanding to the end that justice is facilitated in every

possible way. At the same time the standards must ensure that the judges are not unnecessarily separated from the communities they serve in straitjackets of judicial isolation.

The problems have been given too little attention in the past, and they are not easy. But appropriate solutions must be found.

McKay, *supra*, 35 L. & Cont.Prob. at 9–10. (Emphasis added). Sixteen years later, we were still searching for standards when Professor Lubet observed similarly:

A society governed by the rule of law expects much from its judges. In strictly aspirational terms, it is a truism that judicial conduct must be beyond reproach. *Aspirations, however, are far too elusive a guide for an individual's personal life.* What is "beyond reproach" to one may be condemned by another. In the absence of better articulation, *we must fear not only unreasonable discipline, but also discipline that produces an undesirable in terrorem affect* on judges' moral and social lives.... Judges need and deserve firmer standards, not necessarily to restrain, but to inform.

Lubet, 1986 Ariz.St.L.J. at 399. (Emphasis added). The instant charge demonstrates that almost two decades after Professor McKay's original observation, judicial ethics standards are still only vaguely defined. *Cf.* Lubet, *The Search For Analysis In Judicial Ethics or Easy Cases Don't Make Much Law*, 66 Neb.L.Rev. 430, 430–44 (1987) (emphasis added).

We deal here specifically with the rather problematic issue of what constitutes a censurable "appearance of impropriety." Propriety however, is often in the eye of the beholder. A given individual will find conduct to be within or beyond the bounds of propriety to the extent the conduct comports with that individual's own highly subjective views of propriety.

In many instances society shares common values and a common sense of "propriety." In such cases, the limits of "propriety" may be readily apparent. Nonetheless, disciplinary rules expressed in terms of "propriety" risk mercurial

existence rising and falling with the temper of the moment. Such rules place *ipse dixit* powers, antithetical to rule of law, in the hands of disciplinary boards and courts applying such rules. Professor Martineau has cautioned:

It sometimes appears as if particular courts have merely imposed their own moral standards of what is or is not proper conduct. Those who administer judicial discipline should keep in mind that they are not empowered to enforce their personal views of proper conduct for judges and that the sole purpose of judicial discipline and of restrictions on the nonofficial activities of judges is to preserve public confidence in the judicial system. Courts should strive to develop a more objective standard or test, which will lend itself to consistent and just application and at the same time provide adequate warning to the members of the bench.

Martineau, *supra*, 10 U.Balt.L.Rev. at 245. Similarly, Professors Lubet and Hall have both emphasized the risk of ethical hegemony by the majority resulting in discrimination against minority judges and/or minority values or lifestyles with respect to matters which do not implicate judicial integrity, but which greatly and negatively affect judicial independence. *See* Lubet, *supra*, 1986 Ariz.St.L.J. at 385–86; Hall, *supra*, 21 J.Pub.L. at 146–48.

Professor Lubet has suggested a different focus entirely:

I propose that we evaluate the nature of the act in question with regard to its implication for judging. The proper inquiry is not whether the act is moral or immoral, or whether it is acceptable or unacceptable. We need not even ask whether it is criminal or noncriminal. Rather, we must ask how the act reflects upon the central components of the judge's ability to do the job for which he or she has been empowered: fairness, independence and respect for the public.

Lubet, *supra*, 1986 Ariz.St.L.J. at 386. He has also suggested:

Judges' personal conduct should be governed neither by the overly permissive standard of mere legality nor by the rigid approach of strict moralism. Rather, the permissibili-

ty of any particular act should be determined by balancing the nature of the act itself against its implications for the judging process.

Lubet, *supra*, 79 Northwestern L.Rev. at 995. We agree with the "nexus to the judicial functions" focus suggested, and find it supported in our current Supreme Court precedent.

Initially, our Supreme Court appeared willing to apply a broad-brush hortative approach to Canons 1 and 2. *See In re Franciscus,* [471 Pa. 53] 369 A.2d [1190] at 1194–95 [1977]; *In re Greenberg, supra,* 280 A.2d at 372. In *Matter of Dalessandro, supra,* however, the lead opinion of the plurality departed from the sonorous hortative admonitions of *Franciscus* and *Greenberg,* but appeared to some to veer toward the excessive rigidity of the strict legality approach:

> Canon 1 refers to the "high standards of conduct so that the integrity and independence of the judiciary may be preserved." (Emphasis added.) Canon 2 like Canon 1 focuses upon "public confidence in the integrity and impartiality of the judiciary." (Emphasis added). The language of these Canons strongly indicates that they are concerned with the conduct of a judge in his official capacity and not with his conduct in his private life.

> It can be seen, therefore, that the constitutional scheme and the Canons are concerned with:

> (1) the conduct of a judge acting in an official capacity,

> (2) *any other conduct which affects the judge while acting in an official capacity, and*

> (3) conduct prohibited by law.

> To read into the constitution or the canons prohibitions which go beyond the above categories is to enter a most precarious area of inquiry for the state—the realm in which private moral beliefs are enforced and private notions of acceptable social conduct are treated as law. Standards in these private areas are constantly evolving and escape, at any given moment, precise definition. Conduct of a judge or any public official which may be offensive to the personal

sensitivities of a segment of the society is properly judged in the privacy of the ballot box.

\* \* \* \* \* \*

The imposition of any discipline based on *conduct unrelated to a judge's official conduct* which is not prohibited by the public policy of this Commonwealth as manifested in its laws would raise serious due process issues.

397 A.2d at 757–58. (Emphasis added). While commentators did not appear to take issue with the conclusion that adultery did not provide an appropriate basis for judicial discipline, the perceived "legality" focus was criticized. *See* Blynt, *Judicial Discipline—Does It Exist In Pennsylvania?, supra,* 84 Dickinson L.Rev. at 466–68; Lubet, *supra,* 79 Northwestern L.Rev. at 995; Martineau, *supra,* 10 U.Balt.L.Rev. at 235-37.[8]

In *Matter of Cunningham, supra,* a clear majority of our Supreme Court appear to have recharted the course of judicial ethical regulation and discipline in Pennsylvania between the Scylla of rigid legality and the Charybdis of aspirational, hortative admonitions. In a footnote in that opinion, our Supreme Court went out of its way to explain:

> We reject the implication in the *Matter of Dalessandro,* 483 Pa. 431, 397 A.2d 743 (1979), that matters in one's personal life *which legitimately reflect upon the jurists' professional integrity* are immune from censure. The opinion in that appeal was joined by only two members of the Court and therefore does not represent a binding precedent. However, the test of the appearance of impropriety is not to be given an overly scrupulous gloss. The overly suspicious mind often assigns guilt where none exists.

538 A.2d at 480 n. 12 (emphasis added); *see also Matter of Glancey (II),* 518 Pa. 276, 542 A.2d 1350, 1355 [1356] (1988) ("[n]owhere in the Commentary or Canon itself is this language limited to criminal conduct, nor will we allow this provision to be so restricted"). Thus, "propriety" in the term

**8.** The underlined text provided the basis for the criticism generally; the emphasized language regarding conduct which affects a judge in the judge's official conduct, however, could be read to intend the requirement of a "nexus to judicial integrity" later adopted explicitly.

"appearance of impropriety" is to be focused on conduct which "legitimately reflect[s] upon the jurist's professional integrity." The opposite extremes of subjective propriety and mere legality were both plainly rejected.

Having examined the concept of "impropriety" in the term "appearance of impropriety," we next turn to the term "appearance." By whose standards are we to gauge the appearance? How indulgent or jaundiced are we to assume the standard is in determining appearances?

It has been suggested that the appearance of impropriety should be gauged from the standard of the "objective private citizen" (otherwise known as a hypothetical reasonable person), and that this reasonable person need not have a thorough knowledge of either the facts of the alleged misconduct, or of the applicable law. Blynt, *Judicial Discipline,* 84 Dickinson L.Rev. 447, 458 (1980). While we agree with the suggested application of the reasonable person standard, we reject as entirely untenable the suggestion that it be a reasonable uninformed or misinformed person standard.

In commenting upon the adoption of the reasonable person standard by the Maryland Court of Appeals in *In re Foster,* 271 Md. 449, 318 A.2d 524 [523] (1974), Professor Martineau opined:

> While such a test is not completely objective, it is better than a totally subjective one. The reasonable person standard has long been used in other legal contexts, such as torts, and is a familiar standard to judges facing discipline as well as to the courts considering disciplinary measures. Because the reasonable person standard is well-known to most courts and judges, and because it is intended to reflect public reaction to a judge's nonofficial conduct, the use of this standard would better promote the basis for disciplining a judge for nonofficial conduct: maintaining public confidence in and respect for the judicial system.

Martineau, *supra,* 10 U.Balt.L.Rev. at 243. We entirely agree.

We cannot agree, however, with the suggestion that the appearance be gauged as to a misinformed or uninformed hypothetical reasonable person. The absurdity of such a standard was ably and cogently exposed by, then, Justice Rehnquist as follows:

It is, of course, possible to interpret the phrase "appearance of impropriety" much more broadly and to suggest that it embraces a situation *where the facts are only partially known*, and where this partial version of the facts might rouse legitimate suspicion. Suppose, for example, that it was known only that Judge Haynsworth had *some* stock in the litigant, without it being known how miniscule his interest was? *But this interpretation would cut so broadly as to prevent a judge named Jones from presiding at the trial of a defendant named Jones, even though they were totally unrelated, since it would be possible from simply reading the docket entries to conclude that they were related to one another.* It will not do.

Rehnquist, *supra*, 28 The Record at 701. (Emphasis added). Indeed, if appearances were gauged without reference to the full and true facts, then false appearances of impropriety could be manufactured with ease by anyone with personal or political *animus* toward a judge. If such were the case, then the hope of an independent judiciary would have been less than an evanescent dream, it would have been cruel charade and a dangerous snare for an ethical and unsuspecting judiciary.

Fortunately, our case law is squarely to the contrary. In *In re Greenberg (II)*, 457 Pa. 33, 318 A.2d 740 (1974), our Supreme Court stated succinctly, "it is our duty to consider the totality of the circumstances when determining questions pertaining to professional and judicial discipline." 318 A.2d at 741. (Emphasis added).

Numerous cases would undoubtedly have been decided differently if the totality of the circumstances were *not* considered, and instead the Board and our Supreme Court applied a reasonable *mis* informed or *un* informed person standard. A judge's acceptance of a gift from a union leader might create a distinct appearance of impropriety, if our hypothetical reasonable *un* informed person did not know of their long familial

association, or that the judge had systematically recused himself from any case known to involve a member of the gift donor's union. *See Matter of Braig, supra.* Likewise, an appearance of impropriety might certainly appear if one had neither the benefit of the respondent's version of disputed facts, nor knowledge of the respondent's excellent reputation as an ethical individual and respected jurist. *See Matter of Sylvester, supra.* Moreover, an appearance of impropriety might certainly appear in hindsight based upon facts not known at the time of a judge's challenged conduct, or based upon only one version of disputed facts, which would not appear if the limits of the judge's information at the time of the conduct and the other side of the story were considered. *See Matter of Johnson, supra.*

Contrary to the suggestion in the Blynt article cited above, neither *In re Greenberg (I)* nor *In re Dandridge,* applied the reasonable uninformed or misinformed person standard. In *In re Greenberg,* our Supreme Court gave no weight to character evidence, not because it was probably unknown to the public, but because a *crimen falsi* felony conviction is an absolute and self-executing mandate for removal which would outweigh character evidence regardless of how favorable it might be. 280 A.2d at 372 & n. 10. When the offense had been pardoned and the absolute mandate for removal itself was removed, our Supreme Court then proceeded to consider the totality of the circumstances, and to reinstate Judge Greenberg. 318 A.2d at 741. Likewise, we object to the suggestion that our Supreme Court rejected Judge Dandridge's defense because the general public in assessing his conduct would not have known of the alleged local custom of retaining testimonial proceeds in direct violation of the Canons which Judge Dandridge claimed to rely upon. Rather, our Supreme Court rejected his defense with the far more simple and direct response that, "[i]gnorance of the Canons and misconduct by others are no defense." 337 A.2d at 889. In neither case was a reasonable misinformed or uninformed person standard suggested or applied.

Our Supreme Court has recently cautioned that the appearance of impropriety standard "is not to be given an overly

scrupulous gloss," because "an overly suspicious mind often assigns guilt where none exists." *Matter of Cunningham, supra,* 538 A.2d at 480 n. 12. Likewise, the *un*informed or *mis*informed mind "often assigns guilt where none exists." We construe our Supreme Court's decisions to require application of an "appearance of impropriety to a reasonable person following review of the totality of the circumstances" standard.

By "reasonable" we apprehend a standard which is neither excessively indulgent, nor excessively jaundiced. Judge Markey suggested in his article:

> The problem now is to consider whether we are in danger of going, or may have already gone, too far in the direction of a public presumption of partiality.
>
> It is not too much to say that most persons tend to live up, or down, to the reputation given them and to do the expected. There may be something to be said for the proposition that judges should be given at least an initial presumption of rectitude, if not quite the presumption of innocence given those indicted for crimes. Do we run the risk of attracting less than the best to the Bench if we confront them throughout their remaining lives with our expressed expectation that they are likely to act unethically?

Markey, *supra,* 101 F.R.D. at 381.

Just as this Board and our Supreme Court require clear and convincing evidence before it will conclude misconduct has occurred, reasonable citizens require more than vague conjectures and subtle innuendo before they will entertain suspicions of judicial misconduct or ascribe the "appearance of impropriety" to ambiguous facts and circumstances. We agree that there is little to be gained and much which may be irretrievably lost in the adoption and application of jaundiced presumptions of judicial misconduct. Hence, we decline to do so.

## B. APPEARANCE OF IMPROPRIETY AS APPLIED TO SETTLEMENT NEGOTIATIONS INVOLVING JUDGE LITIGANTS

How does this "appearance of impropriety to a reasonable person following review of the totality of the circumstances"

standard apply to the charge that Justice Larsen has engaged in a censurable appearance of impropriety by making allegedly excessive settlement offers as a judge litigant in a zoning appeal case? We write upon a clean slate.

No such case has arisen previously in this Commonwealth. Indeed, we have exhaustively but fruitlessly searched through the innumerable abstracts of judicial disciplinary proceedings of other jurisdictions reported in accessible digests without detecting even the faintest suggestion that such an allegation has ever been raised previously. *See Judicial Discipline and Disability Digest—January 1981 to June 1986 Supplement, passim* (Begue ed. 1986); *Judicial Discipline and Disability Digest—1980 Supplement, passim* (Brooks & Stewart eds. 1980); *Judicial Discipline and Disability Digest—1979 Supplement, passim* (Stewart & Rosenbaum eds. 1979); *Judicial Discipline & Disability Digest—1960 to 1978, passim* (Rosenbaum ed. 1978). We have also searched in vain for reference to any such scenario, real or even merely hypothecated, in any of the many law review articles on the subject of the judicial ethics and the implications of off-bench judicial conduct. (*See* law review articles cited *supra*, Part VI, at 578 n. 6). This fact, by itself, gives us pause.

Before we explain what we believe to be the proper application of the appearance of impropriety standard as to this charge, we first note the ways in which we find that it does not apply.

We reject any suggestion that legitimate strategic advantages in settlement must be foregone by judge litigants because of the risk that an uninformed public might wrongly assume that the judge's adversary was cowed into an "excessive" settlement because of fear that another judge might improperly favor the judge litigant. Such reasoning impugns the professional integrity of not only the judge litigant but also the judge presiding. Surely our society is not so jaundiced as to presume the impropriety of not one, but two judges, solely on the basis of a an uninformed subjective assessment of the excessiveness of a settlement, which in fact was gained by a judge litigant through "hard bargaining" and/or legiti-

mate settlement strategy without partiality by the presiding judge.

Reasonable citizens would not leap to such conclusions on such a meager basis. Even if they would, they would have no occasion to do so here, as the relevant facts here regarding possible favoritism would dispel the suspicions of even the most jaundiced observer.

In this case, the bench of the Allegheny Court of Common Pleas acting *sua sponte* recused themselves *en masse* in order to avoid even the faintest suggestion of partiality in favor of their former colleague, Justice Larsen. The judge presiding in this matter, Judge McCormick, was specially appointed by Chief Justice Nix for the express purpose of avoiding any appearance (or even jaundiced suspicion) of partiality. Justice Larsen's adversaries on appeal were a condominium development partnership and the Catholic Diocese of Pittsburgh. Neither were likely to be cowed by Justice Larsen's status as a Justice. Settlement negotiations were conducted by the parties' attorneys at the suggestion of and under the supervision of Judge McCormick. Rather than being cowed by Justice Larsen, or by fear that Judge McCormick might improperly favor Justice Larsen, all settlement offers were rejected, and the project fell through before the merits of Justice Larsen's appeal were addressed in the trial court. Finally, all parties involved agreed that Justice Larsen had in no way attempted to use his status as a Supreme Court Justice to gain improper advantage in the settlement negotiations.

How, then, could any reasonable (or even jaundiced) citizen remotely imagine that fear of partiality by Judge McCormick in favor of Justice Larsen played any role in the matter? Patently, it did not.

Indeed, any suggestion that an appearance of impropriety might result from suspicions of partiality by Judge McCormick in favor of Justice Larsen as the result of an allegedly excessive settlement would be inappropriate here. The offers were rejected and no settlement was reached. Hence, we are not concerned with appearances which arose from a settle-

ment, excessive or otherwise. Rather, we are concerned solely with appearances which may have arisen from the appeal itself, and the unsuccessful settlement negotiations which followed.

We also reject any suggestion that it is unethical for a judge to press legitimate strategic advantages in settlement. We find no authority in the Code of Judicial Conduct for the imposition of such a restriction.

It has been suggested that Judges must forego concededly legitimate settlement negotiation advantages because a resulting settlement agreement might appear unfair. To whom? Why?

If such advantages are *legitimate* factors in the settlement calculus for other citizens, why are they not for judge litigants? If an adversary in fact is free to reject any offer of settlement and proceed with a determination on the merits, how is any settlement agreed upon to be deemed excessive or "extortionate?" Is there a duty imposed upon judges to forego legitimate legal rights and negotiate settlement? If a judge considers giving up legal rights which cannot be taken from him but by his consent, must he use community values (rather than personal idiosyncratic values) in deciding what offers to extend or accept? If the advantages of readiness for trial, cost of delay, and expense of litigation of a legitimate claim are to be foregone because they do not address the actual harm sought to be redressed, then would it not follow, likewise, that neither statutes of limitation, waiver rules, allocations of evidentiary burdens, nor the quality of the admissible evidence available to the parties could be factored into settlement negotiations? In short, would not the approach suggested strip judge litigants of a large portion of the tools commonly used in settlement negotiations by other litigants to determine what offers to extend or accept?

Two results are possible under such restrictions—neither desirable. Either judge litigants will wisely stand on their rights and refuse to enter into settlement negotiations blindfolded and bound hand-and-foot by such restrictions, or they

will be forced to settle their legitimate claims for cents-on-the-dollar compared to ordinary citizens whose identical claims may be pressed with zeal and without such restrictions. In other words, such rules would either oppressively tax judges or they would oppressively tax our already overburdened legal system. For what benefit?

The error of such an approach is that it fails to distinguish between the pressing of legitimate strategic advantages—which ought to be conceded as permissible for all alike, and the manipulation of the system for improper advantage by malicious prosecution or abuse of process—which likewise ought to be condemned as unethical for all alike.

Board Counsel alleges that Justice Larsen manipulated the legal process to coerce an unfair settlement from Highpointe, and that his appeal was not brought in good faith, to the extent such claims are cognizable in JIRB proceedings, such allegations sound in the nature of malicious prosecution or abuse of process claims. Inflammatory rhetoric aside, we find the subject worthy of more careful consideration.

## C. MALICIOUS PROSECUTION/ABUSE OF PROCESS

The right to be free from malicious, vexatious, and unjustified litigation is protected by civil actions for malicious prosecution and abuse of process. *Prosser and Keeton on Torts,* § 119, at 870 (5th ed. 1984). Though both torts developed from the action for malicious criminal prosecution, they address different abuses of civil process. In *McGee v. Feege,* 517 Pa. 247, 535 A.2d 1020 (1987), our Supreme Court, in a unanimous opinion by Justice Larsen, explained:

We initially note that there is often confusion in the two separate and distinct actions of malicious use of process and abuse of process. The distinction recognized between the two actions was set forth in *Publix Drug Company v. Breyer Ice Cream Co.,* 347 Pa. 346, 32 A.2d 413 (1943). In that case we said:

The gist of an action for abuse of process is the improper use of process after it has been issued, that is, a perver-

sion of it. 'An abuse is where the party employs it for some unlawful object, not the purpose which is intended by the law to effect; in other words, a perversion of it. . . . On the other hand, legal process, civil or criminal, may be maliciously used so as to give rise to a cause of action where no object is contemplated . . . other than its proper effect and execution.' Malicious use of civil process has to do with the wrongful initiation of such process, while abuse of civil process is concerned with a perversion of a process after it is issued.

535 A.2d at 1023; *see also Weiss v. Equibank,* 313 Pa.Super. 446, 456, 460 A.2d 271, 276 (1983), *quoting Baird v. Aluminum Seal Co.,* 250 F.2d 595, 600 (3rd Cir.1957) (summarizing the Pennsylvania common law of malicious prosecution and abuse of process).

### 1. *Malicious Prosecution*

The common law tort of malicious prosecution has been codified and modified as a statutory cause of action. *See* 42 Pa.C.S.A. §§ 8351–54. Under 42 Pa.C.S.A. § 8351, a cause of action for malicious prosecution has three elements; the defendant must have instituted civil proceedings against the plaintiff without probable cause, with malice, and proceedings must have terminated in favor of the plaintiff. *See Ludmer v. Nernberg,* 520 Pa. 218, 222 & n. 1, 553 A.2d 924, 925 & n. 1 (1989); *Shaffer v. Stewart,* 326 Pa.Super. 135, 140, 473 A.2d 1017, 1019–20 (1984). Malice may be inferred from the absence of probable cause; hence, want of probable cause for the defendant's prior use of civil process, and a termination of that process in the plaintiff's favor are all that is strictly required. *Ludmer v. Nernberg, supra; cf. Kelley v. Local Union 249,* 518 Pa. 517, 521, 544 A.2d 940, 941 (1988).

Under 42 Pa.C.S.A. § 8352, the following rules control the determination of whether probable cause existed for the defendant to initiate the challenged civil process:

A person who takes part in the procurement, initiation or continuation of civil proceedings against another has proba-

ble cause for doing so *if he reasonably believes in the existence of the facts upon which the claim is based, and either*:

(1) *Reasonably believes* that under those facts the claim may be valid *under the existing or developing law;*

(2) *Believes* to this effect *in reliance upon the advice of counsel,* sought in good faith and given after full disclosure of all relevant facts within his knowledge and information; or

(3) *Believes as an attorney of record, in good faith* that his procurement, initiation or continuation of a civil cause *is not intended to merely harass or maliciously injure the opposite party.*

(Emphasis added).

Irregularity in the use of the legal process is not to be presumed. Rather, 42 Pa.C.S.A. § 8354 plainly mandates that in a malicious prosecution action that:

*the plaintiff has the burden of proving,* when the issue is properly raised, that:

(1) The defendant has procured, initiated or continued the civil proceedings against him.

(2) The proceedings were terminated in his favor.

(3) The *defendant did not have probable cause* for his action.

(4) The primary purpose for which the proceedings were brought was not that of securing the proper discovery, joinder of parties or adjudication of the claim on which the proceedings were based.

(5) The plaintiff has suffered damages as set forth in section 8385 (relating to damages).

(Emphasis added).

While we find that concept of malicious prosecution as codified in Pennsylvania to be highly relevant in assessing the ethical implications of Justice Larsen's conduct in the zoning litigation, we do not find that the charge of misconduct must stand or fall on strict proof of each of the traditionally required elements of malicious prosecution. Two aspects of

the law of malicious prosecution seem to us to require modification to adapt the concept appropriately for our present purpose.

Under Pennsylvania law, reliance upon advice of counsel sought in good faith following full disclosure of the relevant facts is an absolute defense to a malicious prosecution action relating to a prior criminal action. *See Kelley v. Local Union 249, supra,* 554 [544] A.2d at 941–43. This same defense is provided as to malicious prosecution actions arising from prior civil proceedings. 42 Pa.C.S.A. § 8352(2). Nonetheless, for the purpose of gauging the legitimacy (and thus the ethics and propriety) of Justice Larsen's conduct with regard to the zoning appeal, an absolute defense of reliance upon counsel's expert advice has no place. As both a judge and an attorney, Justice Larsen could not ethically surrender abjectly all consideration of probable cause to counsel; rather, in such circumstances we find advice of counsel relevant as to whether Justice Larsen had probable cause based upon his own reasonable belief (42 Pa.C.S.A. § 8352(2)), rather than upon counsel's advice (42 Pa.C.S.A. § 8352(3)). *Cf. Kelley v. Local Union 249, supra,* 544 A.2d at 943 (McDermott, J., concurring).

Likewise, we find the favorable termination requirement inapposite in this context. Here, the appeal of the zoning matter was rendered moot when the planned development project for which the contested zoning variances had been granted fell through; hence, no termination on the merits occurred. Nonetheless, we are of the opinion that in gauging the ethical implications of Justice Larsen's conduct, the eventual termination of the zoning matter is irrelevant. Our sole focus is thus reduced to whether the zoning appeal was brought without probable cause. Because the project fell through before Judge McCormick was called upon to decide that issue, we must make this determination ourselves.

Justice Larsen's appeal involved a challenge to zoning variances granted to Highpointe. His argument on appeal was that Highpointe had failed to meet the high burden required to justify a dimensional variance, in that no unusability hard-

ship was demonstrated. Upon careful review of the record and the applicable legal authorities, we find that the existence of probable cause to support the appeal was manifest.

Applicants for dimensional variances bear the burden to establish that unnecessary hardship will result if the variance is denied, and that the proposed use will not be contrary to public interests. *See City of Pittsburgh v. Zoning Bd. of Adj.*, 522 Pa. 44, 59–60, 559 A.2d 896, 903 (1989); *Valley View Civic Ass'n v. Zoning Bd. of Adj.*, 501 Pa. 550, 462 A.2d 637 (1983). The "hardship," moreover, must arise from a unique or peculiar attribute of the particular parcel of land, and not from the impact of the zoning regulation, from which a variance is sought, upon the entire district. *Id.*

Following public hearings at which Justice Larsen appeared as an objector through counsel, the Zoning Board granted Highpointe substantial variances for height, side yard set back, rear yard set back (balcony); and, rear yard set back (structure). Ostensibly, the variances were granted based upon "unique geotechnical characteristics" of the property. The only evidence explaining the significance of the geotechnical characteristics was that of the architect, who testified only that greater stability would be achieved by stretching out the proposed building to the requested dimensional limits.

The scope of review by a decision of a Zoning Board to grant a dimensional variance is limited. The reviewing court on Justice Larsen's appeal could conclude that the Zoning Board had abused its discretion in granting the variances to Highpointe only if there was not substantial evidence to sustain the board's findings, or if an error of law had been made. *City of Pittsburgh v. Zoning Bd. of Adj., supra,* 559 A.2d at 903; *Valley View Civic Association v. Zoning Bd. of Adj., supra,* 462 A.2d at 639.

Nonetheless, the precedents are legion in support of Justice Larsen's claim that the evidence of hardship presented by Highpointe was inadequate as a matter of law to establish the type and degree of hardship required to sustain the variances granted. The following are selected from among the more apposite cases.

In *O'Neil [O'Neill] v. Zoning Bd. of Adj.*, 434 Pa. 331, 254 A.2d 12 (1969), our Supreme Court held that the zoning board abused its discretion in granting dimensional variances based upon a hardship claim that a smaller apartment building could not be built profitably within the present zoning dimensional limits on the lot in question. The evidence of the claimed hardship was found inadequate in two respects: the applicant had purchased the property with knowledge of the zoning regulations and in so doing chose to assume the alleged hardship; and, the applicant failed to present any evidence that the property could not be used profitably for some purpose comporting with the applicable zoning provisions.

In *McClintock v. Zoning Hearing Bd.*, 118 Pa.Cmwlth. 448, 545 A.2d 470 (1988), the Commonwealth Court held that a zoning board abused its discretion in granting a side yard dimensional variance to construct a two car garage. The court held that the evidence of hardship was inadequate in that a one car garage could be built within the zoning dimensional limits, and the applicant had failed to establish that the property would be rendered practically valueless without the two car garage.

In *Appeal of Horsham Tp.*, 103 Pa.Cmwlth. 508, 520 A.2d 1226 (1987), the Commonwealth Court held that the zoning board had abused its discretion in granting dimensional variances to a tavern operator who claimed that crowded conditions caused by a lack of table space resulted in a loss of business revenue. Inability to serve additional clientele, and consequent economic harm, did not amount to "hardship" justifying a variance.

In *Johnson v. Zoning Hearing Bd.*, 95 Pa.Cmwlth. 82, 503 A.2d 1117 (1986), it was determined that sufficient evidence of hardship was not established to sustain a dimensional variance to permit construction of a six story motel on a lot zoned for two stories or less based upon problems alleged to arise from the unique topography of the lot. The court emphasized the complete absence of any evidence that the land could not be used profitably for purposes permitted without the requested variance.

In *Falls Tp. v. Zoning Hearing Bd.,* 91 Pa.Cmwlth. 551, 498 A.2d 13 (1985), the Commonwealth Court held that a use variance was not justified by evidence that a substantial increase in market value would result from the granting of the requested variance. The fact that a residential property could be sold for $350,000 with the variance and could not without the variance was irrelevant. The proper question was whether the unique characteristics of the property rendered it virtually worthless without the requested variance. Because no evidence was presented on that issue, the variance could not be sustained.

In *Roth v. Zoning Hearing Bd.,* 91 Pa.Cmwlth. 445, 497 A.2d 295 (1985), dimensional variances were deemed to have been improperly granted despite the unique undersized nature of the lot, and the inability of the applicant to conduct the proposed permitted use within the applicable dimensional limits. The court noted succinctly that the applicant, "must be held to have failed to meet its burden of proving an unnecessary hardship because it is apparent that the property is suited for uses other than the use proposed. . . ." 497 A.2d at 297.

In *Rennerdale Vol. Fire Dept. v. Zoning Hearing Bd.,* 90 Pa.Cmwlth. 635, 496 A.2d 431 (1985), a volunteer fire department was deemed to have presented inadequate evidence of hardship to justify the grant of dimensional variances for an addition to the fire station, despite testimony that "in order to make reasonable use of the site without major undertaking to improve the property for construction, the variances are required." The court rejected this testimony as too general to establish that construction of an addition was impossible without the variances, or that something more than mere economic hardship (which will not justify a variance) was preventing construction within the dimensional requirements.

In *Vagnoni v. Zoning Hearing Bd.,* 74 Pa.Cmwlth. 431, 459 A.2d 1361 (1983), the Commonwealth Court held that dimensional variances could not be sustained based upon expert testimony that the property could not be sold for its "highest and best use," *i.e.* most marketable use, without the requested

variance. The court rejected the claimed hardship, and noted that despite the fact that the property had been offered for sale unsuccessfully for five years, there was no evidence that the property was virtually valueless without the requested variances, or that the variances requested were the minimum variances necessary to develop the parcel.

Finally, in *Hipwell Mfg. Co. v. Zoning Bd. of Adj.*, 70 Pa.Cmwlth. 83, 452 A.2d 605 (1982), the Commonwealth Court held that a multi-unit apartment developer failed to establish sufficient hardship to justify the variances requested, where it was not shown that a multi-unit development with fewer units could not be built within the existing dimensional requirements. A broad assertion that the lot "cannot realistically be built upon, other than as proposed by the owner," was found not to be supported by the vague testimony of the applicant's expert. 452 A.2d at 607.

Here, the only evidence offered by Highpointe on the issue of hardship was the architect's suggestion that "greater stability" for the proposed structure would be achieved by stretching the building to the requested dimensional limits. There was no evidence that a safe structure could not be built within the existing dimensional requirements or that the same stability advantage could not be gained simply by reducing the number of units in the proposed development. Nor was there any evidence at all that the property was virtually valueless for other permitted uses.

Indeed, there was evidence from Highpointe's own witnesses that the lot was capable of maintaining diverse construction, and that the unique geotechnical concerns necessitated dimensional variances only as to this development proposal. (*See* EX B–24(a) at 27–28, 40–41, 43; EX B–24(b) at 25–27). Moreover, the sole "justification" offered for the height variance was to include an enclosed pool without losing eight or nine of the proposed 52 units. (EX B–24(b) at 38–39).

Moreover, it is well-settled that when an applicant purchases a property subject to zoning restrictions, agreement to a higher purchase price on the expectation of securing variances

necessary to make the purchase profitable does not render denial of such variances a hardship. *City of Pittsburgh v. Zoning Bd. of Adj., supra,* 559 A.2d at 903–04; *Appeal of Gro,* 440 Pa. 552, 269 A.2d 876 (1970). Thus, any hardship to Highpointe from its inability to construct its intended development within the applicable dimensional limits was plainly self-inflicted, and could not provide grounds to sustain the variances.

The dimensional variances granted to Highpointe were substantial: from 35' to 50' for height; from 15'15" to 6'6" for side yard set back; from 30' to 12' for rear yard set back (balconies); and, from 30' to 17' feet for rear yard set back (structure). These dimensional variances were plainly outside the applicable bounds of the *"de minimis"* doctrine. *See Community Council v. Zoning Bd. of Adj.,* 128 Pa.Cmwlth. 391, 563 A.2d 945 (1989); *McClintock v. Zoning Hearing Bd., supra,* 545 A.2d at 473 n. 4; *Zoning Bd. of Adj. v. Pasha,* 118 Pa.Cmwlth. 190, 194, 544 A.2d 1101, 1103 (1988).

From the foregoing, it is clear that Justice Larsen not only had probable cause to challenge the variances, he in fact had a compelling case for their revocation on appeal. It is readily apparent on this record that the alleged hardship was patently inadequate. As Attorney Aaronson noted in his memos to co-counsel and Mr. DiPlacido, Highpointe's only hope to go forward as planned was if the zoning board ignored the absence of hardship, and no one from the neighborhood objected and appealed. (EX R–6; EX R–7).

Highpointe argued, however, that Justice Larsen lacked standing, failed to establish standing at the zoning board, and should not have been granted a *de novo* hearing to establish standing. Highpointe's arguments in support of these assertions, however, mistake the burdens on the standing issue entirely.

The basic premise of Highpointe's standing claim was that counsel who represented Justice Larsen, Attorney Grove, failed to present evidence of an interest of Justice Larsen which would be adversely effected directly and immediately by

the challenged variances. Highpointe's contention is severally flawed.

Attorney William Grove appeared at the November 14, 1983 hearing on the proposed variances and formally entered Justice Larsen's objections to the variances. He identified Justice Larsen's property, which was located 150 feet from the applicant's property. While he did not present evidence of adverse effect—which would have been merely cumulative of that presented by Ms. Evans, Mrs. Parry (Justice Larsen's next door neighbor), and Mr. Grealish; he was permitted by the Zoning Board to question witnesses, and his questions addressed the same concerns regarding potential adverse impact of Highpointe's development on the neighborhood which were raised in the direct testimony of Justice Larsen's neighbors. (EX B–24(a), at 12, 52–59, 64–67, 70, 71, 73–74). At the second hearing on January 5, 1984, Attorney Grove again appeared on Justice Larsen's behalf and specifically identified Justice Larsen as an adjacent property owner claiming detrimental effect. (EX B–24(b) at 3–4, 62–63). No objection to. Justice Larsen's standing was raised at either hearing by Highpointe or the Board. Attorney Grove gave evidence, submitted exhibits, and cross-examined witnesses. When Attorney Grove specifically asserted that Justice Larsen had been made a party to the proceedings and intended to appeal if the requested variances were granted, the Zoning Board Chairman replied, "Well he'll have notice to appeal. We'll make sure that he gets a copy of the decision." (EX B–24(b), at 64–65).

The burden to establish an adverse impact sufficient to establish standing is not an onerous one; one need only show "a perceivable adverse impact on the interest other than the common interest of all citizens in having others comply with the law." *Mosside Assoc., Ltd. v. Zoning Hearing Bd.*, 70 Pa.Cmwlth. 555, 563, 454 A.2d 199, 203 (1982).[9] For example,

9. In an article discussing strategies to minimize, eliminate, or overcome neighborhood opposition to development plans, the law of standing in variance cases was summarized as follows:

neighborhood property owners have been deemed to have demonstrated sufficient adverse impact with evidence of a potential impact on property values, and with evidence of potential parking problems. *See D.E. Street v. Zoning Hearing Bd.,* 103 Pa.Cmwlth. 127, 131, 519 A.2d 1093, 1095 (1987); *Schubach v. Silver,* 9 Pa.Cmwlth. 152, 305 A.2d 896 (1973), *rev'd on other grounds* 461 Pa. 366, 336 A.2d 328 (1975); *Wilson v. Watz,* 60 [101] D. & C.2d 86 (1973). The hearing testimony of similarly situated neighbors (including Justice Larsen's next door neighbor Mrs. Parry), the testimony and documents submitted by Attorney Grove, as well as information elicited by Attorney Grove during cross-examination of Highpointe's witnesses were more than sufficient to meet the minimal burden for establishing Justice Larsen's standing as an adversely affected adjacent property owner.

Moreover, a person who is permitted to appear in opposition to an application to a zoning board, who is likewise permitted to cross-examine witnesses and present evidence, is a party to those proceedings, and is entitled to appeal a grant over his or her opposition, as an aggrieved party. *See Johnson v. Zoning Hearing Bd., supra,* 503 A.2d at 1118 n. 1; *Lower Allen Citizen's Action Group,* 93 Pa.Cmwlth. 96, 102, 500 A.2d 1253, 1257 (1985); *Baker v. Zoning Hearing Bd.,* 27 Pa.Cmwlth. 602, 367 A.2d 819 (1976); *Borner v. Zoning Hearing Bd.,* 37 [Pa.] D. & C.3d 298, 300 (1985) [1984]. Thus, Attorney

*Standing*
The final local zoning decision can be appealed to the courts, however, and the developer must consider this possibility. Neighbor-opponents generally have standing to appeal a variance of rezoning decision or to participate in a developer's appeal.
Standing is granted to "aggrieved persons" under most land use statutes. The tests for an "aggrieved person" are:
—That the decision affects a matter in which the person has a specific interest or right, such as land; and
—That the person must be affected in a way different from the public generally, such as a person who owns land in proximity to the parcel under consideration, which may be depreciated either in terms of value or employment. *See generally,* 4 R.M. Anderson, *American Law of Zoning,* 2d, §§ 25.10–25.20 (Lawyers Co-operative Publishing Co., Rochester, 1977). This generally includes owners of land within sight or sound of the parcel.
Freeman, *When Neighbors Oppose a Development Plan,* 2 The Practical Real Estate Lawyer 79, 87–88 (July 1986). (Emphasis added).

Grove's conduct was sufficient to acquire aggrieved party status, and hence standing, for Justice Larsen.

Assuming, *arguendo*, that there was some defect with respect to Justice Larsen's standing, any such defect was waived by Highpointe's failure to raise such a defect in the zoning hearings, and the zoning board's failure to raise the issue *sua sponte* in the hearings. *See Friedlander v. Zoning Hearing Bd.*, 119 Pa.Cmwlth. 164, 167, 546 A.2d 755, 757 (1988); *In re Farmland Industries*, 109 Pa.Cmwlth. 304, 310, 531 A.2d 79, 81–82 (1987), *appeal denied* 517 Pa. 631, 539 A.2d 812 (1988); *In re Leopardi*, 90 [Pa.] Cmwlth. 616, 496 A.2d 867 (1985), *rev'd on other grounds* 510 [516] Pa. 502 [115], 532 A.2d 311 (1987).[10]

Moreover, in rejecting a virtually identical standing challenge based upon claimed inadequacy of the evidence of a detrimental impact of the variance granted upon the objector appellant, the Commonwealth Court stated in *Hipwell Mfg. Co. v. Zoning Hearing Bd.*, *supra*:

> ... *before* the question of a neighbor's alleged detriment can even be reached, the applicant for the variance has the burden of establishing that there is an unusability hardship arising from unique circumstances.

452 A.2d at 606. (Emphasis added). The court went on to decide that, because a hardship finding could not be sustained, it was unnecessary to address the alleged inadequacy of the objector's claimed detriment. 452 A.2d at 607. Here, the variances at issue were granted without the required hardship;

10. We note that Highpointe's waiver of the standing issue may have been the result of a simple but significant legal error on Attorney Aaronson's part. Review of the exhibits submitted reveals that, immediately after the time had passed to submit additional evidence, Attorney Aaronson (who had apparently been lying-in-wait), sent a letter to the Zoning Board Chairman raising the standing issue and insisting that no new evidence be accepted on that issue. (Ex R–10). Attorney Aaronson apparently felt no scruple against pressing what he erroneously perceived to be a technical (albeit lawful and legitimate) strategic advantage. (Ex R–10, Ex B–28, Ex R–13). The case was plainly hard fought on both sides.

and so likewise, the variances granted here would have been revoked and the standing issue would not have been reached.

Finally, any defect in proof on the standing issue at the zoning hearings was excused by the inadequate notice provided regarding the second hearing. *See Appeal of Booz,* 111 Pa.Cmwlth. 330, 336, 533 A.2d 1097 [1096], 1099 (1987). Highpointe's challenge regarding the adequacy of Justice Larsen's proof of standing was rendered moot when Judge McCormick accepted Justice Larsen's due process claim regarding inadequate notice of the second hearing and ordered a trial *de novo. See In re Leopardi, supra,* 496 A.2d at 869 n. 2. The present record establishes the ability of Justice Larsen to meet the minimal standing requirement at the *de novo* hearing.

The bringing of an appeal from a zoning decision without probable cause could support an inference of malice in an appropriate case, and could then be properly classified as malicious prosecution. *See Azar v. Markle,* 311 Pa. 296, 297–98 [166 A. 889] (1933). However, the absence of probable cause for the challenged process is an indispensible prerequisite to such a claim which must be pled with specificity and then proved by competent evidence, rather than merely asserted. *Id.* Moreover, use of such claims against zoning hearing objectors is strictly scrutinized because of the clear potential for a chilling effect on neighbor's rights to come forward and raise objections under their First Amendment rights to petition for redress of grievances. *See e.g. LaMotte v. Punch Line of Columbia, Inc.* [296 S.C. 66], 370 S.E.2d 711, 713–14 (S.C.1988); *Jacobsen v. Garzo* [149 Vt. 205], 542 A.2d 265, 268 (Vt.1988); *Protect Our Mountain v. District Court,* 677 P.2d 1361, 1364–68 (Colo.1984); *Anchorage Joint Venture v. Anchorage Condominium Ass'n,* 670 P.2d 1249, 1250–51 (Colo.App.1983).

Because Justice Larsen had both standing and probable cause to file the appeal, his appeal cannot be deemed a malicious prosecution or a manipulation of the legal system at its inception. He had every legal right to proceed as he did.

## 2. ABUSE OF PROCESS

Abuse of process differs from malicious prosecution in that the gist of the tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish. *Prosser and Keeton on Torts*, § 131 at 897 (5th ed. 1984). The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself such as the surrender of property or the payment of money by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the assurance of the process itself, which constitutes the tort. *Id; see also McGee v. Feege, supra*, 535 A.2d at 1023; *Weis [Weiss] v. Equibank, supra*, 460 A.2d at 276.

In the abstract, the charge that Justice Larsen manipulated the zoning appeal process "in order to coerce an inordinately high settlement," sounds like a tenable claim of an abuse of process. Upon closer examination, however, the claim fails.

The principle problem with the charge in this case is the tenuous line which the charge draws between legitimate negotiation for the discontinuance of a valid zoning appeal, and the asserted abuse of process by making allegedly excessive settlement offers. No case law was cited to sustain this proposed distinction. We have been able to discover none.

While *Shaffer v. Stewart, supra*, was a malicious prosecution case, rather than an abuse of process case, we nonetheless find the following excerpt from that case relevant in analyzing the "abuse of process *via* excessive settlement offers" allegation raised here:

> It remains to be determined whether appellant has adequately alleged that the filing of the caveat was done maliciously and for an improper purpose. The averment of the complaint is that Stewart acted to extract an unwarranted settlement from appellant. Does this aver an improper purpose for the caveat so as to render malicious the filing

thereof? The answer can be found in the Restatement (Second) of Torts, § 676 where, in comment c, it is stated that civil proceedings are initiated for an improper purpose 'when the proceedings are initiated for the purpose of forcing a settlement that has no relation to the merits of the claim. This occurs, for example when a plaintiff, knowing that there is no real chance of successful prosecution of a claim, brings a 'nuisance suit' upon it for the purpose of forcing the defendant to pay a sum of money in order to avoid the financial and other burdens that a defense against it would put upon him.' An allegation that a caveat to a will has been filed not for purposes of contesting the will but to extort a settlement in favor of disinterested parties states an improper purpose within the meaning of 42 Pa.C.S. § 8351.

473 A.2d at 1021. (Emphasis added). *Shaffer v. Stewart,* *supra,* suggests that "nuisance suits" brought without probable cause for the sole purpose of gaining an unwarranted settlement may be an actionable abuse of process. Prosser and Keaton note:

one court has permitted the jury to conclude that a lawyer's unfounded and uninvestigated medical malpractice claim, followed by a low-figure demand for settlement and a trial in which no expert testimony was produced, reflected an attempt to extort a nuisance settlement for which the lawyer would be liable. The case so far stands alone in allowing a recovery on the facts.

*Prosser and Keeton on Torts,* § 121 at 899.

Application of that precedent to this case, however, would require a substantial extension of the rationale. There is a broad chasm which separates the drawing of an inference of malice from an excessive offer of settlement in a "nuisance suit" brought without probable cause, and the drawing of an inference of malice from an allegedly excessive offer of settlement in a legitimate suit grounded upon more than probable cause. We decline to leap across this chasm.

Here, there is no "nuisance suit." Despite the developer's understandable irritation, the fact remains that Justice Lar-

sen had every right to appeal the grant of substantial variances to Highpointe. He had standing, and every expectation of success on his substantive claim that Highpointe had failed to establish the requisite hardship; he had more than probable cause to appeal. Moreover, the only "gun" being held to the developer's head was the developer's own unwillingness to revise the development plans to comply with the applicable zoning restrictions. Given its underlying merit, Justice Larsen's appeal does not fall within the meaning of the term "nuisance suit" as that term is used in professional parlance. *See generally* Bubchuck, *Suing Solely to Extract Settlement Offer*, 17 J.L. Studies 437, 437–50 (1988); Rosenberg & Shavell, *A Model In Which Suits Are Brought for Their Nuisance Value*, 5 Int'l Rev.L. & Econ. 3 (1985).

Assuming, *arguendo*, that "excessive" settlement offers in legitimate cases could be deemed unethical, our problem would not be solved. We would still have to determine how excessiveness was to be determined in evaluating challenged settlement offers.

Before embarking on an examination of this issue, it is appropriate to note two critical limitations. First, in deciding whether offers were "excessive" the issue is not whether Justice Larsen's settlement offers reflect an amount we would approve or accept in settlement but, whether he could reasonably have believed the offers were reasonable. Moreover, we must evaluate the alleged excessiveness of Justice Larsen's settlement in the context in which it occurred, and not with academic detachment provided by the advantage of hindsight aided by additional expert opinions and other information. *Cf. Matter of Johnson, supra.*

That settlement of legal disputes is favored in Pennsylvania is well-settled:

There is a strong judicial policy in favor of parties voluntarily settling lawsuits. *Pennwalt Corporation v. Plough, Inc.*, 676 F.2d 77 (3d Cir.1982); *Castillo v. Roger Construction Co.*, 560 F.2d 1146 (3d Cir.1977); *Autera v. Robinson*, 136 U.S.App.D.C. 216, 419 F.2d 1197 (1969). A primary

reason to settle claims is that settlement is the faster way to get money into the hands of a victim of tortious conduct. A secondary reason is to reduce the burden on and expense of maintaining courts. *Castillo v. Roger Construction Co., supra.* As the court in *Autera, supra,* stated:

> Voluntary settlement of civil controversies is in high judicial favor. Judges and lawyers alike strive assiduously to promote amicable adjustments of matters in dispute, as for the most wholesome of reasons they certainly should. When the effort is successful, the parties avoid the expense and delay incidental to litigation of the issue; the court is spared the burdens of a trial and the preparation and proceedings that must forerun it. 419 F.2d at 1199.

*Rothman v. Fillette,* 503 Pa. 259, 267, 469 A.2d 543, 546 (1983); *see also Muhammad v. Strassburger, et al.,* [526] Pa. [541], 587 A.2d 1346 (1991) (recognizing the "strong and historical public policy of encouraging settlements."). The policy of favoring settlements rightly applies to conflicts between developers and adjacent property owners. *Cf. Sanders v. Roselawn,* [152 W.Va. 91] 159 S.E.2d 784, 784–800 (W.Va.1968). Thus, given the general policy in favor of amicable settlement of disputes, it was a proper exercise of the judicial office for Judge McCormick to suggest the expediency of compromising differences and to urge settlement in this zoning dispute.

In negotiating settlement, the parties are not bound by rules for assessing damages in court, rather they may stipulate to any amount of damages upon which they may reach agreement. *Cf. Goozh v. Capital Souvenir Co.,* 462 A.2d 1140, 1141 n. 2 (D.C.1980) [1983] (collecting cases). An agreement stipulating damages will not be set aside because it later proves to be an inaccurate assessment of the actual damages in the absence of fraud or the like. *See Bollinger v. Randall,* 184 Pa.Super. 644, 650, 135 A.2d 802, 805–06 (1957); *accord Echols v. Nimmo,* 586 F.Supp. 467, 469 (W.D.Mich.1984). Hence, *post hoc* evaluations of excessiveness are of dubious relevance in such matters to begin with.

Before examining the legal principles suggested as applicable to an assessment of the reasonableness or excessiveness of Justice Larsen's settlement offers, we note the following cogent observation regarding "orthodoxy" in settlement negotiations:

> One of the strengths of the legal system—definitive, precedential rulings to promote clarity, certainty, and order—may actually be dysfunctional for the creation of innovative and idiosyncratic solutions to problems that may never reach judicial resolution. *To the extent that negotiations in the shadow of the court are limited by conceptions of what the court would do, negotiation may present no real, substantive alternative to trial.* Lawyers may prefer this limited conception because it makes evaluation of possible outcomes clearer and easier, especially when discussing alternatives with clients. If this is so, then the large number of settlements can only be explained by the lower cost and relative speed of completion, rather than the superior substantive justice that is done. *The limited remedial imagination of courts, when extended to negotiation, narrows not only what items might be distributed but also how those items might be appointed.*

Menkel–Meadow, *Toward Another View of Legal Negotiation*, 31 U.C.L.A.L.Rev. 754, 790–91 (1984) (footnotes omitted, emphasis added). In sum, orthodoxy may thwart settlement whereas creativity might promote amicable settlement.

Here, settlement negotiations could not have involved mere "prediction of outcome," as neither possible outcome of the appeal involved financial payment by one side to the other. In the highly likely event that Justice Larsen succeeded, the variances would be revoked, without a damage award to Justice Larsen. In the unlikely event that the variances were sustained, the project would simply go forward, again without payment to or from either party. Instead, the settlement negotiations here plainly envisioned a creative alternative to litigation, rather than a mere prediction of the likely outcome of litigation.

Given the unorthodox, alternative nature of the settlement being negotiated, evaluation of the reasonableness of the settlement by analogy to orthodox damage valuation constructs in roughly analogous property cases is of dubious validity. Moreover, the further removed the analogy, the more dubious any reference to its orthodox valuation constructs becomes.

Beyond this overarching difficulty lie numerous more orthodox concerns. We shall touch upon each briefly.

Settlement negotiation is not a sterile process of damage appraisal. It is a matter of intricate strategy. *See generally* Hogan & Hogan, *Negotiating in Eminent Domain Proceedings,* 2 The Practical Real Estate Lawyer 41, 41–50 (July 1986); Sabin, *Pragmatic Aspects of Negotiating for Lawyers,* 32 Practical Lawyer 27, 27–33 (January 1986); Charfoos & Chistensen, *Negotiating Settlements,* 32 Practical Lawyer 57, 57–66 (March 1986); Craver, *The Fundamental of Effective Legal Negotiations,* 7 ALI–ABI Course Materials Journal 5, 5–28 (1983).

Perhaps the most difficult and subjective aspect of settlement negotiations is the determination of an initial offer or counter offer. One practitioner has explained:

THE OPENING OFFER * One difficult aspect for lawyers in negotiations is where to start—what should be the opening offer—regardless of the nature of the case. Furthermore, this problem is more pervasive than might first be believed: even after careful consideration of all the facts, research of the law, and weighing the "pluses" and "minuses" of the positions, the question of the opening offer may still confound the practitioner as negotiator.

While obviously no specific answer can be delineated, successful negotiators talk in terms of a "realistically high" opening offer or position. The emphasis must be placed on both words: the offer or position must indeed be realistic—not fanciful—but justifiable. The offer should also be high to provide the necessary room for negotiation, for tradeoffs, and  for concessions that will still yield the "win-win"

situation. Sabin, *supra,* 32 Practical Lawyer at 32. We recognize this as an accurate assessment of a lawyer's tactical quandary in commencing any settlement negotiations. Thus, we are concerned with whether Attorney Mendelson, acting on Justice Larsen's behalf, was making reasonable "realistically high" offers. This concept, by necessity, has considerable margin for subjectivity as to what is a reasonably "realistically high" offer.

Everyone involved in this matter agrees that the market value of Justice Larsen's condominium was a relevant factor in assessing the reasonableness of Justice Larsen's settlement offers. Board Counsel rejects the three appraisals provided by Justice Larsen's unquestionably qualified real estate experts, and chooses as the "more credible" market value the substantially lower figure of the real estate expert hired by the Board. This approach ignores both the issue at hand, and the highly subjective nature of expert real estate appraisals made in unquestionably good faith.

We are not concerned with whether we would accept Attorney Mendelson's appraisal if we were considering a purchase of Justice Larsen's condominium between 1983 and 1987. We are concerned only with whether Justice Larsen acted reasonably in relying on Attorney Mendelson's appraisal in deciding to extend Attorney Mendelson's settlement offer suggestions to Highpointe during settlement negotiations.

The inherent subjectivity of the appraisal process can lead to widely varying appraisals of the value of the same property by different equally qualified experienced experts acting in good faith. It has been explained that:

Property value is a subject of human attitudes influenced by a plethora of factors. The evidences of value are found in a marketplace of free enterprise composed of millions of people, each applying creative genius and human hopes and intelligence in transacting price. Every taking has its own characteristics and impacts. The list of variables could go on and on. *Suffice it to say there is ample room in the measure and proof of just compensation for wide dispari-*

*ties between the contentions of the opposing sides. Valuation of just compensation is by no means a science.*

Brigham, "Forensic Valuation," in *Planning, Zoning, & Eminent Domain,* § 11.01–11.04 (198_). (Emphasis added).

Numerous decisions have made it clear that disparity in expert appraisal values, by itself, would not warrant rejection of a high or low appraisal as unreasonable. *See e.g. Boring v. Metropolitan Edison Co.,* 435 Pa. 513, 257 A.2d 565 (1969) (appraised at $3,600 and $86,000, $25,000 award upheld); *Springer v. County of Allegheny,* 401 Pa. 557, 165 A.2d 383 (1960) (appraised at $48,500 and $225,000, $76,000 award upheld); *Faith United Presbyterian Church v. Redevelopment Authority of Washington County,* 7 Pa.Cmwlth. 490, 298 A.2d 614 (1972) (appraised at $51,000 and $250,000, $152,000 award upheld); *Redevelopment Authority of Johnstown v. Ajee [Yee] Kai Teung,* 5 Pa.Cmwlth. 65, 289 A.2d 496 [498] (1972) (appraised at $40,000 and $132,000, $73,000 award upheld). Despite, the wide disparity in appraisal values involved, none of the appraisals listed above were excluded or dismissed from consideration in the trial court or on appeal as "unreasonable." These cases provide ample proof of the simple truth that expert real estate appraisers and property owners may reasonably and in good faith come to widely varying appraisal valuations.

Real estate experts such as Attorney Mendelson, Mr. Smith, and Mr. Welsch are men who have studied their specialized field, and have brought to this Board knowledge and expertise which cannot be lightly cast aside. Any suggestion that their appraisals were unreasonable is unsupported by the record. We note that the suggestion is particularly inappropriate in this case, given the fact that the Board's own expert lacked the temerity to suggest that the valuations were unreasonable, rather than simply different as the result of reasonable differences in their subjective professional opinions.

Because property valuation appraisal is such a highly specialized expertise, claimants (including Judge litigants without

real estate expertise, like Justice Larsen) must ordinarily rely to a large extent on the expert advice of their lawyers and their real estate experts (here Attorney Mendelson filled both roles). In the context of eminent domain, with its relatively restrictive focus, client reliance upon expert real estate counsel has been explained as follows:

> Under our adversarial system of jurisprudence, the judge and the jury respond to the initiatives of the opposing trial lawyers. The law of a particular case and the measure of just compensation are decided to a large extent by what the respective lawyers present and how they do it. While the court and the jury actually decide the matter, it is the role of the eminent domain trial lawyer, in the first instance, to breathe life, meaning, and measure into the spirit and value of the constitutional guarantee of just compensation by his or her advocacy.

### [b]   A Great Responsibility

There are substantial impacts to the outcome of an eminent domain valuation trial. More than money is involved. The monetary sum is but a tangible medium by which to measure the worth which the property serves. Hopes and dreams, investment of lives and industry, progress and well-being are involved in the property being taken—both for the individual and for the community. The jury's verdict is very final in these respects. Its impacts can last a lifetime. *Whether condemnor or owner, the eminent domain client looks to the lawyer for the result.* The eminent domain trial lawyer has the ultimate responsibility of seeing to it that the measure and proof of just compensation is all that it should be under the facts and the law and of trying to secure a jury verdict in that amount.

### [c]   A Challenging Task

*In condemnation trials, the lawyers for the condemning authority and for the owner seek a jury verdict equal in amount to the owner's loss caused by the taking of the property. Given the disparity between their respective valuation contentions, it is often difficult to realize that both opposing lawyers are operating under the same consti-*

*tutional mandate for just compensation to the owner. But this paradox only highlights the great adventure of eminent domain practice in measuring and proving just compensation.*

Brigham, *supra*, § 11.01(3)(b). (Emphasis added).

The foregoing observations are equally applicable in the instant matter. Consequently, we accept the highest appraisal of Justice Larsen's experts as reasonable in light of the subjective nature of such appraisals and the wide range within which reasonable real estate appraisers may responsibly disagree.

While we are willing to accept the highest appraisal offered as reasonable, we do not accept, without qualification, the suggestion that because Justice Larsen had reasonably expected his property to appreciation in value by $500,000 over a ten year period, he could then use that lost, expected appreciation value as his measure of damages for settlement of his zoning dispute with Highpointe. Though supported by credible, independent, corroborative evidence, the expectation was nonetheless a flawed guide to damage assessment, as the loss was at least partially attributable to other causes, and a future value of $500,000 would still have had to have been discounted substantially to determine its present value. Thus, while the future appreciation calculus may explain how the initial settlement offer figure was selected, it does not by itself establish the reasonableness of the settlement offers.

The controversy as to the reasonableness of Justice Larsen's demands did not revolve solely around the differences in the market value appraisals. Even granting Justice Larsen the benefit of the highest appraisal, his settlement offers still represented 70%–90% of the appraised value of his condominium. The actual fundamental conflict regarding Justice Larsen's damages revolves around Board Counsel's suggestion that reasonableness must be gauged solely on the anticipated diminution in Justice Larsen's market value of his condominium as the result of the proposed development.

Justice Larsen and Attorney Mendelson both testified that several factors went into Attorney Mendelson's initial assessment of the anticipated damages thought likely to arise from the Highpointe development including: depreciation of property values, annoyance, traffic related safety problems, parking problems, consequential moving expenses, sentimental value regarding the loss of a unique view, and, speculative damages relating to the loss of a unique investment value. While all agree that any expected loss of market value was a proper factor to include in the damage assessment used to gauge the reasonableness or excessiveness of the settlement offers, Board Counsel has taken the position that the inclusion of amounts for annoyance, consequential, sentimental, or speculative damages was unreasonable. We cannot agree.

It is, of course, unquestionably true that when the government takes by eminent domain for public purposes, compensation for annoyance, consequential expenses, sentimental values, or speculative values is generally not provided.

The basis for the denial of compensation for such values has been accurately explained as follows:

Because value is an inexact, highly subjective concept, the Supreme Court has adopted the relatively objective concept of market value at the time of the taking as a just and equitable guideline for measuring just compensation. Market value has been defined as the price a willing buyer would pay a willing seller, with neither party under a compulsion to buy or sell. According to the Court, the market value standard strikes the necessary and proper balance between the government's need and the property owner's loss.

In its endeavor to do substantial justice in eminent domain proceedings, the Court has developed objective working rules that refine the concept of market value. For example, the determination of market value is not limited solely to the condemned property's existing use, but also takes into consideration the highest and most profitable use for which the property is adaptable in the reasonably near future. Furthermore, *a condemnee is not entitled to compensation*

*for consequential damages arising from the condemnation, such as reimbursement for the relocation costs incurred as a result of the condemnation. Also, the property's subjective value to its owner arising from its adaptability to a particular use may not be* considered in the determination of just compensation.

That *the market value standard fails to compensate for all the values an owner may derive from his property* is justified by the need to have "relatively objective valuation standards" and a "workable measure of valuation." The rationale for this failure to indemnify the condemnee completely is that condemnation proceedings are considered to be against the property and not against the property owner. Therefore, compensation is "for the property and not to the owner."

Comment, *United States v. 50 Acres of Land,* 15 U.Balt.L.R. 400, 401–03 (1986) (emphasis added). Justice Frankfurter explained the denial of full compensation for annoyance, consequential damages, and the loss of sentimental or speculative value as "part of the burden of common citizenship." *See Kimbell [Kimball] Laundry Co. v. United States,* 338 U.S. 1, 5, 69 S.Ct. 1434, [1437], 93 L.Ed. 1765, 1772 (1943) [1949].[11]

11. The "price of citizenship" has been quite steep at times. *See e.g. In re Jefferies Homes Housing Project,* 306 Mich. 638, 11 N.W.2d 272 (1943) (aged widow turned out of her marital home); *Denver v. Quick,* [108 Colo. 111], 113 P.2d 999 (1941) (property containing family burial plot condemned for use as a bombing field). It is a price which is sometimes exacted with great reluctance:

> The right thus to forcefully appropriate an old homestead, surrounded, doubtless, by hallowed memories and associations, is a hard doctrine and one which the ordinary mind rebels against as an outrage against private rights; but it is none the less the law, and founded on public necessity. The measure of the citizen's damage when his rights are thus invaded is fixed and determined by the law on the basis of value, and all elements of sentiment are excluded.

*Cane Belt R. Co. v. Hughes* [31 Tex.Civ.App. 565], 72 S.W. 1020, 1020 (Tx 1903). (Emphasis added). Other less sentimental courts have extended the price of citizenship justification to include damages which plainly impact on market value, as when a New York court rationalized exclusion of scenic value from the just compensation value of islands condemned up stream from Niagara Falls:

> Appeal has been made to sentimental considerations. Counsel have been eloquent with reference to the beauties of Niagara Falls....

The critical flaw in the analogy between the relinquishment of Justice Larsen's challenge to Highpointe's variances and eminent domain condemnation cases is that Highpointe was not cloaked with eminent domain powers, and the taking involved is for purely private purposes. The damages involved here are more analogous to those of permanent nuisance than those of condemnation in that Highpointe was essentially negotiating for a private easement via a release of Justice Larsen's contested zoning/nuisance claim. The significant distinction between public condemnation and private negotiation of such "easements" has been cogently explained in the context of permanent nuisance claims as follows:

the owner's right to dispose of his property freely is an inherent property right. As shown below, the dispositional aspect of ownership consists of two closely intertwined rights: the right to decide whether to sell or not sell (the "selling right"), and the right to determine at what price the object will be sold (the "pricing right"). The selling right is embodied in the principle that the taking of property without the consent of the owner must be accompanied by a public purpose. *Without a public purpose, then, the state may take private property only with the owner's consent. Similarly, transfer of property to another without the owner's consent is deemed to be an unlawful conversion. These protections afforded to private ownership of property represent the inherent right of property owners to decide whether or not to sell their property.* The selling right, then, is a right inherent in property, and is qualified only by the ability of the government to take property for a public purpose. The pricing right is also an inherent attribute of

The tumultuous sound of the waters has been well likened to the "voice of God," and it was asserted that there was a certain dignity in the ownership of this property, amounting to almost a patent of nobility; and for this it was claimed that due compensation should be made. Considerations of this kind can have very little weight with us. The question involved is not poetical but eminently practical. 16 Abb.N.C. at 196. *But see Union Elec. Light v. Snyder Estate Co.,* 65 F.2d 297, 309 (1933) (scenic values are properly part of fair market value).

the property itself. As such, it too is protected by the Fifth and Fourteenth Amendments. *The owner's right to fix the price for his property may not be taken except by the government for an important public purpose.*

\*    \*    \*    \*    \*    \*

Courts have viewed the incidental damages such as loss of business, loss of profits, discomfort, disturbance, inconvenience, or loss of sentimental value in the property taken as the price one must pay for living in a civilized society. As noted by Justice Frankfurter in *Kimball Laundry Co. v. United States,*

> In view, however, of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is properly treated as part of the burden of common citizenship.

A permanent nuisance, in contrast, is not an eminent domain taking when the defendant is a private citizen. It is rather a tortious invasion of private property rights. As such, the measure of damages should not be the same as in eminent domain cases. The principle goal of tort damages, as opposed to eminent domain compensation, is to compensate the plaintiff for all injuries proximately caused by the defendant's action. In a permanent nuisance case, then, *the plaintiff should be compensated for all injuries received rather than only for the property lost. This measure of damages would include compensation for the property lost and for incidental injuries which are not recognized in eminent domain actions.* Damages for incidental injuries are not recoverable in eminent domain cases because, as Justice Frankfurter suggests, society as a whole is benefited if citizens whose property is condemned are required to bear the loss of the incidental injuries that accompany the taking. When such injuries are suffered as a result of a tort committed by a private party, however, the benefit inures not to the "common good," but primarily to the tortfeasor.

Society as a whole does not benefit from the loss of the property's incidental value to the owner. Therefore, the principle justification present in condemnations for imposing these incidental costs on the owner is not present in tort cases.

\*　　\*　　\*　　\*　　\*　　\*

A court that *permits* one *private* citizen to force a private property owner to sell *him* the *owner's* property at a set price *violates our society's concept of property ownership.* Accordingly, the derogation of the plaintiff's dispositional rights, which results from the inevitable forced-sale aspect of the permanent nuisance doctrine, is a concrete injury to the plaintiff just as is the diminution in use and enjoyment of the property.

\*　　\*　　\*　　\*　　\*　　\*

In a permanent nuisance case, the existence of a legal injury is relatively certain. The plaintiff in a permanent nuisance case loses the right to determine whether and for how much to sell the defendant an easement. *The damage resulting from this involuntary sale is essentially the difference between the price that the plaintiff would have voluntarily sold the easement for and the price which the plaintiff was forced to accept, that is, the fair market value of the easement as measured by the diminution of the property's market value.* If there were no difference between these two amounts, then there would be no damage resulting from the involuntary sale. As noted by the court in *Boomer,* though, "*it would be unrealistic to assume that* the *defendant* could *acquire a servitude ... by simply paying the price which a willing seller would* accept." *The plaintiff* is *simply not a willing seller.* If he were, it is reasonable to assume that the plaintiff would have settled out of court for the market value. *It is safe to assume that plaintiff's voluntary sale price is greater than the fair market value, thus establishing the existence of damage.* Accordingly, the plaintiff should be allowed to recover damages for loss of dispositional rights if sufficient evidence is presented to

allow the fact finder to approximate the extent of the damage.

*While the additional damages for the judicially forced sale should be recoverable in permanent nuisance cases, valuation of those damages is somewhat problematic.* One solution to this valuation problem was fashioned by the New York Supreme Court in *Boomer v. Atlantic Cement Co.* [72 Misc.2d 834], [340 N.S.Y.2d [N.Y.S.2d] 97 (1972) ], The court considered the plaintiff's estimate of what he would be willing to accept for an easement to interfere with the use and enjoyment of his property, but used the diminution of market value to check the inherent subjectivity of the plaintiff's estimate. In this way, the court was able to compensate the plaintiff fully for his losses, and, at the same time, to mitigate the inflated and subjective nature of the damages.

*The major drawback of an award of damages for the involuntary sale is the subjectiveness of the plaintiff's injury, and the resulting difficulty in determining the appropriate amount.* The injury that results from the trespassory invasion of dispositional rights is the difference between the price at which plaintiff would have voluntarily sold the easement, and the price at which the plaintiff was forced to sell the easement, that is, the market value. For the plaintiff to receive more than nominal damages for his injury, he would have to provide evidence regarding this price difference. *The problem here is that the voluntary price is inherently subjective since it is based in part on the subjective value that the plaintiff attaches to the property.* The court cannot rely solely on the plaintiff's estimation of his own voluntary price, since the temptation would be great to overstate the price he would accept for the easement. *The difficulty of determining the exact damages done by a wrongdoer, or of creating a precise formula for computing damages is not, however, cause for denying redress.*

\*   \*   \*   \*   \*   \*

Another possible solution to the problem of determining the amount of damages for the involuntary sale is to balance the contract price, the special market price, and the diminution of market value, as done by the court in *Boomer v. Atlantic Cement Co.*, [*supra*].

\*    \*    \*    \*    \*    \*

The plaintiff urged that the proper measure of damages should be the contract price or, alternatively, the special market value of the property. The contract price is the price at which the plaintiff would have been willing to sell to the defendant the right to continue the nuisance. The special market price, on the other hand, is the price of the plaintiff's property based on the special market created in the area by the defendant's prior land purchases. The plaintiff's experts testified that the contract price of the plaintiff's property was $918,000, while the special market value was $840,000. There is no indication, however, as to how these figures were determined.

The defendant, on the other hand, insisted that the court should strictly apply the market value rule. "Any other considerations," the defendant argued, "would be speculative and uncertain." *Even the market value estimates, however, varied widely. The plaintiff's expert came up with diminutions of market value of* approximately $400,-000, *while the estimates of* the defendant's experts were $35,000 and $25,000.

Rather than accept their argument, the court took a middle ground. *The court noted that this was not an eminent domain case, but rather a case involving two private parties.* The diminution of market value should not be the sole measure of damages, then, or the case would result in a private taking. On the other hand, the court noted that the plaintiff's measures of damages were likely to be excessive and overly speculative. To counter this effect, the court used the diminution of market value as an objective check on the overly subjective contract price and special market price.

\*    \*    \*    \*    \*    \*

Implicit in this balancing test is the court's attempt to compensate the plaintiff for all injuries suffered by awarding the voluntary price of the easement. *The ideal situation would have been for the defendant to bargain with the plaintiff to buy the easement before the nuisance began. In that situation, there would be neither an involuntary sale nor a tortious invasion of the plaintiff's rights, since the plaintiff's duly acquired consent would render the defendant's actions lawful.* If the court could determine this ideal, bargained-for price, then the plaintiff would essentially be put in the same position he would have been in had this prior bargaining taken place. *In terms of the specific injuries discussed earlier, the award of the voluntary price would compensate the plaintiff for all losses suffered.* The diminution of market value compensates for the easement acquired by the defendant which gives him the right to affect the use and enjoyment of the plaintiff's property in the future. The difference between this market value and the voluntary price represents the pecuniary loss due to the infringement of the plaintiff's dispositional rights. Therefore, the award of the voluntary sale price would compensate the plaintiff for both the loss of the easement and the loss of the dispositional rights. By taking the plaintiff's theories into account, the court impliedly adopted the voluntary sale price as its ideal goal in setting damages.

By considering both plaintiff's own measures of his damages and the diminution of market value, the court in *Boomer* found a good way to determine the voluntary price of the easement.

Hiley, *Involuntary Sale Damages in Permanent Nuisance Cases,* 14 Environmental Affairs 61, 74–90 (1986). (Emphasis added).

The foregoing ably demonstrates the fundamental error in the narrow view suggested by Board Counsel as to Justice Larsen's recoverable damages in this case. Diminution in market value ought to have been the starting point, not the ending point, of the appraisal of the "easement" sought.

Justice Larsen was legally entitled, like any other citizen, to set his own price in deciding to sell the "easement" (by discontinuing his appeal). In setting that price he was entitled to consider not only the diminution in market value, but also his own idiosyncratically determined annoyance, consequential, speculative and sentimental damages as well.

With regard to these special damages, we note and emphasize that while the value of such damages is entirely subjective, there is adequate corroborative evidence to support the existence of legitimate concern regarding these damages by Justice Larsen at the time his settlement offers were made. We note particularly that over 300 neighbors had raised similar concerns regarding annoyances to be caused by the project—any suggestion that their concerns had been assuaged by the minimal revisions made to the plans after the first hearing is belied by the fact that there is no evidence in this record that their representative Ms. Evans received notice of the second hearing or was aware of any need to renew her clearly and adamantly stated objections, nor does a comparison of the minor revisions and the objections raised support any inference that the revisions removed the objections. Likewise, the prospect of having to move as a result of the construction and/or the completed project can hardly be considered an idle one in light of the fact that the Parrys, Justice Larsen's next door neighbors, had raised similar concerns, and then actually moved when the variances were approved. Considering Mrs. Parry's adamant objections and the Parrys' later unsuccessful attempt to intervene in Justice Larsen's appeal, we consider it a fair inference, that the impending Highpointe development was at least a substantial factor in the Parrys' decision to move.

As to the value of these damages, we note that the subjective nature of the allowable damages renders assessment of the "reasonableness" of the settlement offers problematic in the extreme. However, combined with the diminution in market value evidence, it seems apparent that Justice Larsen's settlement offers were at least arguably in a "realistical-

ly high" range of settlement offers, and not "plainly excessive" as charged.

Some discussion of the delay payment aspect of negotiations is appropriate. The record, in this respect remains both incomplete and ambiguous.

Board counsel argues the negotiations for delay payments were no more than an attempt by Justice Larsen to "up-the-ante." However, it is far from clear that the negotiations involved additional demands by Justice Larsen as suggested. Rather, the record is equally supportive of a characterization of the subsequent offers as further negotiations to resolve a mutual disagreement as to the terms of the initial settlement pertaining to the timing of the payment to be made to Justice Larsen.

There is, of course, a material difference between an agreement to accept $350,000 on a date certain upon occurrence of an act solely in Justice Larsen's control, and an agreement to accept $350,000 sometime in the indefinite future upon the occurrence of acts entirely outside Justice Larsen's control. Thus, there is nothing inherently inconsistent in a decision by Justice Larsen that if he was going to settle, then he wanted his settlement money up-front; many settlements are conditioned on such terms.

Moreover, on this record, Justice Larsen's offers could also be viewed as being designed to force Highpointe to speed up settlement by providing strong financial incentive to do so. This too would be a legitimate strategic objective.

Even assuming, *arguendo*, the accuracy of the contested settlement negotiation memorandums, the delay payment negotiations were not as dramatic as has been suggested. It is important to note at the outset that some of the offers were generated by Highpointe, rather than by Justice Larsen.

The alleged January 1985 offer by Justice Larsen envisioned a maximum additional payment of $75,000, and only $30,000 if $100,000 of the $350,000 settlement was paid upon discontinuance of the appeal. (EX B–34). In April 1985,

Attorney Aaronson made a counter-offer for Highpointe of $350,000 at final closing plus $5,000 per month until closing retroactive to February 1985; in June 1985, that offer was repeated but without offer of retroactive payment. (EX R–11). In August 1985, Attorney Mendelson counter-offered for Justice Larsen with an offer for a one-time only $75,000 delay payment (which was equivalent to the original offer to accept $75,000 at $25,000 per month until April, except that the August 1985 offer would then permit settlement to be extended indefinitely without further payment). If final settlement were not expected for another seven months (Attorney Aaronson expected as much as a full year delay if the Parrys appealed), then this offer would also be more favorable than the original counter-offer to Justice Larsen by Attorney Aaronson for Highpointe of $5,000 per month until closing from February 1985. Significantly, Attorney Aaronson's presentation of this offer to his client is neutral, if not favorable. (EX B–34). Each of these offers and counter-offers was rejected.

With regard to the final counter-offer made by Justice Larsen to Attorney Zagari, it is important to note that Justice Larsen's offer to accept $5,000 per month retroactive to February 1985, was a reference to the benchmark of what would have been the payment if Highpointe's April 1985 offer had been accepted. Under such circumstances, it would be unreasonable to imply that Justice Larsen had made a demand for such a payment, as opposed to having merely made an offer to recommence negotiations.

Thus, it is apparent that Justice Larsen's delay payment offers were for no more than $75,000, and with that added to the $350,000 settlement figure his high offer was $425,000, which was still below the original settlement offer of $500,000, which Attorney Mendelson had suggested to Justice Larsen as a fair settlement offer. That Highpointe's delay in reaching a settlement resulted in a partial retreat by Justice Larsen from earlier offered settlement concessions is not evidence of unreasonableness, nor is it evidence of unethical conduct on Justice Larsen's part. Rather, it is evidence of the give and take experience in all such negotiations.

We find that Justice Larsen was lawfully entitled to consider diminution in market value, his reluctance to settle, his loss or diminution of future appreciation of his unique investment property (though not to the full extent claimed), annoyance, loss of scenic view, and potential expenses incident to moving, in setting offers and counter-offers to extend during negotiations. He was likewise entitled, like any other citizen, to make full use of strategic advantages, and to keep his own self-interest as his central focus. He was under no legal obligation to sell his lawful right to block the proposed Highpointe project *via* his zoning appeal at less than his own idiosyncratically determined full settlement value. He had no duty to settle at all.

In light of the subjective nature of the interests he was legally entitled to consider in selecting settlement offers, we cannot find "extortionate" intent based upon the alleged excessiveness of his offers. We emphasize that in Board Counsel's "extortion" metaphor, the metaphorical gun which Justice Larsen allegedly held to the Developer's head, was the Developer's own very adamant unwillingness to comply with duly enacted zoning provisions. Had the Developer been willing to comply with the applicable zoning laws, Justice Larsen's offers of settlement would have lost all suggested "extortionate" force.

Undeniably, there are some aspects of these settlement negotiations which could be seen as troublesome. The record reveals that Justice Larsen's settlement offers for discontinuance of his zoning appeal ranged between 70% and 90% of the highest appraisal values set for his condominium. Some viewing this record, might consider certain aspects of Justice Larsen's anticipated damages as exaggerated or even illusory; they might also view his idiosyncratic valuation of his zoning appeal right as unorthodox and excessive. It is clear that neither Justice Larsen, nor Highpointe, made any attempt at an orthodox, detailed appraisal of Justice Larsen's anticipatable damages at the time of the negotiations. Likewise, it is clear that both sides pressed their respective

technical strategic advantages, and that both sides bargained hardily. Nonetheless, Justice Larsen had no duty to settle, and was entitled to consider both tactical advantages and idiosyncratic damages in deciding whether to discontinue his lawful and likely to be successful zoning appeal.

To some Pennsylvanians, report of a Supreme Court Justice pressing a legal advantage to gain a settlement which may appear to be disproportionate to his ascertainable damages may be distasteful or disheartening. If so, their redress must be at the ballot box. Whatever appearances of subjective impropriety may be said to arise from such conduct, we find they lack sufficient nexus to Justice Larsen's objectively defined "professional integrity" over which we have jurisdiction, as opposed to his subjectively viewed "private morality," over which we have none.

Charge II must be dismissed.

## VII. CHARGES III, IV, V

In the summer of 1988, Justice Larsen contacted Judge Narick concerning the possibility that Judge Narick appear as a witness in the proceedings on charges I and II. Justice Larsen wanted Judge Narick to confirm that Justice Larsen had interceded legitimately on behalf of Judge Finkelhor in the same manner in which Justice Larsen claimed to have been acting in his May 30, 1986 meeting with Judge Ross, *i.e.* appropriately bringing rumors and complaints directly to the affected judge's attention as a concerned colleague. This contact did not result in the benefit Justice Larsen sought.

Instead, Judge Narick thought back over the past several years, reconsidered the import of several of his own contacts with Justice Larsen, and eventually came forward with three alleged improper *ex parte* contacts by Justice Larsen involving improprieties similar to that involved in charge I. The allegations made by Judge Narick gave rise to charges III, IV and V in these proceedings.

Despite Judge Narick's excellent character for honesty and integrity, and his apparent sincerity, we find his uncorrob-

orated testimony insufficient to sustain the charges presented. In reaching this conclusion we imply no improper motive on Judge Narick's part, nor do we imply a lack of credibility generally.

We shall analyze the charges as follows. First, we will note facts applicable to all three charges. Second, we will note facts applicable to each of the charges separately and discuss each briefly.

### A. *General Findings*

1. Judge Emil Narick is currently assigned as a senior judge on the Commonwealth Court of Pennsylvania. He was first assigned to that position on November 6, 1986. (Narick, TR at 1879).

2. Prior to his appointment as a senior judge, Judge Narick served as an elected judge to the Court of Common Pleas of the Allegheny Court of Common Pleas since 1977. Between 1984 and 1986, Judge Narick served as the Administrative Judge of the Civil Division of that court. (Narick, TR at 1880).

3. Prior to his election to the Court of Common Pleas, Judge Narick was engaged in the private practice of law. He had served as an attorney with the NLRB, and as assistant counsel for the United States Steel Workers Union. (Narick, TR at 1880–81).

4. Judge Narick has an excellent reputation for honesty and integrity, and is a respected jurist.

5. The relationship between Justice Larsen and Judge Narick at the relevant times was one of cordial acquaintance rather than personal friendship. (Narick, TR at 2050; Larsen, TR at 2609, 2610, 2226, 2629).

6. In the summer of 1988, Justice Larsen contacted Judge Narick, informed him of Judge Ross' charges against him, and asked Judge Narick if he would appear as a witness for him to confirm that he had interceded with him regarding negative rumors which had been circulated concerning Judge Finke-

lhor. The purpose of this proposed testimony was to corroborate Justice Larsen's testimony that his meeting with Judge Ross concerning negative rumors circulated about her was consistent with a pattern or practice Justice Larsen had followed in such matters. (Narick, TR at 1885–87; Larsen, TR at 2627–30).

7. Later Justice Larsen's counsel called and informed Judge Narick he would not be called as a witness by Justice Larsen. (Narick, TR at 1979).

8. Upon thinking back over his past contacts with Justice Larsen, and upon reviewing his files, Judge Narick recalled three events which he felt warranted the attention of this Board. Judge Narick's report of those matters led to the issuance of charges III, IV and V in October 1988. (Narick, TR at 1894, 1899, 1976–81).

9. By the time Judge Narick was called upon to attempt to recall the relevant events which form the basis of these charges, the allegation that Justice Larsen had importuned Judge Ross on Attorney Ashton's and Attorney Lampl's behalf in return for their part in what was characterized as Justice Larsen's questionable and highly favorable land deal, had been widely disseminated, especially in the Greater Pittsburgh area. Judge Narick was at least generally aware of those allegations. (Narick, TR at 1976–81).

10. There was not a scintilla of credible evidence that Judge Narick was motivated to pursue these charges by a desire to curry political favor, or for any other apparent improper motive.

11. We find Judge Narick's testimony before the Board to have been both forthright and sincere. While we find that his testimony was effectively impeached and rebutted in numerous material respects, we find no indication of improper motive, nor do we suggest a general lack of credit.

## B. *Charge III*

1. Judge Narick testified that sometime in 1985, Justice Larsen came to him and said, "you have a case before you,

there's a fellow named Jay [sic] Ashton, who's an attorney recently reinstated to the bar and, help him out, if you can." (Narick, TR at 1883–84).

2. Judge Narick acknowledged that the words he recalled were consistent with a proper request that Judge Narick help Attorney Ashton in a lawful manner with courtroom skills, consistent with the common practices of trial court judges. (Narick, TR at 2152, 2179).

3. Judge Narick testified that he drew an inference of improper intent on Justice Larsen's part based solely upon the place which Justice Larsen asked to meet him, *i.e.* outside of chambers. (Narick, TR at 2179–80).

4. Judge Narick's testimony on this point was inconsistent, in that he did not recall where Justice Larsen had asked to meet him. He also conceded that the fact that Justice Larsen could have asked to meet him outside of chambers without having an improper motive. (Narick, TR at 1883, 2180).

5. Justice Larsen did not recall making the statement attributed to him by Judge Narick; and, he specifically denied ever suggesting to Judge Narick that he improperly assist Attorney Ashton. (Larsen, TR at 2595–2600, 2629).

6. Judge Narick made no notation of the alleged remark at the time it occurred, and had no reason to recall it until three years later. (Narick, TR at 1932).

7. Judge Narick made no report of the statement to the JIRB until the fall of 1988. Had he felt that Judge Larsen was attempting to importune him improperly at the time the statement was alleged to have been made, Judge Narick would have had an ethical obligation to report that fact to this Board promptly. See Pa.C.J.C. Canon 1, Canon 3(B)(3); Thode, *supra,* at 46–47.

8. Judge Narick's testimony on this subject and contemporaneous events was successfully impeached and rebutted in various material respects. No substantial corroborative evidence was offered.

478

*Discussion*

Judge Narick appeared sincere in his belief that Justice Larsen had attempted to influence him improperly on behalf of Attorney Ashton. Nonetheless, we find his uncorroborated testimony insufficient to sustain the charge.

Judge Narick testified regarding events in the distant past, though the filter of a current charge of a similar alleged impropriety involving Justice Larsen and Attorney Ashton. Judge Narick's conduct at the time of the alleged occurrence of the relevant events was materially inconsistent with his current construction of those events, in that as a respected and ethical jurist, Judge Narick would have reported such impropriety to this Board promptly.

The allegation of impropriety was denied by Justice Larsen, who by evidence presented to this Board was shown to have an excellent reputation for both truthfulness and integrity. While Judge Narick has a similar reputation, the successful impeachment and rebuttal of his testimony undermined its weight in analyzing this charge.

Finally, even accepting Judge Narick's testimony as true, the inference of an improper motive drawn by Judge Narick was not compelling. As Judge Narick conceded, Justice Larsen's conduct, even as alleged, was capable of ethical construction. Given Justice Larsen's excellent reputation for integrity, the inference of an improper motive for the alleged ambiguous statement could not be deemed to be supported by clear and convincing evidence.

Charge III was not proved.

### C. *Charge IV*

1. Judge Narick testified that between March 1986 and August 1986, Respondent asked to meet him out of chambers. (Narick, TR at 1885–87).

2. Judge Narick testified that he met Justice Larsen away from chambers, though he could not recall where. (Narick, TR at 1885–87).

3. Judge Narick testified that Justice Larsen had told him that Judge Narick had a big zoning case in Greentree [Bor-

ough, Allegheny County] and that Justice Larsen thought Judge Narick ought to know that Mayor Caliguiri had an interest in the matter. Judge Narick indicated that he had responded, "I hear you," and that the entire conversation lasted 35 to 45 seconds. (Narick, TR at 1887).

4. Judge Narick indicated that he inferred an improper intent on Justice Larsen's part to influence him to improperly favor the developer, McDermitt Land Co., in that case. (Narick, TR at 1943–44).

5. Judge Narick made no notations of the alleged statements at the time they occurred. (Narick, TR at 1886, 1950).

6. Judge Narick made no report of the alleged statement to this Board until the fall of 1988, though if the statement was made as he testified with the intent he inferred, Judge Narick would have been under an ethical obligation to make a prompt report of such a statement to this Board. *See* Pa.C.J.C. Canon 1, Canon 3(B)(3).

7. Judge Narick conceded that the statement, which he indicated he recalled Justice Larsen having made, did not indicate on which side of the case Mayor Caliguiri was interested, nor did that recalled statement indicate how favoritism was to be granted. (Narick, TR at 1952).

8. Board counsel stipulated that Mayor Caliguiri did not have a financial interest in the development involved in that case, nor does the record suggest that if a statement had been made by Justice Larsen, that Mayor Caliguiri had any part in that conduct or any knowledge of the conduct before or after the fact. (TR at 1950–59).

9. Judge Narick conceded that while he was only a cordial acquaintance of Justice Larsen, he was a close friend of Mayor Caliguiri. (Narick, TR at 1957–59).

10. At the time the statement was alleged to have been made to Judge Narick by Justice Larsen, Judge (now Justice) Cappy was assigned to the zoning case in question. When it had been assigned to Judge Narick, he had no occasion to make any decisions or rulings, nor did he conduct any hearings. (Narick, TR at 1955–56).

11. Judge Narick's testimony on the subject matter of this charge was impeached and rebutted in various material respects, and no substantive corroborative evidence was offered.

12. Justice Larsen denied having made the statement attributed to him by Judge Narick. (Larsen, TR at 2606, 2883–95).

*Discussion*

Judge Narick appeared sincere in his belief that Justice Larsen had attempted to influence him improperly on Mayor Caliguiri's behalf. Nonetheless, again, we find his uncorroborated testimony insufficient to sustain the charge.

Here, again, there are material inconsistencies, and a complete absence of any substantive corroboration. Again, there was the filter of a present, similar allegation through which past events were recalled; and, again Judge Narick's failure to report the matter promptly to this Board is inconsistent with his current recollection, and his reputation as an ethical jurist.

Justice Larsen denied this allegation. That fact is entitled to considerable weight in light of his reputation as an truthful and ethical jurist.

Finally, even accepting Judge Narick's account, the inference of an intent to influence is strained. First, the statement alleged did not indicate on which side of the case Mayor Caliguiri was interested; without such information Judge Narick could not have known which side to favor. Second, it is highly improbable that Justice Larsen, a mere cordial acquaintance of Judge Narick, would seek to influence Judge Narick to favor Mayor Caliguiri, who was a close friend of Judge Narick and who in fact had no financial interest in the litigation. Finally, at the time the statement was alleged to have been made, Judge Narick was no longer in a position to influence the case.

Charge IV was not proved.

### D. *Charge V*

1. Judge Narick testified that sometime in June or July of 1984, Justice Larsen arranged to meet him at the Rivers Club, where they both were members. (Narick, TR at 1891–2085).

2. Judge Narick testified that Justice Larsen met him in the foyer of the Rivers Club locker room, handed him a list of names, and said, "see what you can do about them as far as assigning to certain judges or not to certain judges." (Narick, TR at 1892).

3. Judge Narick testified that the list consisted of one or two sheets of paper with typewritten names of 8–10 tax appeal cases, all of which were being handled by Attorney Mendelson; and that he did not act on Justice Larsen's request. (Narick, TR at 1892–93).

4. While Judge Narick was a close friend of Attorney Mendelson, he was only a cordial acquaintance of Justice Larsen. (Narick, TR at 1894).

5. Judge Narick's testimony as to whether Justice Larsen had indicated specific judges to whom the cases should be assigned was materially inconsistent and self-contradictory. (Narick, TR at 1962–63, 1967–68, 1971–73, 2103, 2132, 2154).

6. Judge Narick adopted as his last and final recollection, that particular judges were *not* specified. (Narick, TR at 1967–68).

7. Judge Narick conceded that without a list of judges to whom Justice Larsen wanted the cases assigned, he would be without any guidance as to how to reassign the cases as desired. (Narick, TR at 1967).

8. Judge Narick testified inconsistently as to whether Attorney Mendelson had been mentioned by Justice Larsen by name. (Narick, TR at 1892, 1961, 2099, 2100, 2103).

9. Judge Narick testified inconsistently as to whether he had asked the motions clerk to check who was the attorney of record in the cases of Justice Larsen's list. (Narick, TR at 1893, 2101–02).

10. Judge Narick's testimony was impeached and rebutted in other collateral respects. (Narick, TR at 2097–98, 2106–08).

11. Judge Narick did not preserve the alleged lists, nor was other corroborative evidence offered.

12. Judge Narick made no report of this incident until the fall of 1988. Had the incident occurred as alleged, Judge Narick would have had an ethical obligation to report that incident to this Board promptly. See Pa.C.J.C. Canon 1; Canon 3(B)(3).

13. Justice Larsen denied this allegation in its entirety. (Larsen, TR at 2609–22).

14. By stipulation, it was agreed that all parties involved in the tax cases would deny participation in or knowledge of the alleged misconduct. Attorney Mendelson likewise denied any need for, participation in, or knowledge of the alleged misconduct. (Ex R–48; Mendelson, TR at 2931–3004).

### Discussion

Here too we find Judge Narick to be sincere, but his uncorroborated testimony insufficient to sustain the charge. The inconsistencies here go to each material aspect of the charge. Again, there is no substantive corroboration.

Justice Larsen denies the charge. Given his reputation as an honest and ethical jurist, the denial is entitled to considerable weight.

Again, there is the filter of the similar contemporaneous allegation through which the past events were recalled. Judge Narick's past conduct was inconsistent again with Judge Narick's present interpretation of the alleged past events, and inconsistent with his own reputation as an ethical jurist.

Finally, again, it is highly improbable that Justice Larsen, a mere cordial acquaintance, would intervene with Judge Narick on behalf of Judge Narick's good friend. Assuming such a motive, arguendo, there is the further problem of the inadequacy of the conduct alleged to provide a sufficient basis upon which Judge Narick could know how Justice Larsen intended Judge Narick to favor Attorney Mendelson.

Charge V was not proved.

*Conclusion*

We find that considering Charges III, IV, and V individually, and collectively, the inconsistencies in Judge Narick's testimony, the absence of corroboration, Justice Larsen's denials, and Justice Larsen's reputation for truthfulness and ethical conduct combine to compel a conclusion that charges III, IV, and V must be dismissed.

## VIII.   RECOMMENDATION SANCTIONS

We have determined that one of the five charges formally brought against Justice Larsen has been sustained by clear and convincing evidence.   In accordance with Pa. Const. Art. V, Sec. 18(g), and JIRB Rules 14 and 16, we must consider, therefore, the appropriate form of discipline to be recommended to the Supreme Court for the judicial misconduct found.

> In *In re Greenberg, supra*, our Supreme Court stated:
> For generations ... it has been taught that a judge must possess the confidence of the community; that he must not only be independent and honest, but, equally important, believed by all men to be independent and honest.   A cloud of witnesses testify that "justice must not only be done, it must be seen to be done."   Without the appearance as well as the fact of justice, respect for the law vanishes in a democracy.

280 A.2d at 372.   This is unquestionably true. *See generally* Schoenbaum, *A Historic Look at Judicial Discipline*, 54 Chi-Kent.L.Rev. 1, 1–27 (1977).

The purpose of procedures for the discipline and removal of judges is to provide a workable system for taking remedial action when a judge, through fault or disability, fails to execute properly the duties of office.   The ultimate sanction of such procedures, invoked only when a judge is plainly not fit to retain office, is removal with perpetual disqualification; less serious shortcomings may result in formal or informal sanctions short of removal. *See* Frankel, *Judicial Discipline and*

*Removal,* 44 Tx.L.Rev. 1117, 1117 (1966). The paramount focus of judicial disciplinary proceedings is the maintenance of public confidence in the judiciary. Hutchinson, *Maintaining Public Confidence in the Integrity of the Judiciary,* 1989 BYULR 283, 302 (1989).

Thus, the primary purpose of a judicial disciplinary sanctions is not to punish the judge, but to safeguard and vindicate the interests of the public in both the integrity and independence of our judiciary. *Cf. In re Franciscus, supra,* 369 A.2d at 1195. These interests are not furthered by "unwavering imposition of maximum penalties, but by fixing sanctions fitted to the particular circumstances of an individual's case." *See In re Greenburg [Greenberg], supra,* 318 A.2d at 745 (Roberts, J., concurring). Consequently, while we must seek to preserve the public's confidence in the integrity of the judicial process, we must not blind ourselves to the fact that such integrity also derives from fair and just treatment of judges through the recommendation of sanctions proportionate to the misconduct proved. *Cf. JIRB v. Snyder, supra,* 523 A.2d at 304 (Papadakos, J., concurring and dissenting).

As noted previously, judicial misconduct (including improper *ex parte* communications) varies in degree from plainly criminal or corrupt misconduct, through injudicious (but not corrupt) misconduct, to misconduct committed for proper motives though pursued by prohibited means. In response to these gradations of misconduct, our law wisely provides sanctions of similar gradation; so that the sanctions imposed may be proportionate to the judicial misconduct involved.

Under our constitution, a judge or justice found to have engaged in judicial misconduct may be "suspended, removed, or otherwise disciplined" as our Supreme Court shall find "just and proper" following recommendation of discipline by this Board. Pa. Const. Art. V, sec. 18(d, h). In past cases, one or more of the Justices of our Supreme Court have voted to impose each of the following responses to a recommendation of discipline by this Board: removal,[12] perpetual disquali-

12. *Matter of Cunningham, supra; In re Zedlar,* unreported, JIRB Dkt. No. 93 (1981), *digested in Judicial Discipline & Disability Digest—190*

fication of a judge no longer sitting,[13] suspension with forfeiture of office,[14] suspension with forfeiture of pay for a set period,[15] public censure,[16] private admonishment,[17] economic forfeiture or fine,[18] and dismissal of charges.[19]

Despite the depth and breadth of the serious charges first leveled against Justice Larsen, and contemporaneously circulated in the media, the deliberative process which we have arduously pursued has left us with only a single charge proved by the required clear and convincing evidence. All unproved allegations must be swept away as chaff, as it is the grain of that single proven charge *alone* which we must weigh in determining an appropriate sanction to recommend.

We have found that Justice Larsen engaged in an improper *ex parte* communication with Judge Ross, without apparent improper motive. We have found, however, that the misconduct was aggravated in two respects. First, the appearance of impropriety arising from the *ex parte* nature of the "tip" provided to Judge Ross regarding a case then pending before her was exacerbated by the fact that it was presented in terms of hearsay from an anonymous or confidential source. Second, because Justice Larsen stood in a superior position to Judge Ross, the appearance of impropriety arising from the *ex parte* communication was further exacerbated by the potential for the difference in status to affect Judge Ross' response to

*Supplement,* at Pa–2 (1985); *In re McCann,* unreported, JIRB Dkt. No. 67 (1981), *reported in Judicial Discipline & Discipline & Disability Digest—1981–1986 Supplement,* at Pa–2 (1985).

13. *JIRB v. Fink, supra; JIRB v. Snyder, supra.*

14. *Matter of Cunningham, supra.*

15. *Matter of Cowell,* JIRB Dkt. No. 94 (1980) (90 day suspension imposed); *digested in Judicial Discipline & Disability Digest—1980 Supp.,* at 167 (1980); *Matter of Johnson, supra; In re Greenberg, supra* (interim suspension already imposed was deemed a sufficient sanction for misconduct found).

16. *Matter of Dalessandro, supra; Matter of Johnson, supra.*

17. *Matter of Johnson, supra; In re Danderidge [Dandridge], supra.*

18. *In re Danderidge [Dandridge], supra; Matter of Cowell, supra.*

19. *Matter of Chiovero, supra; Matter of Braig, supra; Matter of Sylvester, supra; Matter of Dalessandro, supra; Matter of Johnson, supra.*

the "tip," regardless of whether any such effect was intended. We conclude that the judicial misconduct raised an appearance of impropriety which could undermine public confidence in the administration of justice.

At the same time, however, we must consider a significant mitigating factor, *i.e.* Justice Larsen's excellent reputation as a truthful, ethical, and competent jurist. While such a reputation cannot obscure or excuse misconduct, it nonetheless places the misconduct in proper context and lends perspective to it. The members of our judiciary have the right to know that their "long and competent labors in the vineyard will not be *totally* forgotten" when an instance of misconduct is proved. *See JIRB v. Snyder*, 523 A.2d at 304 (Papadakos, J., concurring and dissenting) (emphasis in original); *cf. Matter of Sylvester, supra.* A firm, yet fair, response is required to maintain public confidence in the judiciary.

We reject entirely any suggestion of removal with perpetual disqualification or suspension with forfeiture of office. Those sanctions are reserved for criminal misconduct, serious and unmitigated misconduct, a pattern of non-criminal misconduct, or repetition of misconduct previously disciplined with lesser sanctions.[20] Such sanctions are too plainly disproportionate to the single instance of mitigated misconduct found here to even warrant serious discussion.

Likewise, a finding of misconduct without further penalty would seem to be disproportionate in the opposite extreme. The misconduct found here created an appearance of impropriety for which discipline is required, if public confidence in the judiciary is to be maintained. Our difficulty is in determining where, between the options of admonishment, censure, and suspension, the proper and proportionate sanction is to be found. We have little guidance.

There are no improper *ex parte* communication cases previously decided in Pennsylvania which did not also involve clear

---

**20.** *Compare Matter of Cunningham, supra; Matter of Glancey, supra; JIRB v. Fink, supra; JIRB v. Snyder, supra; and In re Greenberg, supra; accord Matter of Kiley* [74 N.Y.2d 364], 547 N.Y.S.2d 623 [546 N.E.2d 916] (1989).

evidence of an improper motive for the *ex parte* contact. Our review of case law in other jurisdictions reveals that private admonishment, public censure, or brief suspensions have generally been imposed upon judges for such misconduct, with public censure being the more common sanction.[21] A set term of suspension has generally been reserved for a variety of misconduct of intermediate severity.[22] In several cases, jus-

21. *See e.g. In re Edwards* [67 N.Y.2d 153], 501 N.Y.S.2d 16, 492 N.E.2d 124 (1986) (judge publicly censured for calling Magistrate identifying self as a judge, and inquiring as to how to settle his son's traffic violation case); *In re George v. Triplett,* unreported (Ky.Com'n Oct. 2, 1984) (a judge who approached attorney *ex parte* without improper motive to explore possibility that a case on his docket could be settled was *publicly censure,* mitigating circumstances were noted), *digested in Judicial Discipline & Disability Digest—1981–1986 Supplement,* at Ky–3 (1985); *Matter of Harned,* 357 N.W.2d 300 (Iowa 1984) (impulsive attempt by district justice to have another district justice dismiss her daughter's speeding ticket warrant a *four day suspension,* dissent would merely have reprimanded); *Matter of Riley* [142 Ariz. 604], 691 P.2d 695 (Az.1984) (improper *ex parte* conduct as an attorney, and subsequent denial, *warranted public censure* of attorney who had since become a Superior Court judge); *Matter of Murray* [92 N.J. 567], 458 A.2d 116 (N.J.1983) (municipal judge *publicly reprimanded* for *ex parte* communication to second municipal judge attempting to gain special treatment for former client's daughter); *Roberts v. Commission on Judicial Performance* [33 Cal.3d 739, 190 Cal.Rptr. 910], 661 P.2d 1064 (Cal.1983) (trial judge's improper *ex parte* communication with an appeals court judge, and other conduct, warranted *public censure* ); *Matter of Cunningham* [57 N.Y.2d 270, 456 N.Y.S.2d 36], 442 N.E.2d 435 [434] (N.Y.1982) (trial judge's *ex parte* letter to appeals court judge warranted *public censure* ); *Dixon v. State Com'n on Judicial Conduct* [47 N.Y.2d 523, 419 N.Y.S.2d 445], 393 N.E.2d 441 (N.Y.1979) (district justice admonished for asking for special treatment for a friend, mitigating circumstances noted); *cf. Matter of Kiley* [74 N.Y.2d 364], 547 N.Y.S.2d 623 [546 N.E.2d 916] (1989) (judge *publicly censured* for failing to recuse, and for lending prestige of office to influence prosecutors in case involving family friend and former colleague's son); *In re Rabren,* No. C.O.J.-19, unreported (Ala.Ct.Jud. May 19, 1986) (*ex parte* contacts with defendant's mother and counsel and then suspending sentence without notice to prosecution warranted public censure despite absence of corrupt or criminal motives), *digested in Judicial Discipline & Disability Digest—1981-1986 Supp.,* at A1. (1986).

22. *See e.g. Matter of Cowell, supra* (*90 day suspension and forfeiture of* $500 was imposed for prohibited partisan political activity by receiving $500 from a congressional candidate); *cf. In re Broome* [245 Ga. 227], 264 S.E.2d 656 (Ga.1980) (failing to recuse in a series of cases in which son-in-law appeared as counsel and using intemperate language toward

tices of the highest courts in their respective jurisdictions have been censured or reprimanded for violations as serious as, or more serious than, the violations proved here. *See e.g. In re Boyd,* 308 So.2d 13 (Fla.1975) (Florida Supreme Court Justice publicly censured for participating in improper *ex parte* communications regarding a case pending before the justice); Shaman, *Texas Supreme Court Justices Publicly Reprimanded, Admonished,* 9 Judicial Conduct Rptr. 1, 6–8 (Summer 1987) (one justice censured for a series of improper *ex parte* communications and acceptance of gifts under circumstances suggesting impropriety; a second justice was privately admonished for improperly soliciting funds and for failing to prevent staff from accepting a free trip from an attorney who had two cases pending before the Supreme Court); Herman, *Minnesota Chief Justice Reprimanded,* 9 Judicial Conduct Rptr. 2 (Summer 1987) (Chief Justice publicly acknowledged that he had been privately admonished for a violation of the ban on public solicitations by justices for charities).

Such cases provide, of course, at most persuasive authority. Moreover, each is factually distinguishable, as each such case must be judged on its unique facts and circumstances. *Cf. In re Greenberg, supra,* 318 A.2d at 745 (Roberts, J., concurring).

In light of the presence of a significant mitigating circumstance (*i.e.* Justice Larsen's excellent character for truthfulness, integrity, and competence as a jurist), we conclude that a public reprimand is appropriate under the facts and circumstances of this case. We emphasize that we make this recom-

a colleague warranted *30 day suspension* ); *Strickland v. Judicial Inquiry Com'n,* 388 So.2d 1202 (Ala.1980) (knowingly filing false expense claims warranted a *6 month suspension* ); *W.Va. Judicial Inquiry Com'n v. Dostert* [165 W.Va. 233], 271 S.E.2d 427 (1980) (violation of separation of powers by excessive involvement in police/prosecution functions, and violation of state weapons code warranted a *6 month suspension* ); *Matter of Buford,* 577 S.W.2d 809 (Mo.1979) (contempt of directive from a higher court and suggestion that dismissal of civil suit would prevent certification of a juvenile defendant to be tried as an adult on criminal charges warranted *30 day suspension* ); *Matter of Sawyer* [286 Or. 369], 594 P.2d 805 (Or.1979) (judge engaged in prohibited state employment as part-time professor, suspended until prohibited employment terminated).

mendation cautiously in light of the dearth of precedent upon which to base our recommendations as to the appropriate sanction to be imposed in this matter.

For the foregoing reasons, having found that Justice Rolf Larsen has engaged in conduct, in the form of an improper *ex parte* communication, without apparent improper motive, which nonetheless gave rise to an appearance of impropriety which could undermine public confidence in the judicial system, we therefore conclude that:

—Justice Rolf Larsen should receive a public reprimand.

* Judges James, Juiliante, Kelly and Montemuro *JOIN* in this report. Judge Munley *JOINS* in Parts I, II, V, VI, and VII as well as the brief introduction to this Final Report; he *DISSENTS* as to Parts III, IV and VIII, and files a separate report.

PAPADAKOS, Justice, dissenting.

I most reluctantly dissent from the action taken by my colleagues in adopting the recommendation of the Judicial Inquiry and Review Board. I do not reach the merits, as my colleagues have, and I do not question the correctness of the decision on the merits as may appear in the record filed with us by the Judicial Inquiry and Review Board.

Rather, my deep concern arises from the fact that I believe that the entire proceedings have been tainted with procedural infractions of the rules and the substitution of members of the Board participating in successive hearings.

I believe that it was error for the Board to file with us a record on charges they found to be unsubstantiated and for which the Board made no recommendation. I believe this to be a violation of the constitutional mandate of confidentiality for all matters in which no recommendation of sanction is made to the Supreme Court.

The record should have been filed with us which included only the charge which the Board found to have been substantiated and for which the recommendation of public censure was made.

My objections to the composition of the Board which concluded the proceedings against Mr. Justice Larsen and my views as to the proper procedures to have been followed have been fully articulated in my Dissenting Opinion entered in *Larsen v. Kaufmann, et al.,* 525 Pa. 278, 579 A.2d 1302 (1990), and need not be restated here.

However, in response to my colleagues' assertion that the participation of the challenged members did not change the outcome, I must point out that this conclusion lies in the realm of conjecture. The recommendation presented to us is surely the product of a compromise between four who would have opted for a more severe sanction and four who settled for much less. Had the four who settled for much less not met the serious opposition of the other four, would they have carried the day for complete exoneration? Either the image of the judiciary is being severely damaged or the rights of the Respondent have been trampled upon. Under the present circumstances, we cannot know.

Suffice it to say that, in my view, the adding of new charges to proceedings under way, the participation in new hearings by Board members whose terms had expired, and the refusal of this Court to resolve the constitutional issues raised by Mr. Justice Larsen, all of which were held as interlocutory by a divided court on the premise that we can cure any defect upon the filing of a record and recommendation, call for a remand to a properly constituted Judicial Inquiry and Review Board which has jurisdiction to hear and resolve the charge underlying the recommendation of public censure.

The errors alleged by Mr. Justice Larsen and the violations of constitutional rights which he claims in his various petitions to this Court which were held to be interlocutory by a divided Court remain unresolved. The Board cannot resolve these issues as a trial court may. Its only duty is to make a recommendation to our Court as to a proper sanction that may be imposed. Only this Court can now answer those issues.

I realize that this has been a long and trying experience for all parties involved, including this Court which has been put to the unenvious task of judging one of its own on charges of

judicial misconduct. The resolution wrought by my colleagues may bring to a close, once and for all, this sad episode and it may be the wise thing to do. However, I feel that the constitutional infirmities I find to have been committed by the Board can only be exonerated by remanding for new hearings on the charge submitted to us.

I therefore dissent and would order a remand.